Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION ) ) ) ) | Civil Action No. _____ |
| Plaintiffs, ) ) | |
| v. ) ) | MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII. MAUI COUNTY, ) ) ) ) ) | |
| Defendants. ) ) | |

# **Table of Contents**

I.  Introduction.................................................................................................1

II. Statement of the Case ...........................................................................2

III.  Impact on Plaintiffs ...........................................................................3

IV.  ARGUMENT..................................................................................4

  A. Standard for a Temporary Restraining Order/Preliminary Injunction ............4

  B. Plaintiffs Have a Strong Likelihood of Success on the Merits ......................5

    1.  Plaintiffs' conduct is covered by the Second Amendment's plain text .........6

    2.  Controlling considerations under *Bruen* .......................................7

    3.  H.R.S. §134-E Violates the Second Amendment .......................................14

    4.  H.R.S. §134-E Requires Unconstitutional Compelled Speech ..................18

    5.  The Park and Beach Ban is Unconstitutional............................................19

    6.  Hawaii's Carry Ban in Restaurants That Serve Alcohol and Their Parking Lots is Unconstitutional......................................................................21

    7.  Hawaii's Ban on Carry in Banks and Their Parking Lots is Unconstitutional 23

    8.  Hawaii's Ban on the Carry in Government Parking Lots is Unconstitutional 23

V.   Plaintiffs Will Suffer Irreparable Harm ..............................................................24

VI.   Granting the TRO/PI is in the Public Interest ..................................................25

VII.  Conclusion .......................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205 (2013) .........21

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................7

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009)....7

*Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700, at *66 (N.D.N.Y. Nov. 7, 2022)(*"Antonyuk III"*) ............................................................................. 22, 24

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017) ..............23

*Christian v. Nigrelli*, 22-CV-695 (JLS), 2022 WL 17100631, at *7 (W.D.N.Y. Nov. 22, 2022) ................................................................................. 9, 17, 18

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .........................................8, 10

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ..........................27

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................26

*Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020).....................11

*Ezell v. City of Chi.,* 651 F.3d 684. 700 (7th Cir. 2011) .........................................27

*Fisher v. Kealoha,* 2012 U.S. Dist. LEXIS 90734, *40, 2012 WL. ........................27

*Gamble v. United States*, 139 S. Ct. 1960 (2019)....................................................12

*Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220, at *13 (W.D.N.Y. Nov. 3, 2022) ......................................................................................................9

*Heller v. District of Columbia*, 670 F.3d 1224 (D.C. Cir. 2011) ........................ 13, 20

iii

*Heller*, 554 U.S. at 614) ...........................................................................14

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009). ...............................27

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961) .................................................13

*Koons v. Attorney General of New Jersey*, Case No. 23-1900, Doc. 29, Order (3rd Cir. June 20, 2023) ..........................................................................................17

*Koons v. Platkin*, 22-CV-7463 (RMB/AMD), 2023 WL 3478604, at *62 (D.N.J. May 16, 2023) .......................................................................................... passim

*Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235 (D.N.J. May 16, 2023) .........................................................................................16

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ...................................................................13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................................................11

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ...................................................26

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ...................................26

*Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15, 2017) ....................................23

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)..................... passim

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361(2018) ....................21

*Nken v. Holder*, 556 U.S. 418, 433-34, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009) ........................................................................................................17

*People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158 (2018) ................................23

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005). ...........................................27

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020)...........................................................12

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)............................................27

*Royal Inv. Grp., LLC v. Wang*, 183 Md.App. 406, 961 A.2d 665 (2008) ...............18

*Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp.3d 675 (N.D. Ill. 2021) .......23

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) .................................................................12

*Tipple v. County of San Diego*, 2006 U.S. Dist. LEXIS 106905, *5-6 ....................7

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ..................................27

*Virginia v. Moore*, 553 U.S. 164 (2008)...................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7 (2008)............................................7

*Worth v. Harrington*, 2023 WL 2745673 at *11 (D. Minn. Mar. 31, 2023) ........10, 11

*Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018).......................................................4

*Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018).......................................................3

**Statutes**

H.R.S. § 134-9................................................................................................................4

H.R.S. § 134-A (a)(1).....................................................................................................26

