Donald L. Wilkerson  #5730
Attorney at Law
P.O. Box 42
Laupahoehoe, Hawaii 96764
Telephone: (808) 533-4447
E-mail: don@allislandlslaw.com

Matthew Larosiere*
The Law Office of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
Telephone: (561) 452-7575
Facsimile: (844) 894-6204
Email: Larosieremm@gmail.com
*Admitted *Pro Hac Vice*

Attorneys for *Amicus* Second Amendment Foundation

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaii,<br><br>Defendant. | Case No. 1:23-cv-00265-LEK-WRP<br><br>**AMICUS BRIEF OF THE SECOND AMENDMENT FOUNDATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

i

## CORPORATE DISCLOSURE STATEMENT

The Second Amendment Foundation has no parent corporations. It has no stock; hence no publicly held company owns 10% or more of its stock.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS .................................................................... ii

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 2

I.   Historical analysis under the Second Amendment......................................... 2

    A.   The Relevant Historical Time Period ...................................................... 4

    B.   How and Why a Historical Law Affected the Right to Arms is Always
Critical ................................................................................................ 5

    C.   The Important Evidence of No Evidence ................................................. 7

II.   Analysis of Selected Historical Materials ................................................. 10

    A.   The Private Property Ban is Unsupportable ........................................... 12

    B.   Hawaii's Parking Lot Restrictions Are Unsupportable ........................... 15

    C.   Hawaii's Ban on Carrying in Parks, Beaches, and Recreational Facilities
are Unsupportable.............................................................................. 17

    D.   Hawaii's Ban on Carrying in Banks is Unsupportable ........................... 20

CONCLUSION ............................................................................... 21

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Antonyuk v. Hochul,* No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS
201944 (N.D.N.Y. Nov. 7, 2022)....................................................... 14, 17, 18

*Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652
(W.D.N.Y. Nov. 22, 2022) ............................................................ 14

*District of Colombia v. Heller*, 554 U.S. 570 (2008)............................................ 8

*Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246 (2020)...................................... 9

*Fein v. Pennsylvania State Police*, 47 F.4th 247 (3d Cir. 2022).......................... 10

*Koons v. Platkin*, No. CV 22-7463 (RMB/AMD), 2023 WL 3478604
(D.N.J. May 16, 2023)................................................................... 14

*Maryland Shall Issue, Inc., et al., v. Montgomery County*, No. CV TDC-21-1736,
2023 WL 4373260 (D. Md. July 6, 2023)............................................ 7, 15, 17

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)......................................... 4, 8

*McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076
(N.D. Fla. 2016)............................................................................ 12

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)................ passim

*Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) ................................. 8

*United States v. Byle*, No. 8:10-CR-419-T-30TGW, 2011 U.S. Dist. LEXIS 54220

(M.D. Fla. Apr. 15, 2011) ................................................................. 12

*Watson v. Stone*, 148 Fla. 516 (FL 1941) ............................................. 6

**Statutes**

1852 Haw. Sess. Laws Act of May 25, 1852, § 1 ................................. 10

1887 N.M. Laws 56 ........................................................................... 16

1905 Minn. Laws 620, ch. 344 ........................................................... 19

1907 N.M. Laws § 18 ......................................................................... 16

1917 Wis. Sess. Laws 1243-44, ch. 668, § 29.57 ................................. 19

1921 N.C. Sess. Laws 54 ................................................................... 19

1945 Minn. Laws, Ch 248 ................................................................. 19

1979 NC Gen Ass'y Ch. 830 S.B. 226 ................................................. 19

2011 Wis. SB 93 ............................................................................... 19

Miss. Code § 97-37-17 ....................................................................... 16

THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND

PROVIDENCE PLANTATIONS (1798) ........................................... 18

Tx. Pen. Code, Ch. III, Art.408 (1857) ............................................... 13

**Other Authorities**

Adam Winkler, "Gunfight: The Battle over the Right to Bear

Arms in America" (2011) ................................................................. 5

Arthur Conan Doyle, "The Adventure of Silver Blaze", Dec. 1892 ...................... 9

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*,

13 Charleston L. Rev. 205 ............................................................. 11

Diamond, Raymond T. and Cottrol, Robert J., "Never Intended to be Applied to

the White Population": Firearms Regulation and Racial Disparity – The

Redeemed South's Legacy to a National Jurisprudence?"

