James Hochberg (HI Bar No. 3686)
ATTORNEY AT LAW, LLLC
700 Bishop St., Ste. 2100
Honolulu, HI 96813
Telephone: (808) 256-7382
Email: jim@jameshochberglaw.com

C.D. Michel*
Konstadinos T. Moros*
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com
*Admitted *Pro Hac Vice*

Attorneys for Amici Gun Owners of America, Inc., Second Amendment Law
Center, Hawaii Rifle Association, California Rifle & Pistol Association,
Incorporated, Gun Owners of California, and Gun Owners Foundation

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION,<br><br>*Plaintiffs*,<br><br>v.<br><br>ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaii, MAUI COUNTY<br><br>*Defendants*. | Case No. 1:23-cv-00265-LEK-WRP<br><br>**AMICUS BRIEF OF GUN OWNERS OF AMERICA, INC., SECOND AMENDMENT LAW CENTER, HAWAII RIFLE ASSOCIATION, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, GUN OWNERS OF CALIFORNIA, AND GUN OWNERS FOUNDATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Amici Gun Owners of America, Inc., Second Amendment Law Center, Hawaii Rifle Association, California Rifle & Pistol Association, Incorporated, Gun Owners of California, and Gun Owners Foundation certify that they are nonprofit organizations and thus have no parent corporations and no stock.

Dated: July 14, 2023                    Respectfully submitted,

                                        */s/C.D. Michel*
                                        James Hochberg (HI Bar No. 3686)
                                        ATTORNEY AT LAW, LLLC
                                        Email: jim@jameshochberglaw.com


                                        C.D. Michel (pro hac vice)
                                        Konstadinos T. Moros (pro hac vice)
                                        MICHEL & ASSOCIATES, P.C.
                                        Email: cmichel@michellawyers.com

# TABLE OF CONTENTS

**Page**

Interest of Amici ......................................................................................1

Introduction ............................................................................................2

Argument.................................................................................................3

I.     Second Amendment Historical Analysis Required by *Bruen* .......................3

II.     "Sensitive Places" Must Be Narrowly Defined Under *Bruen* ......................6

III.   The "Sensitive Places" Created by SB 1230 Have Not Historically Been Understood to be "Sensitive Places," and Hawaii Cannot Simply Declare That They Are ...............................................................................9

    A.     Parking Areas of Places Where Carry Is Restricted Under SB 1230 ...9

    B.     Government-owned Parking Lots ......................................................10

    C.     Parks and Beaches...............................................................................11

    D.     Restaurants That Serve Alcohol.........................................................14

    E.     Hawaii's "Vampire Rule" ..................................................................16

III.   Americans With CCW Permits Are Overwhelmingly Law-Abiding............20

Conclusion ............................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*303 Creative LLC v. Elenis*,
   No. 21-476, 2023 WL 4277208 (U.S. June 30, 2023)..........................................19

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ............................................................................20

*Antonyuk v. Hochul*,
   No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y.
   Nov. 7, 2022) ............................................................................................... passim

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) ........................................................ 8, 9, 10, 11

*Carrillo v. Penn Nat'l Gaming, Inc.*,
   172 F. Supp. 3d 1204 (D.N.M. 2016)...................................................................16

*Christian v. Nigrelli*,
   No. 22-cv-695, 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov. 22, 2022)...7, 17

*Columbia Hous. & Redevel. Corp. v. Braden*,
   No. M2021-00329-COA-R3-CV, 2022 Tenn. App. LEXIS 395 (Ct. App.
   Oct. 13, 2022) ......................................................................................................10

*Drummond v. Robinson Twp.*,
   9 F.4th 217 (3d Cir. 2021) ....................................................................................4

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011)....................................................................5, 11

*Koons v. Platkin*,
   No. CV 22-7463, 2023 WL 3478604 (D.N.J. May 16, 2023)...................... passim

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
   138 S. Ct. 1719 (2018)..........................................................................................19

iii

*Md. Shall Issue, Inc., v. Montgomery County*,
    No. CV TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023) ......... 12, 13, 14

*Morris v. U.S. Army Corps of Engineers*,
    60 F. Supp. 3d 1120 (D. Idaho 2014) .................................................................10

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ................................................................................ passim

*Oliver v. United States*,
    466 U.S. 170 (1984).............................................................................................16

*Pac. Gas & Elec. Co. v. Pub. Utils. Com.*,
    475 U.S. 1 (1986)...............................................................................................20

*Project 80s v. Pocatello*,
    942 F.2d 635 (9th Cir. 1991) .............................................................................16

*United States v. Harrison*,
    No. CR-22-00328, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023).....................15

*United States v. Kokinda*,
    497 U.S. 720 (1990)...........................................................................................11

*Wooley v. Maynard*,
    430 U.S. 705 (1977)..................................................................................... 18, 19

**Statutes**

1859 Conn. Pub. Acts, ch. LXXXII, § 5.................................................................15

1867 Kan. Sess. Laws 25 .........................................................................................15

Mich. Comp. Laws Serv. § 750.234d .......................................................................9

Neb. Rev. Stat. § 69-2441 .........................................................................................9

United States Statutes At Large, 56 Cong. Ch. 339, April 30, 1900, 31 Stat. 141,
    section 7 ...............................................................................................................6

iv

**Other Authorities**

Assemb. Comm. on Pub. Safety, Bill Analysis, S. 2, 2023-2024 Reg. Sess.
(Cal. June 26, 2023) ................................................................................21

Clayton E. Cramer & David B. Kopel,
*"Shall Issue": The New Wave of Concealed Handgun Permit Laws*,
62 Tenn. L. Rev. 679 (1995)....................................................................22