H.R.S. §134-2.................................................................................................................4

H.R.S. §134-A...............................................................................................................22

H.R.S. §134-A (1) ..........................................................................................................5

H.R.S. §134-A (12) ....................................................................................................5, 25

H.R.S. §134-A (4) ................................................................5

H.R.S. §134-A (9) ................................................................5

H.R.S. §134-A(4) ...............................................................23

H.R.S. §134-E .............................................................. passim

## Other Authorities

https://en.wikipedia.org/wiki/BNY_Mellon#cite_ref-Globe2011_7-3 ..................25

https://www.aba.com/about-us/our-story/aba-history/1782
1799#:~:text=Future%20Treasury%20Secretary%20Alexander%20Hamilton,ope
rating%20today%20as%20BNY%20Mellon. ......................................................25

Jenna Bridges, *Louisiana panel approves permitless concealed carry for adults*,
4WWL CBS (May 17, 2023), https://bit.ly/430FSSS .............................................5

*Permitless Carry States*, bit.ly/3OxbWJD (last accessed June 22, 2023) .................5

Wallack, Todd (December 20, 2011). "Which bank is the oldest? Accounts vary -
The Boston Globe". The Boston Globe .............................................................25

## Treatises

*'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for
Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not
1868*, SSRN, Oct. 1, 2022 ......................................................................10

11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ............................................................................................................26

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021) ....22

Christine Sismondo, America Walks Into a Bar: A Spirited History of Taverns, Saloons, Speakeasies and Grog Shops 15 (Oxford 2011) ....................................24

Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020)................19

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw.......10

OMRI BEN-SHAHAR & JOHN A. E. POTTOW, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651, 653 (2006) ........................................................................19

Philip J. Cook, et al., *Gun Control After* Heller, 56 U.C.L.A. L. Rev. 1041, 1082 (2009) ..................................................................................................................5

The Autobiography of Benjamin Franklin 148 (Smyth, ed., 1907) ........................24

*The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation......22

Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47, 48 (1961) ....................................................................................22

**Constitutional Provisions**

U.S. CONST. amend. III ................................................................8

U.S. CONST. amend. IV ................................................................8

I.   **Introduction**

The Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), compelled the State of Hawaii to issue permits to carry concealed handguns. Prior to *Bruen*, carry permits were almost never granted. *See Young v. Hawaii*, 896 F.3d 1044, 1071 n.21 (9th Cir. 2018) ("Hawaii counties appear to have issued only *four* concealed carry licenses in the past *eighteen years. See* 2000 Haw. Att'y Gen. Reps., *Firearm Registrations in Hawaii, 2000 et seq*;"). As a direct response to *Bruen*, on June 2, 2023, the Governor of Hawaiʻi, signed Senate Bill 1230 into law as Act 52 ("SB 1230"). SB 1230 includes several provisions which together ban the carrying of handguns in the vast majority of the State. These provisions go into effect on July 1, 2023.

Plaintiffs are three Maui County residents who have been issued permits to carry concealed handguns by the Maui County Police Department ("MPD") and organizations that has members who possess such permits. They challenge Hawaii's prohibition on the carry of handguns in several areas they frequent. All would carry handguns to defend themselves at those locations but for Hawaii law. To that end, Plaintiffs seek a temporary restraining order and a preliminary injunction to enjoin enforcement of SB1230's restrictions on carrying on private property open to the public, beaches, parks, restaurants that are licensed to serve alcohol, banks, financial institutions and the parking lots of all the aforementioned.

## II.   <u>Statement of the Case</u>

In Hawaii, carrying a handgun is generally prohibited.  Obtaining a handgun carry permit "acts as a limited exception to the State of Hawaii's "Place[s] to Keep" statutes, which generally require that gun owners keep their firearms at their "place of business, residence, or sojourn." H.R.S. §§ 134-23, 134-24, 134-25."" *Young v. Hawaii*, 896 F.3d 1044, 1048 (9th Cir. 2018). SB 1230 specifically targets permit holders and restricts where individuals—who have met Hawaii's background check and training requirements—are allowed to carry.