70 Chi-Kent L. Rev. 1307 (1995)....................................................... 5

George Washington Paschal, "A Digest of the Laws of Texas: Containing Laws in

Force, and the Repealed Laws on Which Rights Rest" (Vol. 2, 1873).............. 13

Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the*

*Critical Period for Historical Analogues Is when the Second Amendment Was*

*Ratified in 1791, and not 1868*, Oct. 1, 2022, https://bit.ly/3CMSKjw ............... 4

R.H. Thompson, The Annotated Code of the General Statute Laws of the State of

Mississippi (1892).......................................................................... 16

Texas Historical Statutes Project, 1879 Penal Code of the State of Texas ........... 13

Texas Penal Code, Duke Law Center Repository of Historical Gun Laws........... 13

## INTEREST OF *AMICUS CURIAE*

The Second Amendment Foundation, Inc., ("SAF") is a non-profit membership organization founded in 1974 with over 720,000 members and supporters, in every State of the Union. Its purposes include education, research, publishing, and legal action focusing on the Constitutional right to keep and bear arms. SAF has an intense interest in this case because it has many members residing in Hawaii who would like to exercise their right to carry arms for self-defense and other lawful purposes.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Hawaii has followed New York, New Jersey, and Maryland in taking deliberate action to undermine the Supreme Court's landmark *Bruen* ruling and the fundamental general right to carry an effective mechanism of self-defense it affirmed. Hawaii's SB 1230 and similar laws specifically, and unfairly target those who have taken their rights most seriously in attempting to exercise them, even submitting to Defendants' background check and training requirements.

With this brief, *amicus* hope to assist this honorable Court by sharing its research on relevant historical materials, especially "how and why the [historical] regulations burden a law-abiding citizen's right to armed self-defense" as compared to Defendants' complained-of conduct. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2131 (2022).

## I.      Historical analysis under the Second Amendment.

To avoid the unnecessary spilling of ink, *Amicus* will refrain from again regaling this honorable Court with the depth of analysis required by *Bruen*, as Plaintiffs have already explained that the finding of "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Bruen* 142 S. Ct at 2132. However, *Amicus* is concerned about what appears to be a collapsing of standards exhibited by some

district courts, and feels it necessary to highlight the importance of the historical inquiry as articulated by the Supreme Court.

Given that the "how and why" of a firearm regulation is a critical goalpost under *Bruen*, Hawaii's law is due some critical analysis. It is manifest that Hawaii's SB 1230 is what has colloquially been called a "*Bruen*-response bill," given its timing and similarity to those laws in New York, New Jersey, and Maryland. The broad sweep of locations in which possession of firearms, even with a License to Carry Firearm (LTCF), is banned by SB 1230, the vagueness of some of these locations, and the severity of consequences for any violation is manifestly different even from questionable early concealed carry restrictions. The law doesn't target the simple carrying of firearms, but the carrying of firearms *by license holders* in a distinct majority of locations. The object here, taken with Hawaii's previous reluctance to issue LTCFs at all, is to eviscerate the utility of a LTCF and wholesale chill the carrying of firearms.

While *Bruen* identified three distinct locations, i.e., "inside" a polling place, courthouse, and legislative assembly as potentially regulable, such is a far cry from Hawaii's condemnation of all parks, beaches, and private property. Unlike the distinct locations identified by the Supreme Court, Hawaii's law is calculated to, and does, create an *in terrorem* effect on the carry of arms by license holders, lest they be charged with a misdemeanor and face the permanent revocation of their LTCF

for entering a coffee shop without first being invited. To justify SB 1230, Defendants must point to "a well-established and representative historical analogue" for each such regulated place. *Amicus* respectfully submits that the government simply cannot meet that burden.