David Kopel & Joseph Greenlee,
*The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, (2018)..............7, 8

Fl. Dep't of Agric. & Consumer Servs., Div. of Lic.,
*Concealed Weapon or Firearm License Summary Report Oct. 1, 1987- Jun. 30,*
*2023* (June 30, 2023) ..............................................................................22

Floor Alert from Cal. State Sheriff's Ass'n to All Members of the Cal. State
Assemb. (Aug. 29, 2022), https://tinyurl.com/calstatesheriffsopposeSB918.......21

James T. Mitchell, et al.,
*Statutes at Large of Pennsylvania from 1682 to 1801*, vol III .............................17

Katherine Rosenberg-Douglas,
*Explore: Shootings by CCL Holders in Illinois Since Concealed Carry Law Went*
*Into Effect in 2014*, Chic. Trib. (Mar. 1, 2020),
https://www.chicagotribune.com/news/breaking/ct-viz-illinois-ccl-shootings-
tracker-20200227-ww4ldqwdjrd2ze63w3vzewioiy-htmlstory.html (last visited
July 12, 2023)..........................................................................................24

Mark W. Smith,
*Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*,
24 Harvard J. L. & Pub. Policy Per Curiam 31 (2022)..........................................5

Press Release, *BCA Releases 2021 Permit to Carry Annual Report, Data Provided*
*to BCA by Minnesota Law Enforcement Agencies* (Mar. 1, 2022),
https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-
Permit-to-Carry-Annual-Report.aspx ...................................................................24

Steven Walters,
   *The Legacy of Concealed Carry in Wisconsin*, Urban Milwaukee (Oct. 11, 2021),
   https://urbanmilwaukee.com/2021/10/11/the-state-of-politics-the-legacy-of-
   concealed-carry-in-wisconsin/ (last visited July 12, 2023) ..................................23

Tex. Dep't of Pub. Safety, *Active License/Certified Instructor Counts as of Dec.
   31, 2020* (December 31, 2020) ...........................................................................21

Tex. Dep't of Pub. Safety, *Conviction Rates for Handgun License Holders,
   Reporting Period: 01/01/2020 – 12/31/2020* (Feb. 11, 2021).............................21

Wisc. Dep't of Just., *Department of Justice Concealed Carry Annual Report –
   175.60(19) – January 1 – December 31, 2022* ....................................................23

## INTEREST OF AMICI

Gun Owners of America ("GOA") is a nonprofit organization formed in 1976 by the late Sen. H.L. (Bill) Richardson to preserve and defend the Second Amendment rights of gun owners. GOA sees firearms ownership as an issue of freedom and works to defend that freedom through lobbying, litigation, and outreach. GOA has served as a party or amicus in Second Amendment challenges in almost every state in the nation to protect gun owner rights. GOA has also worked with members of Congress, state legislators, and local citizens to protect gun ranges and local gun clubs from closure.

The Second Amendment Law Center, Inc. ("2ALC") is a nonprofit corporation headquartered in Henderson, Nevada. 2ALC is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

Hawaii Rifle Association ("HRA") is a membership organization with the stated mission "[t]o protect [members'] Second Amendment Right to Keep and Bear Arms, and protect Hawaii's hunting and shooting traditions."

Founded in 1875, California Rifle & Pistol Association, Inc. ("CRPA") is a nonprofit organization that defends Second Amendment rights. In service of its mission to preserve the constitutional and statutory rights of gun ownership, CRPA regularly participates as a party or amicus in firearm-related litigation. CRPA has

1

been a party to or amicus in various Second Amendment challenges.

Gun Owners of California ("GOC") is a 501(c)(4) not-for-profit entity founded in 1975 to oppose infringements on Second Amendment rights. GOC is dedicated to the unequivocal defense of the Second Amendment and America's extraordinary heritage of firearm ownership. Its advocacy efforts regularly include the participation in Second Amendment litigation, having filed amicus briefs in numerous cases, including cases before the U.S. Supreme Court.

Gun Owners Foundation ("GOF") exists to educate the public about the importance of the Second Amendment and to provide legal, expert, and support assistance for law-abiding individuals involved in firearms-related cases. GOF is a 501(c)(3) charitable organization, incorporated in the Commonwealth of Virginia.

## INTRODUCTION

In enacting SB 1230, Hawaii has followed New York, New Jersey, and Maryland in adopting a radical plan designed to undermine the Supreme Court's *Bruen* ruling and the right to "bear" arms it confirmed. As the *Wolford* Plaintiffs convincingly argue, SB 1230 and other *Bruen*-response laws like it, "specifically target permit holders and restricts where individuals—who have met Hawaii's background check and training requirements—are allowed to carry." Pl's Mem. Supp. Mot. Temp. Restraining Order & Prelim. Inj. ("Mot") at 2.

With this brief, Amici hope to assist this Court by building on arguments made by Plaintiffs as to each location that SB 1230 designates as "sensitive," and proving further the absence of relevant historical analogues. Although the issue of supposed harm to Hawaii's interests is not relevant to success on the merits, it

relates to the factors the Court considers in granting injunctive relief. On that point, Amici will demonstrate that Americans with concealed handgun licenses ("CCW permits") commit crimes at rates far less than the general population, making them among the most law-abiding of any demographic. Thus, temporarily restraining or preliminarily enjoining enforcement of SB 1230 as Plaintiffs request will do no harm to Hawaii's interest in public safety.