In Hawaii, handgun carry permits are issued by the county Chiefs of Police pursuant to H.R.S. § 134-9. Just to acquire a handgun in Hawaii, all gun owners are fingerprinted, thoroughly investigated by the police and are required to undergo training. H.R.S. §134-2.  Among other requirements, state law requires the county chiefs of police to promulgate additional standards to determinate that a carry permit applicant is "qualified to use the firearm in a safe manner" and "[a]ppear[s] to be a suitable person to be so licensed". *See* H.R.S. §134-9.  In Maui County, carry permit applicants must pass a shooting test to qualify for a carry permit. Complaint ¶ 31. Indeed, 27 States in the United States do not require a permit to carry in public.[1]

---

[1] Those States are Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming. <u>*Permitless Carry States*</u>, bit.ly/3OxbWJD (last accessed June 22, 2023) (listing these States with

Permit holders, nationwide, are disproportionately law-abiding. *See* Philip J. Cook, et al., *Gun Control After* Heller, 56 U.C.L.A. L. Rev. 1041, 1082 (2009). SB 1230 adds restrictions to where duly licensed individuals may carry a handgun.  Plaintiffs specifically challenge: 1. H.R.S. §134-A (9) which prohibits carry in parks and beaches and their parking lots; 2. H.R.S. §134-A (4) to the extent it bans the carry of handguns in restaurants and their parking lots; 3. H.R.S. §134-A (12) prohibition on the carrying of handguns in banks, financial institutions and their parking lots; 4. H.R.S. §134-E which prohibits "[c]arrying or possessing a firearm on private property of another person without authorization" in its entirety; 5. H.R.S. §134-A (1) to the extent that duplicates the ban on carry challenged elsewhere in this lawsuit (e.g. the parking lot of parks and beaches that have government buildings).

### III.   <u>Impact on Plaintiffs</u>

Each individual plaintiff has a valid concealed carry permit issued to them by the Maui County Police Department. Complaint ¶¶ 59, 60, 61. Associational plaintiff Hawaii Firearms Coalition has members who have been issued concealed carry permits in Maui and elsewhere in Hawaii. Complaint ¶ 4.

---

corresponding statutory citations). A 28th State, Louisiana, limits permitless carry to those with military service. *Id.* The legislature is currently considering expanding permitless carry to all adults. *See* Jenna Bridges, *Louisiana panel approves permitless concealed carry for adults*, 4WWL CBS (May 17, 2023), https://bit.ly/430FSSS.

Plaintiffs all regularly visit places within Maui County that are impacted by H.R.S. §134-E, parks, beaches, restaurants that serve alcohol, banks and the accompanying parking lots of all of the aforementioned. And but for the challenged laws would carry while visiting these locations within Maui County. Complaint ¶ ¶ 59, 60, 61. Plaintiff Kasprzycki is additionally burdened by H.R.S. §134-E because he is a private business owner who owns the property his business is located in which is open to the public. Complaint ¶ ¶ 62, 64, 66, 67. H.R.S. §134-E compels him to post a sign or otherwise share his view on firearm carry in order to allow others to carry on his property. That he is unwilling to do. Complaint ¶ 65. But for the challenged law, he would allow others to carry on his property. *Id.*

## IV.    **ARGUMENT**

### A. **Standard for a Temporary Restraining Order/Preliminary Injunction**

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in favor of injunction; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7, 20 (2008)). Alternatively, an "injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the*

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted). The standard for issuing a temporary restraining order is the same as that for issuing a preliminary injunction. *Tipple v. County of San Diego*, 2006 U.S. Dist. LEXIS 106905, \*5-6.

### B. Plaintiffs Have a Strong Likelihood of Success on the Merits

"[T]he Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may "'bear' arms in public for self-defense." *Bruen*, 142 S.Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129–30. It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127; *see also id.* at 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined.

### 1. Plaintiffs' conduct is covered by the Second Amendment's plain text

If the plaintiffs' proposed course of conduct falls within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and, most relevant here, to bear simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134—or for that matter, any distinction between locations at all. That makes the Second Amendment unlike other Amendments. *See* U.S. CONST. amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."); U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). And it means that any locational restrictions on Second Amendment rights must come from history, not from the plain text.