### A. The Relevant Historical Time Period

The Founding Era is the appropriate time period for this Court's historical analysis. See generally Mark W. Smith, *'Not all History is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, Oct. 1, 2022, https://bit.ly/3CMSKjw (last visited Jul. 12, 2023).

The *Bruen* Court did note an academic debate over whether courts should look to the Reconstruction era in determining the scope of individual rights, which the Court did not need to resolve. *Bruen* 142 S. Ct. at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry."). But *Bruen* did not overturn—and in fact reaffirmed—*McDonald*, which flatly rejected the notion of a separate Second Amendment standard for the states. *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010). Other dangers inherent in such materials will be more thoroughly explained *infra*. Even still, *amicus* will provide some 19th-century materials within context in

4

an effort to help this honorable Court sort through the weight due historical evidence.

### B. How and Why a Historical Law Affected the Right to Arms is Always Critical

The Supreme Court spent pages upon pages detailing the criticality of how and why a historical law or regulation presented by the government in attempting to carry its burden implicated, specifically, protected conduct including the fundamental right to self-defense. *See generally*, *Bruen*. Though a historical law may first seem relevantly similar on its apparent facial neutrality, examination of how and why it affected the right to defend oneself remains critical, especially given the acute issues posed by materials from the Reconstruction era.[1]

One factor which makes the "how and why" especially important is the depth of racial animus that characterizes a great deal of the Reconstruction-era laws implicating the carrying of arms. *See* Diamond, Raymond T. and Cottrol, Robert J., "Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity – The Redeemed South's Legacy to a National Jurisprudence?" 70 Chi-Kent L. Rev. 1307 (1995). One such example is Florida's 1893 carry law, which

---

[1] It ought not be terribly controversial to point out that many Reconstruction-era firearm laws were passed with animus towards people of color. For example, Martin Luther King Jr. was denied a permit to carry a concealed firearm under a facially neutral law even after his home had been firebombed, which reasonably leads one to question the *actual* purpose of the law. Adam Winkler, "Gunfight: The Battle over the Right to Bear Arms in America" at 235 (2011).

made it unlawful for an individual to carry a pistol or repeating rifle on or about the person without a permit. Long before *Bruen*, and concurring specially in the judgment of discharge because he felt the statute offensive "against the Second Amendment to the Constitution of the United States and Sec. 20 of the Declaration of Rights of the Constitution of Florida," Justice Buford wrote:

> I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State. . . . The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and *there has never been*, within my knowledge, *any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention to the Constitution and non-enforceable if contested.*

*Watson v. Stone*, 148 Fla. 516, 524-525 (FL 1941) (Buford, J., Concurring with respect to discharge) (emphasis added).

The *Watson* case, plus many other similar Reconstruction-era laws affecting carry, highlight the danger inherent in relying on the government's bare invocation of a historical statute. It is Defendants' burden to prove that the challenged conduct is supported by "enduring" and "well-established" restrictions with roots in the Founding era, through reasoning by analogy with reference to "representative" laws

that are not historical "outliers" and impose a comparable burden on the right to an effective self-defense for comparable reasons. *Bruen*, 142 S. Ct. at 2126, 33, 53, 47, & 56.

In light of the foregoing, it bears emphasis that there is no justification for the skipping of "how and why" analysis in assessing the government's purported analogues under *Bruen*. One district court recently reasoned that "considerations of 'how and why' historical regulations burden rights relating to firearms" were inapplicable "when there is a clear historical example of the exact same type of regulation[.]" *Maryland Shall Issue, Inc., et al., v. Montgomery County*, No. CV TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023) (*on appeal* to 4th Cir. No. 23-1719) ("*Maryland Shall Issue*"). It is well settled that actual analysis of legislative purpose is crucial in fundamental rights jurisprudence, and thus the government cannot meet its burden with bare assertions that the historical material it relies upon *actually* reflects a deeply-rooted, longstanding reflection of American firearms regulation.