## ARGUMENT

### I.   SECOND AMENDMENT HISTORICAL ANALYSIS REQUIRED BY *BRUEN*

Last year, the Supreme Court strongly reaffirmed the *Heller* test—"text as informed by history"—for analyzing Second Amendment challenges, applying that test to conclude that the Second Amendment protects the right to armed self-defense in public just as much as it does in the home. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127, 2134-35 (2022) ("*Bruen*"). The *Bruen* Court reiterated that courts may not apply a "means-ends" "interest-balancing" test akin to "intermediate scrutiny" in Second Amendment cases. *Id*. at 2129. Instead, courts must inspect the historical record of the ratification era and then conduct an analogical analysis to determine whether the modern-day restriction infringes on Second Amendment rights. *Id*. at 2129-30. The Court also clarified in crystal-clear language how a proper Second Amendment analysis is to be applied:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 2126.

*Bruen* made emphatically clear that, whenever "the Second Amendment's plain text covers an individual's conduct," the government shoulders the burden of justifying a restriction on the Second Amendment by proving that a longstanding American tradition supports that restriction. Lest there be any confusion, the Court explained the burden on the government repeatedly: "[T]he *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added); *see also id.* at 2127, 2130, 2149, n.25, 2150, 2156.

Even if there were *some* relevant history of a type of gun control law, it is not enough to meet the standard set by the Court when the proposed historical analogue is an outlier, or a law that was not what most states at the time embraced. The historical law must instead be a "well-established and representative historical analogue." *Id*. at 2133. Courts may not uphold a challenged law just because a few similar laws may be found in the past, because doing so "'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id*. (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). For example, in *Bruen*, New York presented, and the Court analyzed, three laws from the colonial era, three turn-of-the-18th-century laws, three 19th-century laws, and five late-19th-century regulations from the Western Territories. *Id*. at 2138-56. The Court held that all that history was not enough to uphold New York's Sullivan Act. The Court emphasized that, as in *Heller*, it will not stake its interpretation of the Second Amendment upon historical outliers that contradict the overwhelming weight of

4

other evidence about the right to bear arms in public for self-defense. *Id*. at 2153.

The Court also explained that late-19th-century evidence is relevant only if it provides confirmation of what had been established before. "'[P]ostratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text'." *Id*. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).[1] Twentieth century antecedents are even less relevant; the Court discussed such laws only in a brief footnote. *Id.* at 2154 n.28.

Particularly relevant here, the Attorney General's office argued to the legislature that, because Hawaii had restrictive gun laws in its history, the State's gun laws, including potentially SB 1230, meet *Bruen*'s historical tradition test. The argument fails because Hawaii did not become a territory of the United States until 1900, and it did not become a state until 1959. The laws in effect in Hawaii in 1791 or 1868 were not laws subject to the U.S. Constitution, and Hawaii may not rely on them to meet its burden to prove that SB 1230 is part of the "nation's historical tradition of firearm regulation." *See Bruen*, 142 Sup. Ct. at 2154-56 (explaining that the laws of the territories are not relevant historical evidence of this country's tradition of firearm laws). Moreover, Hawaii's entry into the Union was conditioned on its adoption of the U.S. Constitution, including the Second

---

[1] *See also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J. L. & Pub. Policy Per Curiam 31 (2022) ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791").

Amendment. Indeed, the Organic Act of 1900 repealed the laws of the Republic of Hawaii that were inconsistent with our constitution, including the Republic of Hawaii's Penal Laws sections 748-755, which required licensing for the possession and carry of firearms. United States Statutes At Large, 56 Cong. Ch. 339, April 30, 1900, 31 Stat. 141, section 7.

Finally, *Bruen*'s observation that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," 142 S. Ct. at 2132, to determining whether a law is consistent with historical tradition does not apply. This case is "fairly straightforward" because SB 1230 "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. And the Supreme Court made clear that the "lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. (emphasis added). Even if Hawaii considers people carrying firearms a "societal problem*," it is not a novel one*. So this Court should not adopt a "more nuanced approach" or allow Hawaii to justify its modern carry ban by resorting to analogical reasoning.

These parameters create what is, no doubt, an exacting test that is difficult for the Sate to meet. And it should, given that what is at stake is an enumerated constitutional right that expressly commands that it "shall not be infringed."

## II.     "SENSITIVE PLACES" MUST BE NARROWLY DEFINED UNDER *BRUEN*

As to special locations where the right to bear arms may be restricted, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited ...." *Bruen*,

6

142 S. Ct. at 2133. And it cautioned that:

> [E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly ... [it] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id*. at 2133-34. The Court also warned that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2118-19. Likewise, there is no basis for Hawaii to limit carry to just some streets and sidewalks, as well as a few private businesses that put up signs allowing carry.

"Sensitive places" restrictions are intended to be the *exception* to the rule that firearms must be permitted, as only "relatively few" sensitive places existed historically. *Id.* at 2133. According to the Court, aside from schools, the historical record essentially supports just three categories of places where legal firearm carry could be foreclosed: legislative assemblies, polling places, and courthouses. *Id*. (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-247 (2018). Beyond that, there are no well-represented examples that meet *Bruen*'s exacting test.[2]

Considering all this, it is clear that Hawaii engaged in no thoughtful *Bruen*

---

[2] District courts in New York and New Jersey have addressed near-identical questions as those presented here, after both states had passed similar laws in response to *Bruen*. *See Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022); *Christian v. Nigrelli*, No. 22-cv-695, 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov. 22, 2022); *Koons v. Platkin*, No. CV 22-7463, 2023 WL 3478604 (D.N.J. May 16, 2023).

analysis when considering and adopting SB 1230. The law bans carry in virtually every public place in the state except for some roads and sidewalks. But Hawaii's mere declaration that a place is "sensitive" does not make it so. As one judge has explained, "most places are 'sensitive' for someone. If a declaration were all that was required, … the government [would have] untrammeled power to restrict Second Amendment rights in any place even plausibly considered 'sensitive.'" *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1136-37 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part).