The Supreme Court's binding determination of the meaning of these words and phrases definitively resolves the question of whether Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. Plaintiffs and their members are Americans who seek to carry bearable arms for self-defense. As in

6

*Bruen*, these undisputed facts end the textual inquiry: "the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." 142 S. Ct. at 2134. Accordingly, under *Bruen*'s unambiguous directions, "the burden falls on [the State] to show that [the challenged ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *see also Koons v. Platkin*, 22-CV-7463 (RMB/AMD), 2023 WL 3478604, at *62 (D.N.J. May 16, 2023); *Christian v. Nigrelli*, 22-CV-695 (JLS), 2022 WL 17100631, at *7 (W.D.N.Y. Nov. 22, 2022); *Hardaway v. Nigrelli*, 22-CV-771 (JLS), 2022 WL 16646220, at *13 (W.D.N.Y. Nov. 3, 2022).

### 2.  Controlling considerations under *Bruen*

The State bears a burden that it will not be able to meet for the challenged provisions because there is no historical tradition of analogous regulations that demonstrate these provisions are consistent with the Second Amendment. In *Bruen*, the Supreme Court set out several requirements to determine whether a tradition of historical regulations is sufficiently analogous to justify a modern restriction.

First, the relevant time period for the historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at 2135–36; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw. That is because "'[c]onstitutional rights are

enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S. Ct. at 2136, quoting *Heller*, 554 U.S. at 634–35. Although the Court in *Bruen* noted an academic debate surrounding whether courts should look to 1868 and Reconstruction (when the Fourteenth Amendment was adopted), the Court found no need to address the point as the result with respect to carry was the same. *Bruen*, 142 S. Ct. at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry." (emphasis added)).

But there can be no doubt that the actual analysis of the Court is focused on l791. See *Worth v. Harrington,* 2023 WL 2745673 at *11 (D. Minn. Mar. 31, 2023) (noting the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters"). The Court noted that its past precedents had "assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137. The Court likewise stated that the courts should "guard against giving post-enactment history more weight than it can rightly bear." *Id.* at 2136. Justice Barrett, in her concurring opinion, stressed this point, noting that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill

8

of Rights." *Id.* at 2163 (Barrett, J., concurring). And the Court "made no small effort to distance itself from even *Heller's* reliance on post-enactment history except to the extent that such history was consistent with the founding era public meaning. *Worth*, 2023 WL 2745673 at *11, (citing *Bruen*, 142 S. Ct. at 2136–37). *Bruen*'s characterization of the Court's precedents as assuming that 1791 is the proper answer is an understatement. In *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), for example, the Court held that "more than *30*" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding Era practice. *Id*. at 2258–59 (emphasis added).

Second, *Bruen* reiterated that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137. In *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010), the Court decisively rejected a different standard for States under the Second Amendment, holding that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment" (internal quotation marks omitted). There should be no dispute that 1791 is controlling as to the federal government and, since the standard is the same, there can be no reasonable dispute that standard is likewise applicable to the States.

*Bruen* relied on two very recent decisions, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Timbs v. Indiana*, 139 S. Ct. 682 (2019), to illustrate the point. *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track" approach to incorporation. The relevant historical benchmark for the Court's analysis was 1791. *Ramos* 140 S. Ct. at 1396 (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791). Similarly, in *Timbs*, the Court held that the Excessive Fines provision of the Eighth Amendment was incorporated as against the States. 139 S. Ct. at 686–87. The Court once again looked to the scope of the right as it existed in 1791. *Id*. at 687–88 (discussing "colonial-era provisions" and the "constitutions of eight States"). The Court's other precedents are in accord. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). That this case challenges State-imposed restrictions and not federal law is thus irrelevant.

In all events, "to the extent later history contradicts" the text of the Second

Amendment, "the text controls." *Bruen*, 142 S. Ct. at 2137. "Thus, 'post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1224, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Moreover, 20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 & n.28. Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*. In other words, only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Third, the historical analogues the State points to must be "representative." Historical "outlier" requirements of a few jurisdictions or of territorial governments are to be disregarded. *Bruen*, 142 S. Ct. at 2133, 2153, 2147 n.22 & 2156. This means regulations from only a handful of states or those that cover only a small portion of the population are not enough to demonstrate that modern regulations are consistent with the Second Amendment. *Id.* at 2155 (rejecting regulations applying to only 1% of the

American population); *see also Koons*, 2023 WL 3478604 at *78, *85 (finding regulations covering 10% and 15% of American population insufficient). *Buren* also categorically rejected reliance on laws enacted in the Territories, including expressly "Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are *most unlikely* to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 554 U.S. at 614) (emphasis added).