### C. The Important Evidence of No Evidence

*Amicus* hopes to call to this honorable Court's attention what appears to be a concerning trend developing in cases relying on Reconstruction-era and later regulations to rely on inferences drawn from those late 18th and early 19th century materials. This misses an important directive, that "late-19th century evidence

cannot provide much insight into the meaning of the Second Amendment *when it contradicts earlier evidence*" especially not outlier regimes which contradict "the overwhelming evidence of an otherwise enduring American tradition permitting public carry" *Bruen*, 142 S. Ct. at 2154 (quoting *District of Colombia v. Heller*, 554 U.S. 570 at 614 (2008)). Indeed, the Eleventh Circuit glazed over this point when it relied primarily on late 19th-century materials in *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) (reasoning that "because the Fourteenth Amendment is what caused the Second Amendment to apply to the States" that "sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."). This logic, like the materials pointed to by the government in similar cases, would be an outlier in fundamental rights jurisprudence where we understand that rights incorporated "against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137; *see also McDonald*, 561 U.S. 765 (again re-affirming that rights incorporated through the Fourteenth Amendment "according to the same standards that protect those personal rights against federal encroachment").

The consistent thread here is that courts so-finding ignore the fact that, where government defendants lay the thrust of their cases solely on post-founding materials, *the lack of founding-era material is itself important evidence of unconstitutionality*. *Bruen* explained that "when a challenged regulation addresses a

general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem *is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.*"142 S. Ct. at 2129 (emphasis added); *see also Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2258–59 (2020) (holding that "more than 30" state-law provisions enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" where they lacked grounding in Founding-era practice). The interests here asserted by Hawaii—a non-particularized desire to protect "sensitive areas" and "the public"—are in no way unique to this century, or even this millennium. That something vaguely analogous appeared over a hundred years later does not negate the very probative evidence that such a measure was not taken until the Reconstruction era. [2]

---

[2] The government's failure to point to founding-era analogues, if *amicus* can venture to reason by analogy, is like the curious case of the dog that didn't bark. Arthur Conan Doyle, "The Adventure of Silver Blaze", Dec. 1892 (A Sherlock Holmes adventure set up where Gregory, a Scotland Yard detective asks of Sherlock Holmes "Is there any other point to which you wish to draw my attention?"
Holmes: "To the curious incident of the dog in the night-time."
Gregory: "The dog did nothing in the night-time"
Holmes: "That was the curious incident."
That curious incident is easily explained: the dog did not bark, because, as Holmes explains "I had grasped the significance of the silence of the dog, for one true inference invariably suggests others.... Obviously the midnight visitor was someone whom the dog knew well.") There, in The Adventure of Silver Blaze, the dog did not bark when a prize horse was stolen, because there was no "thief." Here, the government has not analogically barked, because there is no analogue.

Still, *amicus* will here address the most relevant analogues it thinks applicable, but thinks it important to re-iterate the further caveats cautioned in *Bruen*, that in addition to a distinct lack of regulations,

> if earlier generations addressed [the same] societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

142 S. Ct. at 2129-30.

## II.   Analysis of Selected Historical Materials

Under *Bruen*, a court must "closely scrutinize *all* gun restrictions for a historically grounded justification." *Fein v. Pennsylvania State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (emphasis in original). Such scrutiny is difficult, especially where historical materials are hard to find, and thus *amicus* hopes to assist this honorable Court with the result of its contextual historical research. *Amicus* anticipates Defendants to point to Hawaiian session laws from 1852, which generally prohibit the carrying of arms at pain of up to a Thirty Dollar fine, and up to two months' hard labor. 1852 Haw. Sess. Laws Act of May 25, 1852, § 1 at 19. As a threshold matter, it is important to note that Hawaii session laws prior to 1852 are irrelevant to a Second Amendment inquiry, as the region was not even annexed until 1898, and that the Supreme Court has discounted the utility of territorial restrictions as deserving "little weight". *Bruen* 142 S. Ct. at 2117. Aside from the fact that the law would have