Hawaii's attempt to restrict firearm possession in so many places that Hawaiians visit every day illustrates well the concern Judge Tymkovich identified in *Bonidy*. And it flouts the Supreme Court's command that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Bruen*, 142 S. Ct. at 2134. As the Kopel & Greenlee article cited approvingly in *Bruen* explained:

> The government's behavior can demonstrate the true importance of the alleged government interest. Passing a statute declaring some place to be a 'gun free zone' does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a *courthouse, is protected by metal detectors and guards*, the government shows the seriousness of the government's belief that the building is sensitive . . . Conversely, *when the government provides no security at all*—such as in a Post Office or its parking lot—the government's behavior shows that the location is probably not sensitive….

Kopel & Greenlee, *supra*, at p. 292 (emphasis added).

## III. THE "SENSITIVE PLACES" CREATED BY SB 1230 HAVE NOT HISTORICALLY BEEN UNDERSTOOD TO BE "SENSITIVE PLACES," AND HAWAII CANNOT SIMPLY DECLARE THAT THEY ARE

Amici now turn to a discussion to some of the claimed "sensitive places" covered by SB 1230 for which Plaintiffs seek a temporary restraining order.[3]

### A. Parking Areas of Places Where Carry Is Restricted Under SB 1230

It should be beyond dispute that most parking areas are not "sensitive" areas, and Hawaii will be unable to provide any historical support for its inclusion of adjacent parking areas in several sections of SB 1230. In a 2015 dissent that has been vindicated in the post-*Bruen* era, Judge Tymkovich explained that "the presumption of lawfulness associated with sensitivity does not necessarily hold in the adjacent parking lot… [T]o the extent they exist at all, the unique characteristics supporting the regulation's validity within the post office are far weaker in the parking lot." *Bonidy*, 790 F.3d at 1129 (Tymkovich, J. concurring in part and dissenting in part). To be sure, a surrounding area could be sensitive, but that typically would not be the case as Judge Tymkovich explained:

> The White House lawn, although not a building, is just as sensitive as the White House itself. Consequently, the presumption of lawfulness for a regulation penalizing firearm possession there might approach the categorical. At the spectrum's other end[,] we might find a public park associated with no particular sensitive government interests—or a post

---

[3] Amici do not discuss banks, both because other cases have not discussed this topic and because Amici are aware of no historical restrictions on law-abiding people carrying in banks. Even today only two states partially restrict the practice. *See* Mich. Comp. Laws Serv. § 750.234d(1) (allowing concealed carry but not open carry); Neb. Rev. Stat. § 69-2441(a) (allowing open carry but not concealed carry). This does not include the recent *Bruen*-response bills from Hawaii, New York, New Jersey, and Maryland, which included banks among many other places, and are facing Second Amendment challenges. Before *Bruen*, however, no state fully banned carry in banks.

office parking lot surrounding a run-of-the-mill post office.
*Id*. at 1137. The parking lots Hawaii restricts are on the latter end of this spectrum.

### B. Government-owned Parking Lots

While Plaintiffs only sought temporary relief as to the parking areas of places where carry is restricted under SB 1230, Mot. 24, the law broadly restricts carry on *all* public property, including all government-owned parking lots. The same principles discussed above apply. Again, just because an area is "public property" does not necessarily make it a "sensitive area" where Second Amendment rights can be restricted, as several recent court decisions have held.

For instance, the Tennessee Court of Appeals ruled just last fall that tenants in public housing did not forfeit their Second Amendment rights. *Columbia Hous. & Redevel. Corp. v. Braden*, No. M2021-00329-COA-R3-CV, 2022 Tenn. App. LEXIS 395, *10 (Ct. App. Oct. 13, 2022). And the District of Idaho held, in *Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120, 1125 (D. Idaho 2014), that "[t]he regulation banning the use of handguns on Corps' property by law-abiding citizens for self-defense purposes violates the Second Amendment...." The *Antonyuk* court ruled that New York may not ban public carry of firearms on various types of public property, including public parks and buses. 2022 U.S. Dist. LEXIS 201944 at *190-192, 197-203. And the *Koons* court held the same when referring to government-owned property:

> [T]he Second Amendment cases that the State cites do not support the sweeping proposition that carrying for self-defense in public does not extend to any location in which the government owns the land. In each of the cases cited, the courts found that the government property was integrally connected to a government building that it regarded as a "sensitive place" where

10

prohibition on carrying firearms is presumptively lawful. 2023 WL 3478604, at *54.

Nor does the government being the proprietor change the analysis. "While it is certainly true that 'the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers .... [just] as a private individual' may, [citations omitted], the State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property." *Id.* at *51; *see also United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business[.]")

Indeed, there is a crucial distinction between the Supreme Court's discussion of *government buildings* and SB 1230's prohibition of carrying on *any government property*. As Judge Tymkovich rightly observed, "a prohibition's presumption of lawfulness depends on the nature of the government property at issue." *Koons*, 2023 WL 3478604, at *55 (referencing concurrence in *Bonidy*, 790 F.3d 1121, 1135). Even if Hawaii can restrict firearm carry in certain government buildings where official business is conducted (like the "legislative assemblies" found to have a historical analogue in *Heller* and *Bruen*), that rule does not apply to all public property—and certainly not to mere parking lots.