Fourth, the historical analogues must be "relevantly similar," which is to say that they must burden ordinary, law-abiding citizens' right to carry for self-defense in a similar manner and for similar reasons. *Bruen*, 142 S. Ct. at 2132. *Bruen* held that the inquiry into whether an analogue is proper is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). For example, poaching and hunting restrictions are thus generally insufficient to demonstrate the constitutionality of a modern-day restriction that regulates carrying firearms during day-to-day life. Both *how* hunting laws burdened the right to carry firearms for self-defense (when hunting) and *why* they did so (to regulate hunting, to reduce the taking of certain animals in certain places during certain seasons) have little

or nothing to do with restricting the right of self-defense in modern-day Hawaii. *See, e.g.*, *Koons*, 2023 WL 3478604 at *64–*65.

In attempting to "affirmatively prove" that its restrictions on public carry are consistent with the Nation's historical tradition, Hawaii may refer to historical analogues, such as restrictions on carrying in "sensitive places" at the Founding and claim those meet *Bruen*'s "how" and "why" standard. 142 S. Ct. at 2127, 2133. The Supreme Court has endorsed only three such places "where weapons were altogether prohibited," naming "legislative assemblies, polling places, and courthouses." *Id.* at 2133. While *Bruen* cites *Heller*'s suggestion that sensitive places may include "schools and government buildings," the Court focused on only "legislative assemblies, polling places, and courthouses" for purposes of conducting the inquiry into analogues. *Id.* The Court stated explicitly that "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* (emphasis added). Accordingly, "sensitive places" cannot be construed "too broadly," *i.e.*, beyond what the historical tradition at the Founding demonstrates, and these certainly do not authorize restrictions that "would in effect exempt cities" or entire States "from the Second Amendment." *Id*. at 2134. Sensitive places may not be used to "eviscerate the general right to publicly carry arms for self-defense." *Id*. After all, governments may bar the carrying of firearms

in only "exceptional circumstances." *Id*. at 2145. The exception cannot become the rule.

Fifth, the historical analysis required by the Supreme Court is a legal inquiry that examines legal history, which is appropriately presented in briefs. *See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "*legal* questions" that judges can address) (emphasis in original); *see also id*. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend upon any of the factual questions raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court. With these analytical guideposts established by *Bruen*, the State cannot meet its burden to justify the challenged restrictions on carrying firearms.

### 3.   H.R.S. §134-E Violates the Second Amendment

H.R.S. §134-E is unconstitutional. It is important to note that a trial court in New Jersey recently enjoined a law virtually identical to Hawaii's *See Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235 (D.N.J. May 16, 2023) ("Koons II"). And the Third Circuit just refused to grant a motion to stay of that trial court's preliminary injunction as to New Jersey's version of H.R.S. §134-E.  *See Koons v. Attorney General of New Jersey*, Case No. 23-1900, Doc. 29, Order (3rd Cir. June 20, 2023) ("Koons III") (attached). A party must show a likelihood of success on the merits to be granted a stay. *Nken v. Holder*, 556 U.S. 418, 433-34,

129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)). Thus, in denying New Jersey's motion, the Third Circuit has implicitly found the relevant law is likely unconstitutional.

SB 1230 enacts, for the first time in Hawaii's history, a presumption against carrying firearms in property open to the public. Hawaii will be unable to demonstrate that this new Anti-Carry Default "permissibly regulates the right to carry for self-defense in public." *Koons*, 2023 WL 3478604 at *68. The main reason is that the Anti-Carry Default is the *exact opposite* of this Nation's traditional regulatory approach, which has entrusted "private property owners" with principal responsibility to exercise the "right to exclude others from their property" throughout American history. *Christian*, 2022 WL 17100631 at *9. The historical default rule has been that "carrying on private property" is "generally permitted absent *the owner*'s prohibition." *Id.* (emphasis added).