10

been clearly unconstitutional under *Bruen*, and thus could not possibly be an applicable analogue, the Hawaiian session law afforded an exception for good and proper reason, which the law at issue does not.

Also, as discussed *supra*, later historical materials do not trump the text of the Second Amendment nor founding-era materials, especially where the later material contradicts a founding-era common state of affairs. As a general matter, American law around the time of the founding "typically required that arms be brought to churches or to all public meetings," and statutes existed requiring "arms carrying when traveling or away from home. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36; *see also id.* at 242 ("Boston's unusual law against carrying loaded guns into buildings was far outnumbered by statutes all over America that required bringing guns into churches, and sometimes to other public assemblies."). The impetus for requiring the carrying of arms to churches and assemblies was to guard against the potential of attack. While the feared source of assailant has certainly changed over the centuries, the very same general issue of public safety which has existed for millennia, and thus this founding-era manner of achieving the same public safety goals is evidence of SB 1230's unconstitutionality under *Bruen* as heretofore discussed. It is unsurprising that the historical record reflects a general respect of the right to keep and bear arms in day-to-day life. On this much alone, no amount of later material should be able to flip

the founding-era encouragement or even *requiring* of carrying arms to the state of proscription called for by SB 1230.

In its aggression, the government has effectively disarmed even those scant few it had issued LTCFs to prior to *Bruen*. It simply defies reason that a bill enacted in response to a Supreme Court ruling respecting the right to keep and bear arms outside the home could yield a result restricting the ability, *even with an LTCF*, to carry one's firearms anywhere but, for practical purposes, one's home and car.

## A. The Private Property Ban is Unsupportable

SB 1230 quite unprecedentedly proscribes the carrying of arms onto private property unless the owner has "provided express consent or clearly and conspicuously post[ed] a sign". Given that this inverts the common law principles of trespass,[3] it ought be no great surprise that finding a historical analogue was difficult. However, *amicus* found one: a Texas enactment from 1867 which prohibited "the Carrying of Firearms on Premises or Plantations of Any Citizen Without the Consent of the Owner[.]" George Washington Paschal, "A Digest of the

---

[3] *See United States v. Byle*, No. 8:10-CR-419-T-30TGW, 2011 U.S. Dist. LEXIS 54220 (M.D. Fla. Apr. 15, 2011) (reasoning that owner's intent to exclude visitors was not apparent because gate was not locked and no 'No Trespassing' signs were posted); and *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1096 (N.D. Fla. 2016) ("Thunder Beach contains no barricades, barriers, or attendants meaningfully limiting egress and ingress. It contains no signs conveying a message to the effect of 'private event—no trespassing.' Any person can choose to walk in to the event just as one could choose to walk to the same location on a given weekend when an event is not being held").

Laws of Texas: Containing Laws in Force, and the Repealed Laws on Which Rights Rest" Page 1321-1322, (Vol. 2, 1873).[4]

The reason this Texas law, which by 1879 would have been Article 688, with exceptions at 689 never showed up in the 1879 penal code is simple: "the articles were stricken out by the legislature before adopting the Codes." Texas Historical Statutes Project, 1879 Penal Code of the State of Texas, 90. Thus, the law is at best a historical outlier—as the *Bruen* court characterized firearm regulations from nineteenth-century Texas—but more realistically mere a blip which the Texas legislature thought better of sometime between 1867 and 79, and where it was enacted, would have fallen alongside "offenses against property," which by 1879 covered property theft, destruction of fences, and so-on, suggests the "how" and "why" there was nowhere near that of Hawaii's. Texas Historical Statutes Project, 1879 Penal Code of the State of Texas, 42-43; *Bruen*, 142 S. Ct. 2168. It bears emphasis the Texas law, if it was even momentarily in effect, would have been in effect alongside a prohibition on the selling of "any ardent spirits, arms or ammunition" to a "free person of color." Tx. Pen. Code, Ch. III, Art. 408 (1857) and, when passed, would have been sandwiched between articles dealing with affrays,