## C.   Parks and Beaches

As other courts have found, there is little historical support for barring carry in parks, and beaches are not distinct from parks in any relevant way. In *Antonyuk*,

11

for example, New York presented a handful of local laws that barred guns in city parks, but the court explained that "even if the number and geographical origins of these city laws … were sufficient to constitute a tradition that was *established*, they do not constitute a tradition that was *representative* of the Nation…." 2022 WL 16744700, at *67. And the court noted how even that small degree of historical support vanishes when applied to parks outside of cities: "at most, the city laws support a historical tradition of banning firearms in public parks *in* a city (where the population density is generally higher), not public parks *outside of* a city (where people are generally free to roam over vast expanses of mountains, lakes, streams, flora and fauna)." *Id*. at *66.

In examining New Jersey's similar law, the *Koons* court concluded that "the State has failed to come forward with any laws from the 18th century that prohibited firearms in areas that today would be considered parks. Consistent with the *Koons* [p]laintiffs' findings, this [c]ourt has only uncovered colonial laws that prohibited discharging firearms in areas that were the forerunners of today's public park." *Koons*, 2023 WL 3478604, at *83. As to the late-19th century laws that New Jersey cited, they were not "representative of the entire nation. By 1890, those laws—one state law and about 25 local ordinances—governed less than 10% of the nation's entire population and thus are unrepresentative." *Id.* at *85.

Amici know of only one case that has arrived at the opposite conclusion, which it reached by ignoring *Bruen*'s commands. *See Md. Shall Issue, Inc., v. Montgomery County*, No. CV TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023). The court there cited almost exclusively local historical regulations to

12

uphold a ban on carrying in parks, even though *Bruen* contemplated an "enduring American tradition of *state* regulation." *Bruen*, 142 S. Ct. at 2155 (emphasis added). As the court in *Antonyuk* discussed, these local ordinances were clearly not representative of the nation.

Moreover, the *Maryland Shall Issue* court cited just two laws of any kind from around the time of the ratification of the 14th Amendment, *Md. Shall Issue*, 2023 WL 4373260, at *11, and none from the most relevant founding-era period. Even if the court were to disregard that there were no founding-era laws cited and focus just on the 19th century, *Bruen* was clear that relying on even two state laws would not be enough. 142 S. Ct. at 2153. Only one law from the reconstruction era relied on in *Maryland Shall Issue* was a state law, and even that 1870 Pennsylvania law only applied to Fairmount Park, not all parks in the state. The earliest state law that banned carry within state parks generally that the *Maryland Shall Issue* court cited did not arrive until 1905 in Minnesota. There is simply no historical tradition of state regulation barring carry in parks, even though parks existed in our history.

Perhaps realizing this obvious deficiency in the historical record, the district court instead relied on a series of mostly local laws from the 1890s and the early 20th century. *Md. Shall Issue*, 2023 WL 4373260, at *11. But the Supreme Court did not "endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring). And it did not bother with 20th-century history at all because, "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the

13

meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28. Here, the handful of late-in-time laws and ordinances contradict the history of generally allowing carry in parks.

Finally, many laws and ordinances the *Maryland Shall Issue* court relied on were regulations enacted to protect wildlife and stop poaching, not to stop gun-related violence. Faced with yet another point that undermined the government's position, the court invented a rule that, when there is a clear historical example of a very similar regulation, "how and why" that regulation was enacted is not relevant. *Md. Shall Issue*, 2023 WL 4373260, at *11. On the contrary, what the Supreme Court said was that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing *that problem* is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131 (emphasis added). If the historical law presented did not address "that problem" but some other unrelated problem, it is neither distinctly similar nor analogous. The *Maryland Shall Issue* court did not conduct a proper *Bruen* analysis, and hopefully will be corrected on appeal.

SB 1230 fails on its ban on carrying in parks and beaches for the same reasons the New York and New Jersey laws did. Amici doubt that Hawaii will unearth any well-established and representative analogues not already found by the other courts that examined this issue.

### D.    Restaurants That Serve Alcohol

If Hawaii had chosen merely to ban carrying while intoxicated in public, it

might have found some support in certain historical laws, though none from the founding era. *See, e.g.*, *United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138, at *7 (W.D. Okla. Feb. 3, 2023) (discussing mid-to-late 19th-century prohibitions on carrying a firearm while intoxicated). But under SB 1230, even one who *never* drinks would still be prohibited from taking their family out to dinner (while carrying) to a restaurant that also happens to serve beer and wine. There is no historical basis for such a prohibition.

The *Antonyuk* court said of New York's similar law that it "did not criminalize becoming intoxicated while carrying a firearm. It criminalized a license holder's *mere presence* at an establishment licensed for the on-premises consumption of alcohol while carrying concealed— regardless of whether he or she is consuming alcohol there." 2022 WL 16744700, at *72. "Simply stated, the burdensomeness of this regulation is unreasonably disproportionate to the burdensomeness of its relevant historical analogues." *Id.*

For its part, New Jersey relied on a historical law barring the possession of pistols by intoxicated persons, 1867 Kan. Sess. Laws 25, and a law barring the sale of alcohol near a military encampment. 1859 Conn. Pub. Acts, ch. LXXXII, § 5, p. 62. Neither affected the carry rights of people who were not intoxicated. New Jersey also cited a lone law from the Oklahoma territory that banned firearms from places where liquor is sold, but the *Koons* court rightly noted that the law was an outlier, concluding that "the State has not shown that well-established and representative historical firearm laws support Chapter 131's handgun ban at bars and restaurants that serve alcohol." 2023 WL 3478604, at *86. SB 1230 fails on

this point for the same reasons.