This concept is basic to the law of trespass. "[T]the well-developed concept of implied license . . . operates to grant permission to enter another's premises according to custom or other indicia of consent." *Koons*, 2023 WL 3478604 at *58. As to property otherwise open to the public, "the public has the implied consent to enter, unless such consent is conditioned or subsequently revoked by the property owner." *Id*; *see also Royal Inv. Grp., LLC v. Wang*, 183 Md.App. 406, 961 A.2d 665, 688 (2008) ("Consent may be express or implied."). *Bruen* confirms that there is a "general right to publicly carry arms for self-defense." 142 S. Ct. at 2134. That

"general right" necessarily means that "[t]he right to armed self-defense follows the individual everywhere he or she lawfully goes" in public outside of the "exceptional circumstances" when a government may bar firearms. *Koons*, 2023 WL 3478604 at *61; *Bruen*, 142 S. Ct. at 2155. The right to carry for self-defense thus extends to private property open to the public, "presumptively," unless the owner affirmatively "withdraw[s] consent." *Koons*, 2023 WL 3478604 at *61. Plaintiffs here do not challenge that right of a private property owner. Given this basic and well-established premise of trespass law, the State will be unable to point to any relevant historical tradition of firearm regulation from the Founding suggesting otherwise. *See, e.g., Koons*, 2023 WL 3478604 at *68 (granting restraining order against New Jersey on a similar law); *Christian*, 2022 WL 17100631 at *9.

This is unsurprising as the academic proponents behind the Anti-Carry Default conceded that it would be novel and be a significant departure from this Nation's history of firearm regulation. In their book expanding on anti-carry default rules, the proponents stated that "[a]n implied condition of every invitation [onto another's property] is that the invitee is welcome to bring a firearm." *Koons*, 2023 WL 3478604 at *58 n.35. In fact, as of 2020, "*no state* ha[d] adopted generalized 'no carry' defaults for retail establishments." Ian Ayres and Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J L. MED. & ETHICS 183 (2020) (emphasis added).

The reason Hawaii has sought to change the default rule is plain: "[g]iven the inertial tendency to stick with the status quo, lawmakers should expect that a 'prohibited-unless permitted' default would radically expand the private spaces where guns could not be carried." *Id.* After all, a "default rule" of interaction with strangers, i.e., members of the public coming to a property open to the public, is particularly "sticky." *See generally* OMRI BEN-SHAHAR & JOHN A. E. POTTOW, *On the Stickiness of Default Rules*, 33 FLA. ST. L. REV. 651, 653 (2006), https://bit.ly/3pWXM6Y (last visited June 23, 2023). By "sticky," legal scholars mean that individuals have a well-known tendency to stick by the default rule *even when* they would otherwise take a different position. *Id.* at 651–54. Thus, Hawaii can expect many owners of property, who would otherwise allow or be indifferent to lawful carrying of firearms on their property, to simply stick with the new default. As they do so, the Anti-Carry Default "might have knockon effects, reducing preferences to carry and possess firearms more generally, as it becomes increasingly inconvenient to do so." Ayres & Jonnalagadda, 48 J L. MED. & ETHICS at 184. This is likely for individual Plaintiffs, who have all declared that they would drastically reduce their carry for self-defense when the Anti-Carry Default goes into effect. Complaint at ¶¶ 59, 60, 61.

At bottom, Hawaii may have policy reasons that it seeks to change the default rule for carrying firearms in property open to the public as a means to stop

individuals from exercising their rights. But the Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Because of "this balance—struck by the traditions of the American people," *id*., — "certain policy choices" have been definitively taken "off the table," *Heller*, 554 U.S. at 636. Among these policy choices is establishing a presumption against carrying in buildings open to the public because the Second Amendment itself establishes a presumption that Plaintiffs and other licensed, law-abiding citizens have a "right to 'bear' arms in public for self-defense." *Bruen*, 142 S. Ct. at 2135. Hawaii may not flip a presumption codified in the Constitution. But that is exactly what Hawaii has done by dictating that all buildings open to the public are now presumptively off-limits without conspicuous signage or express consent. No historical analysis can support such a law.