---

[4] Reference to this law can be found at the Duke Center for Firearms Law, but keen observers might note that it lacks a citation to the Texas Penal Code. Duke Law Center Repository of Historical Gun Laws (last accessed 7/11/2023) https://bit.ly/3PTFfXo.

13

horse racing, and indecent exposure, rather than as part of a concerted attempt to render an LTCF *inutile*. This reversal, and the isolated nature of such laws, is certainly probative evidence of unconstitutionality.

To wit, three district courts have handled similar challenges so far, and found for Plaintiffs. *Antonyuk v. Hochul,* No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944 at *79 (N.D.N.Y. Nov. 7, 2022), ("Section 5's imposition of a state-wide restriction on concealed carry on all private property that is *open for business to the public* finds little historical precedent."); *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652, *9 (W.D.N.Y. Nov. 22, 2022) ("The State also argues that private property owners have always had the right to exclude others from their property and, as such, may exclude those carrying concealed handguns…But that right has always been one *belonging to the private property owner*—not to the State."); and *Koons v. Platkin*, No. CV 22-7463 (RMB/AMD), 2023 WL 3478604 at *67 (D.N.J. May 16, 2023) ("In contrast, the Default Rule is designed to exclude firearms from all private property in New Jersey, for whatever reason and regardless of the nature of the land at issue…The colonial hunting laws and the Default Rule are differently situated; they do not impose a comparable burden on licensed firearm carriers.").[5]

---

[5] Notably, in *Koons*, the 3rd Circuit declined to stay the injunction against the private property firearms exclusion pending appeal. Given the standard of a stay pending appeal mirrors that of a preliminary injunction, an unlikelihood of success on the

### B. Hawaii's Parking Lot Restrictions Are Unsupportable

Parking lots are, quite naturally, something hard to find reference to in the relevant historical time period, given the invention of the automobile, but still, *amicus* will here give some context to historical laws. To begin with, as discussed *supra*, the carrying of arms while traveling was something respected, even compelled by early American laws. Even some southern states which dubiously enacted concealed carry prohibitions excepted carry while traveling. *See*, *Bruen*, 142 S. Ct. at n. 16. Parking lots are an essential component of modern travel, and while the state may attempt to wriggle by "allowing" one limited time to disarm in a parking lot, that does little to save the statutory scheme from its manifest inconsistency with the overarching history and tradition of the comparatively free carrying of arms as an individual goes about his business.

In any event, parking lots lack the acute character of even the examples of potentially regulable locations articulated in *Bruen* and *Heller*. Little distinguishes a street and parking lot from the road one travels on, save for acceptable rate of speed. Hawaii's attempt to ban carry in many parking lots smacks of the 100-yard buffer zone attempted in *Maryland Shall Issue*, for which there is no historical support. Government defendants in *Maryland Shall Issue* pointed to an 1887 New Mexico

---

merits for the government can be inferred, at the very least as it relates to the Default Rule.

law which prohibited the carrying and use of deadly weapons "within three hundred yards of any inhabited house, in the territory of New Mexico." 1887 N.M. Laws 56. Defendants there left out the minor detail that the three-hundred yard "buffer" was intentionally removed from the law and the statute re-tooled and exempting lawful self-defense by 1907, and again narrowed before statehood in 1912. 1907 N.M. Laws § 18.[6] The government also there pointed to an 1892 Mississippi law which forbid "the concealed carry of weapons within two miles of a university, college, or school". R.H. Thompson, The Annotated Code of the General Statute Laws of the State of Mississippi 327, § 1030 (1892). The government there conspicuously left out the context that the law only ever applied to students, not the general public, and that the "buffer zone" was eliminated before 1942. *See* Miss. Code § 97-37-17.