E.     Hawaii's "Vampire Rule"

Perhaps the most extreme aspect of SB 1230 is H.R.S. §134-E which proscribes carrying "on the private property of another person without authorization." This prohibition applies to all private property, including all businesses open to the public. Often called the "vampire rule," because the law requires that people with carry permits be invited in like mythological vampires, the requirement flips the traditional rule for private property on its head—especially as to businesses that serve the public.

 Usually, a private property owner who wants to exclude certain people must post signs letting the public know who or what actions are *prohibited*. While some spaces are so obviously private that there need not be signage to announce they exclude people, such as fenced-off private property, that does not apply to places of business open to the public because they are "by positive law and social convention, presumed accessible to members of the public unless the owner manifests his intention to exclude them." *Oliver v. United States*, 466 U.S. 170, 193 (1984) (Marshall, J., dissenting).

Moreover, while *businesses* open to the public have a broad right to exclude people from their establishments, *Carrillo v. Penn Nat'l Gaming, Inc*., 172 F. Supp. 3d 1204, 1217 (D.N.M. 2016), under SB 1230 the *State* decides who to exclude, unless the business owner publicly states otherwise. This is something that would never be acceptable in the First Amendment context. *See, e.g*., *Project 80s v. Pocatello*, 942 F.2d 635, 639 (9th Cir. 1991) ("Under the Idaho Falls and

16

Pocatello ordinances, residents who wish to receive uninvited door-to-door solicitors must post a 'Solicitors Welcome' sign. The government's imposition of affirmative obligations on the residents' first amendment rights to receive speech is not permissible").

The few historical examples of anti-poaching laws requiring permission before carrying a gun onto private property did not deal with places of business accessible to the public. For example, a 1721 Pennsylvania statute provided that "if any person or persons shall presume ... to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation ... he shall for every such offense forfeit the sum of ten shillings." James T. Mitchell et al., *Statutes at Large of Pennsylvania from 1682 to 1801*, vol III, p. 254 (1896). Such a restriction on enclosed private lands where unauthorized hunting could be conducted is obviously not analogous to a modern coffee shop or grocery store. And Amici know of no relevant historical examples of laws that generally barred carrying in all businesses open to the public unless the person carrying a firearm received permission from the owner first.

All three district courts to examine this question have agreed with Amici. *Antonyuk*, 2022 WL 16744700, at *79 ("Section 5's imposition of a state-wide restriction on concealed carry on all private property that is *open for business to the public* finds little historical precedent.") (emphasis added); *Christian*, 2022 WL 17100631, at *9 ("The State also argues that private property owners have always had the right to exclude others from their property and, as such, may exclude those

17

carrying concealed handguns…. But that right has always been one *belonging to the private property owner*—not to the State.") (emphasis added); *Koons*, 2023 WL 3478604, at *67 ("In contrast, the Default Rule is designed to exclude firearms from all private property in New Jersey, for whatever reason and regardless of the nature of the land at issue…. The colonial hunting laws and the Default Rule are differently situated; they do not impose a comparable burden ….") In short, if private businesses choose to post signs telling people with CCW permits they are not welcome, they may do so. But that is based on property principles, not because the business is a sensitive place. What Hawaii cannot do is preemptively declare all private businesses to be sensitive places, unless the proprietors post signs saying otherwise.

In addition, there are serious compelled speech issues here, as Plaintiff Kasprzycki argues. Mot. 19. The State knows that posting a "guns allowed" sign would be a politically charged action for a business to take in Hawaii. It can be expected that most businesses would choose not to do so out of fear of customer backlash, even if they have no objection to customers carrying concealed. Freedom of thought and expression "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714 (1977). And just because business owners could be motivated to oppose putting up a sign in part out of fear of lost profits, that does not make it any less unacceptable for the State to compel speech. Indeed, the Supreme Court "has repeatedly rejected the notion that a speaker's profit motive gives the government a freer hand in compelling speech." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138

18

S. Ct. 1719, 1745 (2018).

Even if businesses owners did not fear customer backlash, they may not want to put up signs because to do so makes them players in an unconstitutional anti-gun scheme. In discussing New York's similar provision, the *Antonyuk* court observed that the law "appears to compel [p]laintiffs' speech another way: by *coercing* them, as busy store owners, to conspicuously speak the state's controversial message." 2022 WL 16744700, at *83 (emphasis added). So too here.

Putting up such signs concedes the State's unconstitutional scheme, and business owners have a right not to "be an instrument for fostering public adherence" to points of view they find unacceptable. *Wooley*, 430 U.S. at 715. Just last month, the Supreme Court affirmed that the First Amendment guards against compelled speech, explaining that it does not matter "whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative LLC v. Elenis*, No. 21-476, 2023 WL 4277208, at *8 (U.S. June 30, 2023).

Nor would a disclaimer solve the problem. The Supreme Court has decided that question too: "The Colorado Court of Appeals also erred by suggesting that Phillips could simply post a disclaimer, disassociating Masterpiece from any support for same-sex marriage. Again, this argument would justify any law compelling speech. And again, this Court has rejected it." *Masterpiece Cakeshop*, 138 S. Ct. at 1745. The government may not "require speakers to affirm in one breath that which they deny in the next." *Pac. Gas & Elec. Co. v. Pub. Utils. Com*.,

19

475 U.S. 1, 16 (1986).

The vampire rule—perhaps more than any other component of SB 1230—is a serious affront to the *Bruen* Court's conclusion that there are "relatively few" places where the historical record supports prohibiting carry. 142 S. Ct. at 2133.