### 4. H.R.S. §134-E Requires Unconstitutional Compelled Speech

The First Amendment prohibits the State from telling people what they must say. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *See also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc*., 570 U.S. 205, 213 (2013). The private property sign or other form of consent requirement in H.R.S.

§134-E impermissibly compels the speech of property owners and lessees. It requires property owners and lessees to espouse a belief one way or the other on the carriage of firearms outside the home by requiring them to expressly consent or post a sign. Plaintiff Atom Kasprzycki owns an architecture business. He also owns sections of the building which his business is in. Complaint at ¶ 62. Plaintiff Kasprzycki would allow the carry of handguns on his property, but he does not want to have to post a sign on his property explicitly saying so or otherwise have to expressly give consent. Complaint at ¶ 63. Hawaii's requirement that he do so prior to allowing people to carry handguns on his property violates his First Amendment rights.

### 5. The Park and Beach Ban is Unconstitutional

There is nothing new about parks and beaches and there is nothing new about potential violence in parks or public green spaces set aside by the government generally. The carry ban in parks, beaches and their parking lots is unconstitutional. Boston Common is considered "America's oldest park" and was established in 1634. Not only was it commonly used for militia purposes (making it *not* a gun-free zone), "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." *See* Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021). In New York, City Hall Park began as a "public

common" in the 17th century. *The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation, available at https://on.nyc.gov/3hBZXfe (last visited June 23, 2022). New York's Bowling Green Park was established "for the Recreation & Delight of the Inhabitants of [New York] City" in 1733. *Id.* In the South, Savannah was planned around public squares—open green spaces which became the landscaped parks that residents know today. *See* Turpin Bannister, *Oglethorpe's Sources for the Savannah Plan*, 20 J. of Soc'y of Arch. Hist. 47, 48 (1961) (noting Savannah's squares started initially as "open, unplanted plazas" and were "remodel[ed] . . . around 1800 . . . into landscaped neighborhood parks"). And of course, public beaches have always existed in the United States. Despite the existence of parks and beaches dating to the Founding, there is no relevantly similar historical tradition of banning firearms by ordinary, law-abiding citizens. Moreover, much of the land covered by H.R.S. §134-A are "vast expanses" of the great outdoors "where people are generally free to roam." *Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700, at *66 (N.D.N.Y. Nov. 7, 2022)(*"Antonyuk III"*). And the State will simply be unable to point to any historical tradition of banning firearms in the parks or beaches.

Even prior to *Bruen*, courts had rejected such locations as "sensitive places." *See*, *e.g*., *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017) (holding that State parks and State forests were not "sensitive places" and that

the State's ban on firearms in such places was unconstitutional under Delaware's version of the Second Amendment); *People v. Chairez*, 2018 IL 121417, 104 N.E.3d 1158, 1176 (2018) (holding that an Illinois statute that banned the possession of a firearm within 1000 feet of a public park violated the Second Amendment, rejecting the argument that the area was a "sensitive" place); *Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120, 1123–25 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15, 2017), (rejecting the government's argument that U.S. Army Corps of Engineers' outdoor recreation sites were sensitive places); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F.Supp.3d 675, 690–96 (N.D. Ill. 2021) (finding a forest preserve district was not a "sensitive place").

### 6. Hawaii's Carry Ban in Restaurants That Serve Alcohol and Their Parking Lots is Unconstitutional

H.R.S. §134-A(4) also prohibits  the carry of handguns in locations licensed to sell or dispense alcohol, namely bars and restaurants as well as their parking lots. With this and its other location-specific prohibitions, Hawaii has made it doubly illegal to carry into such locations, first by prohibiting all carry of firearms into private property without express consent or signage and second, by banning carry in such places *regardless* of the owner's wishes. The State will be unable to support this restriction with historical evidence from the Founding.