The plain text of the Second Amendment protects the right to carry a firearm on most public property, and most places Americans find themselves in the course of their ordinary business, and it should thus be impossible to support a contention that a ban on the carrying of arms on slabs of asphalt with lines painted on them consistent with this nation's history and tradition of firearms regulation.

---

[6] *Amicus* notes New Mexico was also one of the territories whose regulations *Bruen* expressly declined to consider.

### C.  Hawaii's Ban on Carrying in Parks, Beaches, and Recreational Facilities are Unsupportable

As other courts have found, there is little historical support for barring carry in parks or beaches. While governments have attempted to point to city ordinances and 18th-century laws affecting the discharge of arms and casting of missiles within or across parks, such laws were generally motivated by game preservation and the urban nature of the affected parks.[7] The *Antonyuk* court even noted how whatever small degree of historical support a ban on carrying in parks might have vanishes when applied to parks outside of cities: "at most, the city laws support a historical tradition of banning firearms in public parks *in* a city (where the population density is generally higher), not public parks *outside of* a city (where people are generally free to roam over vast expanses of mountains, lakes, streams, flora and fauna)." *Antonyuk*, 2022 WL 16744700, at *66-*67. The only district court to reach the opposite conclusion was the *Maryland Shall Issue* case, which did so in direct contravention of *Bruen*'s command, as discussed *supra*.

The state's bans on carry in public areas, including any public park, libraries and recreational facilities and other public areas are also without support. Again, *Antonyuk* is instructive. There, the court struck down New York's ban on carry by

---

[7] *Amicus* in no way concedes that parks can be considered "sensitive places" simply because they are urban in character, but merely highlights this to demonstrate how weak the analogical link to a total park prohibition is in those rare early regulations.

permit holders in "libraries, public playgrounds, public parks, and zoos," holding that the "common thread" of the bans placed on these and other locations by New York, was that "they are all locations where (1) people typically congregate or visit and (2) law-enforcement or other security professionals are--presumably--readily available." 2022 WL 3999791 at *33. As the court noted "[t]his is precisely the definition of 'sensitive locations' that the Supreme Court in NYSRPA considered and rejected." *Id.*, citing *Bruen*, 142 S.Ct. at 2133-34. The court found that New York had failed to demonstrate that such bans on the simple *carriage* of arms were "consistent with this Nation's historical tradition of firearm regulation."

Around the founding, some regulations existed respecting the *discharge* of firearms, as opposed to the simple carry for self-defense. *See, e.g.*, THE PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 568 (1798) ("That if any person shall fire any gun, musket, blunderbuss or pistol, loaded with a bullet or shot, in or across any road, street, square or lane, he shall, upon conviction as aforesaid, forfeit and pay as a fine a sum not less than three dollars"). That the state cannot bring forth any evidence of common founding-era *bans* on the carriage of firearms in such spaces is dispositive proof that "the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. 2131.

In previous cases, government defendants identified two states—Minnesota and Wisconsin—who attempted to prohibit firearms in their state parks, neither of which are analogically similar to the government's use here, and are not temporally relevant. Still, because other governments have cited these laws with misleading context, *amicus* hopes the following is helpful to this honorable Court. Minnesota in 1905 required firearms be put into a bag by the park's commissioner or deputy, and was focused entirely on bird preservation. A few years later, it had been re-titled to § 99.08, and was repealed by 1945. 1905 Minn. Laws 620, ch. 344, § 53; 1945 Minn. Laws, Ch 248, § 7. In 1917, Wisconsin proscribed a person from having "in his possession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carrying case" while in nay "wild life refuge, state park, or state fish hatchery lands". 1917 Wis. Sess. Laws 1243-44, ch. 668, § 29.57 (4). This law is manifestly and obviously about game preservation, and an exemption for handguns was added by the 21st century. 2011 Wis. SB 93. Notably, North Carolina in 1921[8] prohibited firearms in any public or private park or reservation unless the owner or manager gave permission. 1921 N.C. Sess. Laws 54. The law was completely eliminated sometime between 1921 and 1979. *See* 1979 NC Gen Ass'y Ch. 830 S.B. 226.