## III.    AMERICANS WITH CCW PERMITS ARE OVERWHELMINGLY LAW-ABIDING

The Supreme Court has repeatedly banned interest-balancing analyses in Second Amendment cases. *Bruen*, 142 S. Ct. at 2127. That said, at the temporary restraining order stage, one of the factors for courts to consider is the balance of hardships between the parties. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011). Unlike Plaintiffs, who would have their right to carry eviscerated because they could effectively carry almost nowhere, Hawaii will face no hardship whatsoever. Indeed, neither the legislature nor the Governor cited any evidence that *people with CCW permits* are causing a significant amount of gun-related crime. They did not because they could not; no such evidence exists.

That is because Americans with CCW permits are an extremely law-abiding demographic. When California tried to pass SB 918, a law much like SB 1230, the California State Sheriffs Association opposed the bill largely because people with CCW permits seldom commit crime, and they do not generally pose a problem to law enforcement. The Association stated in a letter to the California State Assembly that SB 918 "greatly restricts when and where licensees may carry concealed and could severely restrict the exercising of [the right to bear arms]…*individuals who go through the process to carry concealed legally are exceedingly unlikely to violate the law*, yet SB 918 turns much of the state into 'no-

20

carry' zones that will do nothing to foster public safety." Floor Alert from Cal.

State Sheriff's Ass'n to All Members of the Cal. State Assemb. (Aug. 29, 2022),

https://tinyurl.com/calstatesheriffsopposeSB918 (emphasis added). California is

trying to pass a bill much like SB 1230 again this year, and it is opposed by many

law enforcement organizations for the same reasons. Assemb. Comm. on Pub.

Safety, Bill Analysis, S. 2, 2023-2024 Reg. Sess. (Cal. June 26, 2023),

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=20232024

0SB2 (select 06/26/23 – Assembly Public Safety).

      The evidence from other states that maintain data on crimes committed by

CCW permit holders also establishes that people with CCW permits are

overwhelmingly peaceable and law-abiding. For example, in 2020 (before it

enacted constitutional carry) Texas had 1,626,242 active conceal carry weapon

license holders.[4] CCW permit holders thus made up about 5.7% of the state

population in 2022. But according to the Texas Department of Public Safety, they

made up just 114 of the state's 26,304 convictions.[5] That is just 0.4334% of the

state's serious crimes. Even among those few convictions, most involved no gun at

all. Of the ones that did, permit holders were responsible for an even smaller

percentage. For example, there were 1,441 convictions for aggravated assault with

---

[4] Tex. Dep't of Pub. Safety, *Active License/Certified Instructor Counts as of Dec. 31, 2020*, at 1 (December 31, 2020), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf.

[5] Tex. Dep't of Pub. Safety, *Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, at 5 (Feb. 11, 2021), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictionratesreport2020.pdf.

a deadly weapon in 2020, but people with a valid CCW permit committed just 4 of those—or 0.2776% of the total, again far below their 5.7% share of the population.

The state of Florida confirms this pattern as well. Indeed, as of June 2023, the state had issued 5,795,150 concealed weapon licenses since October 1, 1987. Of those, 2,593,004 are active.[6] In that 26-year timespan, only 18,435 permits have been revoked without being reinstated, or roughly 0.3% of the total issued. *Id.*

The modern right-to-carry movement gathered steam in Florida, though a handful of states had liberal permit-issuance policies before then. The state's enactment of "shall-issue" permitting was met with predictions of wild-west style violence and "blood in the streets," but none of that happened. At least one prominent opponent of the law admitted his error: Representative Ronald A. Silver stated in 1990 that "[t]here are lots of people, including myself, who thought things would be a lot worse as far as that particular situation [carry reform] is concerned. I'm happy to say they're not." Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 692-93 (1995). John Fuller, General Counsel for the Florida Sheriffs Associated, added: "I haven't seen where we have had any instance of persons with permits causing violent crimes, and I'm constantly on the lookout." *Id*. The Metro Dade Police Department originally kept detailed records of every incident involving concealed weapon licensees from enactment of the law in 1987 until August 31, 1992. *They stopped doing so because the rarity of such incidents made the effort a*

---

[6] Fl. Dep't of Agric. & Consumer Servs., Div. of Lic., *Concealed Weapon or Firearm License Summary Report Oct. 1, 1987- Jun. 30, 2023*, at 1 (June 30, 2023), https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf

*waste of time*. *Id.*

Wisconsin has similar data. In 2022, the state issued 38,326 new permits, and 60,838 renewals.[7] While Wisconsin does not appear to consistently report the number of active permits, as of 2021, 458,630 total permits had been issued.[8] According to the 2022 report, 1,334 licenses were revoked. Wisc. Dep't of Just., *supra* n.7, at 3. Of those, 463 were revoked because the permit holder was no longer a Wisconsin resident, while another 332 were revoked because the permit holder was found to have unlawfully used a controlled substance like marijuana (but committed no other crime). *Id.* The remaining 539 were a mix of misdemeanor and felony crimes, involuntary commitments, and more. *Id.* It is unclear how many of the 539 were revoked because the holder had used a firearm in furtherance of a crime—the relevant concern when it comes to fears that people will use legally carried firearm to commit a crime. In any event, what *is* clear is that 539 is just 0.12% of 458,630. Wisconsinites with CCW permits rarely commit violent crimes of any kind.