It should be undisputed that "taverns, inns, public houses, 'tippling houses,' 'victualing houses,' or 'ordinaries'" existed during the Founding. *Antonyuk III,* 2022

WL 16744700 at *74. In fact, Benjamin Franklin engaged in "constant study" at a library that he founded to avoid the "amusement" that he would otherwise find "in taverns, games, or frolics of any kind." Benjamin Franklin, The Autobiography of Benjamin Franklin 148 (Smyth, ed., 1907). While Franklin sought to regulate his private habits, other members of the Founding generation sought to regulate these institutions by public means. "In all states" during the Founding era, "tavern legislation was involved and constantly changing." Christine Sismondo, America Walks Into a Bar: A Spirited History of Taverns, Saloons, Speakeasies and Grog Shops 15 (Oxford 2011). Nevertheless, we are unaware of any ban on mere possession of firearms in these places. The absence of any Founding era analogues is dispositive. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. And even if there were, there certainly were never regulations which prohibited the carry of firearms in the parking lot of a place that sold alcohol. Establishments licensed to serve alcohol have existed for centuries. Nevertheless, the State will be unable to demonstrate a historical tradition of "criminaliz[ing]" an ordinary, law-abiding citizen's "*mere* presence at those locations with a handgun." *Koons*, 2023 WL 3478604 at *86.

### 7.  Hawaii's Ban on Carry in Banks and Their Parking Lots is Unconstitutional

H.R.S. §134-A (12) bans the carry of handguns on the premises of any bank or financial institution including adjacent parking areas. Plaintiffs wish to carry both at their banks and in the parking lot of their banks. Banks have always existed in the United States. And historically, the government always allowed private banks to determine for themselves whether or not individuals could carry firearms there.  The first bank in the U.S. was the Bank of North America in Philadelphia, which was chartered by the Continental Congress in 1781; Alexander Hamilton, Thomas Jefferson and Benjamin Franklin were among its founding shareholders. Wallack, Todd (December 20, 2011). "Which bank is the oldest? Accounts vary - The Boston Globe". The Boston Globe.[2] In February 1784, The Massachusetts Bank in Boston was chartered. *Id.*[3] Thus, banks have existed in this country since the time of the Founding.  However, plaintiffs have not found any historical laws banning the carry of firearms at banks.   And there certainly were none in the parking lot of banks either.   Thus, this Court should find both the restriction on carry at banks and separately the ban on carry in their parking lots unconstitutional.

### 8.  Hawaii's Ban on the Carry in Government Parking Lots is Unconstitutional

---

[2] See also https://www.aba.com/about-us/our-story/aba-history/1782
1799#:~:text=Future%20Treasury%20Secretary%20Alexander%20Hamilton,opera
ting%20today%20as%20BNY%20Mellon.

[3] *See also* https://en.wikipedia.org/wiki/BNY_Mellon#cite_ref-Globe2011_7-3

H.R.S. § 134-A (a)(1) bans the carry of handguns in any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas. Plaintiffs challenge the ban in government parking lots.  This law also prohibits the carry of handguns in the parking lots of several places Plaintiffs frequent in addition to the laws challenged above.  Complaint at ¶¶ 59, 60, 61. For all the reasons raised above, H.R.S. § 134-A (a)(1) is unconstitutional.

## V.    Plaintiffs Will Suffer Irreparable Harm

The remaining preliminary injunction factors follow readily. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The Ninth Circuit has imported the First Amendment "irreparable-if-only-for-a-minute" rule to other rights and, in doing so, has held deprivation of those rights is irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The Second Amendment should be treated no differently. *Ezell v. City of Chi.,* 651 F.3d 684. 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable and having no adequate

remedy at law."). This Court has found Second Amendment violations constitute irreparable harm. *Fisher v. Kealoha,* 2012 U.S. Dist. LEXIS 90734, *40, 2012 WL.

## VI.    <u>Granting the TRO/PI is in the Public Interest</u>

The last two preliminary injunction elements merge when the government is the defendant. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citation omitted). When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). As the Ninth Circuit has made clear, "all citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). The State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable . . . to allow the state . . . to violate the requirements of federal law." (citations omitted)). On the other hand, granting an injunction will end the ongoing violation of Plaintiff's rights.

## VII.   <u>Conclusion</u>

The motion should be granted.

Dated: June 23, 2023.

Respectfully submitted,

*Counsel for Plaintiff*

/s/*Kevin Gerard O'Grady*
Kevin O'Grady

*/s/ Alan Beck*
Alan Alexander Beck