---

[8] Far beyond the temporal scope of what courts may consider under *Bruen*. *See* 142 S. Ct. at 2154 n.28.

In short, these restrictions on carrying in parks are not analogous to Hawaii's attempt to eliminate the utility of an LTCF. The laws that are most similar, are only tangentially similar, were passed for manifestly different purposes, and repealed in short order. Because of the lack of historical support, Hawaii may try to argue that parks and beaches can be restricted as "sensitive places" because they are sometimes crowded. But as the Supreme Court explained, "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly . . . [it] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S. Ct. at 2133-34.

### D. Hawaii's Ban on Carrying in Banks is Unsupportable

Banks are not new, and certainly predate the founding, as Plaintiffs pointed out in the motion underlying the current briefing. There are certain characteristics of banks that make them different from, say, a parking lot, but there is no "unprecedented societal concern[] or dramatic technological change[]" separating banks now from the time of the founding. *Bruen*, 142 S. Ct. at 2132. *Amicus* found, as early as 1908, a carry law *exempting* individuals securing a bank, but no prohibition on the carry in banks. The Charter and Code of the Ordinances of Yazoo City, Ch. 20, §§293-300 (1908). Given that bank robberies were likely more a threat at the time of the founding than now—where most money is stored in zeroes and

ones rather than in a vault—the fact that the historical record does not support the banning of ordinary people from carrying arms to banks, much less LTCF-holders, such should be probative evidence of its unconstitutionality.

## **CONCLUSION**

For this and for all the reasons discussed in this brief, *amicus* respectfully requests this Court grant Plaintiffs' requested relief.

Dated: July 14, 2023                    Respectfully submitted,

/s/ *Matthew Larosiere*
Matthew Larosiere (*pro hac vice*)
THE LAW OFFICE OF MATTHEW LAROSIERE
E-mail: Larosieremm@gmail.com

/s/
Donald Wilkerson  #5730
Attorney  at  Law
E-mail: don@allislandslaw.com

21

# CERTIFICATE OF COMPLIANCE

**Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitations of Local Rule 7.4(a) because this brief, less excluded parts, contains less than 25 pages and less than 6,250 words.

2. This brief complies with the typeface requirements of Local Rule 10.2 because it has been prepared in 14-point, double-spaced Times New Roman plain style, except for those parts exempted by LR 10.2(a)(2) and (4).


Dated: July 14, 2023.


/s/
Donald Wilkerson    #5730
Attorney at Law
E-mail: don@allislandslaw.com


/s/ Matthew Larosiere
Matthew Larosiere (*pro hac vice*)
THE LAW OFFICE OF MATTHEW
LAROSIERE
E-mail: Larosieremm@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date noted below, the foregoing document was filed with this Court's CM/ECF system, which generated a notice of filing, and a true and correct copy of the foregoing document was emailed to all participants in this case who are registered CM/ECF users, and will be served by the CM/ECF system or other mechanism of service pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Dated: July 14, 2023.

Respectfully submitted,

/s/
Donald L. Wilkerson  #5730
Attorney at Law
E-mail: don@allislandslaw.com

/s/ Matthew Larosiere
Matthew Larosiere (*pro hac vice*)
THE LAW OFFICE OF MATTHEW LAROSIERE
E-mail: Larosieremm@gmail.com

23