Turning to Illinois, in 2020, the Chicago Tribune reported on all known uses of a gun (shootings or threats) by the 315,000 people in the state with CCW

---

[7] Amici arrived at these numbers by subtracting the number of new or renewal applications "denied" from the number of new or renewal applications "accepted." For instance, the state accepted 40,306 new applications, of which 1,980 were denied, for a total of 38,326 new applications approved and new permits issued. Wisc. Dep't of Just., *Department of Justice Concealed Carry Annual Report – 175.60(19) – January 1 – December 31, 2022*, at 1-2 https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf (last visited Jul 12, 2023).

[8] Steven Walters, *The Legacy of Concealed Carry in Wisconsin*, Urban Milwaukee (Oct. 11, 2021), https://urbanmilwaukee.com/2021/10/11/the-state-of-politics-the-legacy-of-concealed-carry-in-wisconsin/ (last visited July 12, 2023).

permits.[9] The Tribune found just 71 incidents between 2014 and 2020. Many incidents listed were not crimes, but legitimate self-defense. For instance, one of the entries in the article reads:

> Elvis Garcia, 39, was talking outside with neighbors ages 20 and 27. Two men drove up and started shooting at them; all three were hit. Garcia, a CCL holder, returned fire, killing Michael Portis, 17. Both Garcia and Portis died from their wounds. The second man who fired at the three neighbors later was arrested.

But even if all 71 incidents were crimes, that would come out to CCW permit holders in Illinois having a 0.02% chance of committing a crime using a gun at any point in the six-year period the Tribune examined.

Minnesota goes a step further and identifies not just the infrequent crimes committed by permit holders, but also the proportion of crimes involving firearms. According to the Department of Public Safety, the state had 387,013 valid carry permits in 2021—*and only 40 permits were revoked that year*.[10] In addition, 3,863 crimes were committed by people with carry permits. Press Release, *supra* n.10. This sounds much larger than Texas or Florida, but that is because Minnesota greatly expands the definition of what constitutes a "crime." Indeed, of those 3,863 crimes, more than 60% were DWIs or other traffic offenses. *Id.* Just over 2% of the crimes—or about 80 of them—were crimes where a firearm was used to further the

---

[9] Katherine Rosenberg-Douglas, *Explore: Shootings by CCL Holders in Illinois Since Concealed Carry Law Went Into Effect in 2014*, Chic. Trib. (Mar. 1, 2020), https://www.chicagotribune.com/news/breaking/ct-viz-illinois-ccl-shootings-tracker-20200227-ww4ldqwdjrd2ze63w3vzewioiy-htmlstory.html (last visited July 12, 2023).

[10] Press Release, *BCA Releases 2021 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies* (Mar. 1, 2022), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-Permit-to-Carry-Annual-Report.aspx.

crime. *Id.* In other words, in Minnesota, only about 0.02% of people with carry permits used a firearm in furtherance of a crime in 2021.

There are probably other states with similar data, but these five examples, along with the California State Sheriffs Association's letter opposing the failed SB 918, make the point: Even if Hawaii could use "public safety" as a reason to curtail the right to carry in places that are not truly sensitive (and it cannot because *Bruen* forbids such interest balancing), people with carry permits are dramatically more law-abiding than the population as a whole and are thus very unlikely to pose a criminal threat. The criminals Hawaii must worry about are already carrying illegally, and they do not bother to obtain permits. With SB 1230, the State is punishing the law-abiding for going through a long legal process to exercise a constitutional right.

## CONCLUSION

For these reasons and those discussed in Plaintiffs' moving papers, this Court should grant Plaintiffs' requested restraining order.

Dated: July 14, 2023                    Respectfully submitted,

*/s/C.D. Michel*
James Hochberg (HI Bar No. 3686)
ATTORNEY AT LAW, LLLC
Email: jim@jameshochberglaw.com

C.D. Michel (pro hac vice)
Konstadinos T. Moros (pro hac vice)
MICHEL & ASSOCIATES, P.C.
Email: cmichel@michellawyers.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of Local Rule

7.4(a) because it contains less than 25 pages.

2.      This brief complies with the typeface requirements of Local Rule 10.2

because it has been prepared in 14-point, double-spaced Times New Roman plain

style, except for those parts exempted by LR 10.2(a)(2) and (4).


Dated: July 14, 2023                          */s/C.D. Michel*
                                              James Hochberg (HI Bar No. 3686)
                                              ATTORNEY AT LAW, LLLC
                                              Email: jim@jameshochberglaw.com

                                              C.D. Michel (pro hac vice)
                                              Konstadinos T. Moros (pro hac vice)
                                              MICHEL & ASSOCIATES, P.C.
                                              Email: cmichel@michellawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date first stated below, and in compliance with the rules of this Court, I did serve a true and exact copy of the following documents:

**AMICUS BRIEF OF GUN OWNERS OF AMERICA, INC., SECOND AMENDMENT LAW CENTER, HAWAII RIFLE ASSOCIATION, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, GUN OWNERS OF CALIFORNIA, AND GUN OWNERS FOUNDATION IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

via this Court's electronic filing system and in accordance with the Rules of this Court upon all participants in this case who are registered CM/ECF users, and will be served by the CM/ECF system pursuant to Fed. R. Civ. P. 5(b)(2)(E).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: July 14, 2023

*/s/C.D. Michel*
James Hochberg (HI Bar No. 3686)
ATTORNEY AT LAW, LLLC
Email: jim@jameshochberglaw.com

C.D. Michel (pro hac vice)
Konstadinos T. Moros (pro hac vice)
MICHEL & ASSOCIATES, P.C.
Email: cmichel@michellawyers.com