ANNE E. LOPEZ (7609)
  Attorney General of the State of Hawaiʻi
KALIKOʻONĀLANI D. FERNANDES (9964)
  Solicitor General
NICHOLAS M. MCLEAN (10676)
  First Deputy Solicitor General
Department of the Attorney General
  State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Tel.: (808) 586-1360
Email: kaliko.d.fernandes@hawaii.gov

NEAL K. KATYAL*
DANA A. RAPHAEL*
  Special Deputy Attorneys General
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel.: (202) 637-5600
Email: neal.katyal@hoganlovells.com

MARY B. MCCORD*
RUPA BHATTACHARYYA*
  Special Deputy Attorneys General
Institute for Constitutional
  Advocacy & Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
Tel.: (202) 661-6607
Email: mbm7@georgetown.edu
*Pro Hac Vice Motion Pending

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as
the Attorney General of the State of Hawaiʻi

(Additional Counsel on Next Page)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, <br><br> Plaintiffs, <br><br> v. | Civil No. 1:23-cv-00265-LEK-WRP <br><br> **DEFENDANT ANNE E. LOPEZ'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER (ECF NO. 7); DECLARATION OF NICHOLAS M. MCLEAN; DECLARATION OF SAUL CORNELL; DECLARATION** |

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i; MAUI COUNTY,

Defendants.

**OF BRENNAN RIVAS; DECLARATION OF TERENCE YOUNG; DECLARATION OF PATRICK MCCALL; DECLARATION OF LAURA H. THIELEN; EXHIBITS; CERTIFICATE OF SERVICE**

<u>District Judge</u>:
Hon. Leslie E. Kobayashi

<u>Magistrate Judge</u>:
Hon. Wes Reber Porter

<u>TRO Hearing</u>:
July 28, 2023 at 10:30 AM

## ADDITIONAL COUNSEL

BEN GIFFORD*
  Special Deputy Attorney General
Institute for Constitutional
  Advocacy & Protection
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
Tel.: (202) 662-9835
Email: bg720@georgetown.edu

*Pro Hac Vice Motion Pending

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................1

II.  LEGAL STANDARD ............................................................................2

III. ARGUMENT..........................................................................................3

    A.   PLAINTIFFS' CLAIMS ARE UNLIKELY TO SUCCEED ...............3

        1.   Hawaiʻi's sensitive-place restrictions are
            constitutional. ..............................................................................3

            a.   Bars and restaurants serving alcohol ...............................7

            b.   Public parks and beaches.................................................10

            c.   Banks and financial institutions......................................16

            d.   Parking lots adjacent to government buildings ..............18

        2.   The private property default rule is constitutional....................18

        3.   Plaintiffs' facial challenge cannot succeed..............................23

    B.   PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM ................24

    C.   THE BALANCE OF THE EQUITIES AND PUBLIC
        INTEREST STRONGLY WEIGH AGAINST ISSUING A
        TRO ....................................................................................................25

IV. CONCLUSION.........................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aholelei v. DPS*,
   488 F.3d 1144 (9th Cir. 2007) ................................................................23

*Altman v. Cnty. of Santa Clara*,
   No. 20-cv-02180 (N.D. Cal. Apr. 10, 2020) .......................................24

*Andrews v. State*,
   50 Tenn. 165 (1871) ..............................................................................18

*Application of Ashford*,
   50 Haw. 314, 440 P.2d 76 (1968) .........................................................11

*Application of Sanborn*,
   57 Haw. 585, 562 P.2d 771 (1977) .......................................................11

*Bauer v. Becerra*,
   858 F.3d 1216 (9th Cir. 2017) ................................................................8

*Blum v. Yaretsky*,
   457 U.S. 991 (1982) ..............................................................................20

*Bonidy v. U.S. Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) .................................................... 11, 18

*California Rifle & Pistol Ass'n, Inc. v. City of Glendale*,
   No. 2:22-cv-07346-SB-JC, 2022 WL 18142541 (C.D. Cal. Dec. 5, 2022).........23

*Cedar Point Nursery v. Hassid*,
   141 S. Ct. 2063 (2021) ..........................................................................20

*Dahl v. Swift Distrib., Inc.*,
   No. 10-cv-00551 SJO (RZx), 2010 WL 1458957 (C.D. Cal. Apr. 1, 2010) .......24

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) .................................................................... 6, 8, 18

*Frey v. Nigrelli*,
   No. 21-cv-05334 (NSR), 2023 WL 2473375
   (S.D.N.Y. Mar. 13, 2023) ........................................................ 5, 17, 19

*GeorgiaCarry.Org, Inc. v. Georgia*,
   687 F.3d 1244 (11th Cir. 2012) ................................................................... 19, 20

*Goldstein v. Hochul*,
   No. 22-cv-8300 (VSB), 2023 WL 4236164 (S.D.N.Y. June 28, 2023) ...............5

*Grandinetti v. Alexander*,
   No. 16-cv-00480 LEK-KSC, 2017 WL 4855390 (D. Haw. Oct. 26, 2017).........2

*Hill v. State*,
   53 Ga. 472 (1874) ...............................................................................................18

*Jarvis v. JP Morgan Chase Bank, N.A.*,
   No. 10-cv-4184-GHK (FMOx), 2010 WL 2927276
   (C.D. Cal. July 23, 2010) ....................................................................................14

*Koons v. Platkin*,
   No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023) ..... 22, 23

*Mahoney v. Sessions*,
   871 F.3d 873 (9th Cir. 2017).............................................................................11

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
   No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023).................... passim

*McCormack v. Hiedeman*,
   694 F.3d 1004 (9th Cir. 2012) ..........................................................................23

*New York State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) .............................................................................. passim

*NIFLA v. Becerra*,
   138 S. Ct. 2361 (2018) .......................................................................................22

*Nordyke v. King*,
   681 F.3d 1041 (9th Cir. 2012) ..........................................................................11

*NRA v. Bondi*,
   61 F.4th 1317 (11th Cir. 2023) ...........................................................................5

*NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
   700 F.3d 185 (5th Cir. 2012)...............................................................................8

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
   762 F.2d 1374 (9th Cir. 1985) ...............................................................24

*Or. Firearms Fed'n, Inc. v. Brown*,
   No. 2:22-cv-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ...................24

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) .............................................................................22

*Safari Club Int'l v. Bonta*,
   No. 2:22-cv-01395-DAD-JDP, 2023 WL 184942 (E.D. Cal. Jan. 12, 2023)........2

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976)................................................................................7

*State v. Spencer*,
   876 P.2d 939 (Wash. App. 1994)..........................................................25

*Tracy Rifle & Pistol LLC v. Harris*,
   118 F. Supp. 3d 1182 (E.D. Cal. 2015).................................................25

*UnifySCC v. Cody*,
   No. 22-cv-01019-BLF, 2022 WL 686310 (N.D. Cal. Mar. 8, 2022) .................24

*United States v. Alaniz*,
   69 F.4th 1124 (9th Cir. 2023) ..............................................................4

*United States v. Bena*,
   664 F.3d 1180 (8th Cir. 2011) ..............................................................8

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ................................................... 7, 11, 18

*United States v. Focia*,
   869 F.3d 1269 (11th Cir. 2017) ............................................................8

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010)....................................................................8

*United States v. Masciandaro*,
   648 F. Supp. 2d 779 (E.D. Va. 2009) ......................................... 12, 18

*United States v. Reyna*,
    No. 3:21-cr-41 RLM-MGG, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022).......3

*United States v. Tallion*,
    No. 8:22-po-01758-AAQ, 2022 WL 17619254 (D. Md. Dec. 13, 2022)..............3

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ...............................................................................................2

*Zaitzeff v. City of Seattle*,
    484 P.3d 470 (Wash. App. 2021).......................................................................12

**Statutes**

HRS § 134-A...............................................................................................................7, 16

HRS § 134-E ............................................................................................................. 16, 21

HRS § 184-5...............................................................................................................10

**Rules**

FRE 201(b)...............................................................................................................14

HAR § 13-146-19.......................................................................................................10

HAR § 13-146-41.......................................................................................................10

HAR § 3-111-12.........................................................................................................24

HAR § 3-111-3...........................................................................................................24

**Other Authorities**

About PALS for Parents Program,
    https://www.mauicounty.gov/DocumentCenter/View/139258/ABOUT
    -PALS-for-Parents...........................................................................................12

County of Maui, Parks & Recreation Webpage,
    https://www.mauicounty.gov/119/Parks-Recreation ...........................................12

Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural
    Place*, Smithsonian Mag.,
    https://www.smithsonianmag.com/history/inventing-beach-unnatural-
    history-natural-place-180959538 (June 23, 2016)................................................13

Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459 (2019) ...................................................................7

Dep't of Bus., Econ. Dev. & Tourism, Rsch. & Econ. Analysis Div*., U.S. Visitors Continued Surpassing 2019 Level in May* (June 29, 2023), https://www.hawaiitourismauthority.org/media/11194/may-2023-visitor-statistics-6-28-2023-final.pdf...........................................................14

Haunani H. Kane et al., *Vulnerability Assessment of Hawaiʻi's Cultural Assets Attributable to Erosion Using Shoreline Trend Analysis Techniques*, 28 J. Coastal Rsch. 533 (2012) .......................................................12

James Mak, *Developing a Dream Destination: Tourism and Tourism Policy Planning in Hawaiʻi* 13 (2008)....................................................13

John Davenport & Julia L. Davenport, *The Impact of Tourism and Personal Leisure Transport on Coastal Environments: A Review*, 67 Estuarine, Coastal & Shelf Sci. 280 (2006) ........................................................13

State of Hawaiʻi, Dep't of Bus., Econ. Dev. & Tourism, *Visitor Satisfaction Study Q1 2023*, 32-33, https://www.hawaiitourismauthority.org/media/11034/q1_2023_hta_v sat_final.pdf.................................................................13

State of Hawaiʻi, *Fact Sheet: Benefits of Hawaiʻi's Tourism Economy*, https://www.hawaiitourismauthority.org/media/11158/tourism-econ-impact-fact-sheet-may-2023.pdf.........................................................13

Statement of Chris J. Sadayasu, Director of Department of Business, Economic Development, and Tourism before the House Committee on Finance, in consideration of SB 1230, https://www.capitol.hawaii.gov/sessions/session2023/Testimony/SB1 230_HD1_TESTIMONY_FIN_04-05-23_.PDF .................................................16

## I.   <u>INTRODUCTION</u>

To address the dangers of firearms and gun violence, the Hawaiʻi

Legislature recently passed Act 52—a crucial public safety measure that, among

other things, designates certain locations as sensitive places where guns may not be

carried. Plaintiffs[1] challenge four sensitive-place provisions: restrictions on

carrying guns in (1) bars and restaurants serving alcohol, (2) public parks and

beaches, (3) banks, and (4) parking lots adjacent to government buildings.[2]

Plaintiffs also challenge Act 52's requirement that individuals not carry firearms

on others' private property without authorization—a rule that honors people's right

to decide for themselves whether guns may be carried on their property.

Plaintiffs ask this Court to issue a TRO enjoining these provisions on an

emergency basis,[3] but fail to establish their entitlement to the extraordinary relief

they seek. Indeed, Plaintiffs cannot establish *any* of the preconditions for injunctive

relief: They have no likelihood of success on the merits, will suffer no irreparable

---

[1] Plaintiffs are three Maui residents and an organization, the Hawaii Firearms Coalition ("Plaintiffs"). *See* ECF No. 1 ("Complaint") ¶¶ 1-4.

[2] HRS § 134-A(a)(4) (bars/restaurants); HRS § 134-A(a)(9) (parks/beaches); HRS § 134-A(a)(12) (banks/financial institutions); HRS § 134-A(a)(1) ("parking areas" "adjacent" to government buildings); Declaration of Nicholas M. McLean Ex. 1 (copy of Act 52). Except where otherwise indicated, references to "Ex." are to the exhibits attached to the McLean Declaration.

[3] This memo addresses Plaintiffs' motion for a TRO only. The parties will further develop the record and brief the request for a preliminary injunction separately.

harm, and the balance of the equities and public interest overwhelmingly favor denying their request, not granting it.

## II.   <u>LEGAL STANDARD</u>

For a court to grant a TRO, "the moving party must demonstrate that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Grandinetti v. Alexander*, No. 16-cv-00480 LEK-KSC, 2017 WL 4855390, at *1 (D. Haw. Oct. 26, 2017) (cleaned up).[4] This "extraordinary remedy . . . may only be awarded upon a clear showing that the plaintiff is entitled to such relief," and is "never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 24 (2008). And where, as here, the interim relief sought "is identical to the ultimate relief sought . . . courts generally disfavor the granting of injunctive relief." *Safari Club Int'l v. Bonta*, No. 2:22-cv-01395-DAD-JDP, 2023 WL 184942, at *21 (E.D. Cal. Jan. 12, 2023).

---

[4] "If a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a [TRO] may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1099 (D. Haw. 2015) (cleaned up).

III.   **ARGUMENT**

A.   **PLAINTIFFS' CLAIMS ARE UNLIKELY TO SUCCEED**

1.   **Hawaiʻi's sensitive-place restrictions are constitutional.**

Tested against the framework the Supreme Court has established for Second Amendment claims, Plaintiffs are unlikely to prevail. Under *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), a plaintiff challenging a gun regulation must first establish that "the Second Amendment's plain text covers [his] conduct." *Id.* at 2126. It is not enough for Plaintiffs to simply say they wish to carry firearms for self-defense, *see* TRO Mot. 6-7; they must meet their textual burden as to their *specific* course of conduct—here, carrying firearms into each of the particular types of locations they cite. *See, e.g.*, *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 WL 17619254, at *5 (D. Md. Dec. 13, 2022) ("[T]he question is whether the Second Amendment includes a right to carry weapons onto government complexes like the NIH campus.").[5]

---

[5] *See id.* at *6 ("*Bruen* does not alter the conclusion that the location the regulation affects remains relevant to assessing whether the Second Amendment covers the conduct."); *United States v. Reyna*, No. 3:21-cr-41 RLM-MGG, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text—a plain text that is more complex than mere possession. To do otherwise would be to compare the regulated conduct to the Second Amendment's bare and oversimplified text— keeping and bearing arms, without the original public meaning emphasized in *Heller* and [*Bruen*].").

If a plaintiff meets that textual burden, the government must show that its regulation "is consistent with this Nation's historical tradition of firearm regulation."[6] *Bruen*, 142 S. Ct. at 2126. This inquiry "will often involve reasoning by analogy"—"determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by asking "whether the two regulations are relevantly similar." *Id.* at 2132 (cleaned up). The Supreme Court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but stated that prior cases "point[ed] toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. This historical analysis is not a "regulatory straightjacket" and does not require "a modern-day regulation [to be] a dead ringer for historical precursors." *Id.* at 2133. The government must "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* *Bruen* also establishes that "cases implicating unprecedented societal concerns . . . may require a more nuanced approach" to the historical inquiry. *Id.* at 2132.

In conducting the historical analysis, Plaintiffs would restrict this Court to "the Founding, centering on 1791." TRO Mot. 7. But *Bruen* explicitly left open

---

[6] Where—as here—specific sensitive-place provisions are plainly supported by historical authorities and analogues, courts can also assume step 1 is met and reject the claim at step 2. *Cf. United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) ("assum[ing], without deciding, that step one of the *Bruen* test is met," and "find[ing]" a law "constitutional under step two" based on "history and tradition").

whether the analysis should be focused on 1791 (when the Bill of Rights was

adopted) or 1868 (when the Fourteenth Amendment was ratified), *Bruen*, 142

S. Ct. at 2138, and numerous courts have properly held that "the more appropriate

barometer is the public understanding of the right when the States ratified the

Fourteenth Amendment and made the Second Amendment applicable to the

States," *NRA v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023).[7]

Nor is 1868 a cut-off; later historical analogues can also provide guidance.

*See, e.g.*, *Frey v. Nigrelli*, No. 21-cv-05334 (NSR), 2023 WL 2473375, at *13

(S.D.N.Y. Mar. 13, 2023) (considering "municipal gun regulations from 1750 to

the late 19th century" and noting that *Heller* "indicat[ed] that post-enactment

history that sheds light on the public understanding of a legal text is a critical tool

of constitutional interpretation" (cleaned up)). This is especially true when

addressing a technology (*e.g.*, airplanes) or social phenomenon (*e.g.*, large crowds

---

[7] *See Bondi*, 61 F.4th at 1322 n.9 ("Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." (cleaned up)); *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) ("[H]istorical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment."). Furthermore, "*Bruen* considered evidence from both the founding era (the years around 1791) and reconstruction era (the years around 1868)." *Goldstein v. Hochul*, No. 22-cv-8300 (VSB), 2023 WL 4236164, at *11 (S.D.N.Y. June 28, 2023).

of tourists congregating at public beaches) that did not emerge until our more recent history.[8]

Prior to *Bruen*, *District of Columbia v. Heller*, 554 U.S. 570 (2008), recognized that certain regulations—including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"—were "presumptively lawful." *Id.* at 626-27 & n.26. *Bruen* expanded *Heller*'s list of illustrative sensitive places to include "legislative assemblies, polling places, and courthouses," stating that it was "aware of no disputes regarding the lawfulness of such prohibitions." 142 S. Ct. at 2133.[9] *Bruen* also explained that courts may look to the examples identified in *Heller* and *Bruen* and "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

*Heller* and *Bruen*'s examples yield several principles that justify a place's designation as sensitive: among these, a place may be deemed sensitive if the government is acting as a proprietor, or if "the people found there or the activities

---

[8] Nor did *Bruen* "impose any specific requirement that the historical statutes considered must have applied to a certain number of states or a certain percentage of the relevant population." *Maryland*, 2023 WL 4373260, at *16.

[9] Justice Kavanaugh's concurrence in *Bruen*—joined by the Chief Justice— further emphasized that "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful." 142 S. Ct. at 2162 (cleaned up).

that take place there" are particularly susceptible to the risks of gun violence. *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (cleaned up).[10]

### a.    Bars and restaurants serving alcohol

Plaintiffs' challenge to the restriction on carrying guns in bars and restaurants serving alcohol, HRS § 134-A(a)(4), cannot succeed. To start, Plaintiffs lack standing because they have not identified any bar or restaurant that has authorized (or would authorize) Plaintiffs to carry a gun into their premises. The fact that Plaintiffs identify certain bars and restaurants where they unilaterally wish to carry firearms, Complaint ¶¶ 59(h), 60(h), 61(h), is insufficient. That is because Plaintiffs have not shown that their alleged injuries "fairly can be traced to the challenged action of the defendant," as opposed to "the independent action of some third party not before the court," or that any injury caused by not being allowed to carry firearms on private property "is likely to be redressed by a favorable decision." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 41-42 (1976).

On the merits, the Legislature acted within its constitutional authority in designating bars and restaurants serving alcohol as sensitive locations. *First*, because Plaintiffs have not adequately established that the Second Amendment's

---

[10] Schools, for example, are sensitive because children are especially vulnerable to gun violence. Government buildings—including legislative assemblies, polling places, and courthouses—are sensitive in part because they are essential to the protection of other constitutional rights. *See* Darrell A. H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts. J. 459, 466 (2019).

text covers possessing firearms in bars or restaurants serving alcohol, Plaintiffs fail to satisfy their threshold burden. "[L]aws forbidding the carrying of firearms in sensitive places" are "presumptively lawful," *see Heller*, 554 U.S. at 626-27 & n.26, such that they fall outside the scope of the Second Amendment.[11]

*Second*, even if Plaintiffs had satisfied their initial textual burden, the prohibition on carrying firearms in places that sell intoxicating liquor comports with a longstanding tradition of regulation. Inebriated individuals bearing firearms pose obvious risks to fellow patrons and staff, particularly in crowded places. *See State v. Torres*, 75 P.3d 410, 413 (N.M. App. 2003) (recognizing "obvious danger in the combination of firearms and liquor consumption"). To guard against these dangers, governments before and after the Founding recognized the commonsense proposition that it is wise to separate guns and alcohol. A 1746 New Jersey law prohibited the selling of "any strong Liquor" to members of the militia, Ex. 2, and a 1756 Delaware law provided that "no Captain or other Officer shall Appoint any place of Meeting for his Company . . . within the Distance of half a mile of any Inn

---

[11] Post-*Heller*, courts have held that "presumptively lawful regulatory measures" could be upheld under the first step of the then-governing Second Amendment test, which asked whether the challenged law regulated conduct that fell outside the scope of the Second Amendment, and which *Bruen* endorsed as "broadly consistent with *Heller*." 142 S. Ct. at 2127; *see Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017); *United States v. Focia*, 869 F.3d 1269, 1286 (11th Cir. 2017); *NRA v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010).

or Tavern," Ex. 3. A Maryland law passed the same year prohibited "any Person of the Militia" from getting "drunk on any Muster-day," and banned the sale of "any Strong Liquor at any Place of training or at any other Place within Five Miles of any Place of training." Ex. 4. And a 1780 Pennsylvania law prohibited "any non-commissioned officer or private" from parading drunk, and provided that "[n]o company or battalion shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged." Ex. 5.[12] Other measures excluded "common drunkards" from the militia,[13] and regulated the interaction of firearms and alcohol.[14] And in the nineteenth century, an 1853 New Mexico law prohibited people from carrying "fire arms or other deadly weapons, whether they be shown or concealed upon their persons" in a "Ball or Fandango, . . . or room adjoining said ball where Liquors are sold." Ex. 19. An 1879 New Orleans ordinance forbade

---

[12] Additionally, laws from the mid-nineteenth century prohibited "any intoxicating liquor" from being "kept or sold . . . on or near the ground of any . . . military muster." *See* Ex. 6 (1852 Vt.); Ex. 7 (1853 R.I.). An 1859 Connecticut law prohibited the sale of liquor "within one mile of any military parade-ground, muster-field or encampment." Ex. 8.

[13] *E.g.*, Ex. 9 (1837 Mass.); Ex. 10 (1837 Me.); Ex. 11 (1840 R.I.).

[14] *See* Ex. 12 (1851 Chicago law providing that "no permit [to keep or sell gunpowder] shall be granted to any retailer of intoxicating liquors"); Ex. 13 (similar 1858 Minnesota law); Ex. 14 (1867 Kansas law prohibiting firearm possession by intoxicated individuals); Ex. 15 (similar 1883 Missouri law); Ex. 16 (similar 1883 Wisconsin law); Ex. 17 (1890 Oklahoma law prohibiting officers from carrying arms "while under the influence of intoxicating drinks"); Ex. 18 (1878 Mississippi law forbidding sale of weapons, including firearms, to "any . . . person intoxicated").

"any person to carry a dangerous weapon, concealed or otherwise, into any . . .

tavern." Ex. 20. Similarly, an 1890 Oklahoma law prohibited firearms in "any

place where intoxicating liquors are sold." Ex. 17. These laws demonstrate a strong

tradition of restricting firearms in places people gather, often in close proximity,

and consume alcohol.

### b.    Public parks and beaches

Plaintiffs are also unlikely to prevail on their claim that the Legislature's

designation of parks and beaches as sensitive locations is unconstitutional.[15] There

are three reasons why the parks and beaches provisions of Act 52 are

constitutional: (1) the text of the Second Amendment does not cover Plaintiffs'

proposed course of conduct; (2) the State and county have authority to regulate

these locations as proprietors; and (3) there are ample historical analogues that

demonstrate that these restrictions are constitutional under *Bruen*.

*First*, for the reasons previously set forth, Plaintiffs again fail to establish

that the specific course of conduct they wish to undertake is covered by the text of

the Second Amendment.

---

[15] Notably, restrictions on firearms in Hawaiʻi State Parks are not new. For decades it has been unlawful in State Parks to "use or possess . . . firearms . . . or other implements designed to discharge missiles," HAR § 13-146-19(a), except for hunting purposes as provided by law, *id.* § 13-146-41. These regulations, adopted in 1990, have the force of law. HRS § 184-5. The fact that these restrictions have existed for many years further underscores that, with respect to State Parks, Plaintiffs' request for emergency temporary injunctive relief should be denied.

*Second*, public parks and beaches are owned by the government and thus are subject to its authority to administer those locations as a proprietor.[16] The government's role as proprietor weighs in favor of upholding a regulation. For example, in *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012), the *en banc* Ninth Circuit upheld a county ordinance against a Second Amendment challenge because (among other things) it applied "only on County property." *Id*. at 1044. *Nordyke* drew on the principle—already recognized by the Supreme Court in other contexts—that "there is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation." *Id*. at 1045 (cleaned up).[17] Like the ordinance in *Nordyke*, Act 52's parks and beaches provisions focus on government property.

And whether assessed at step 1 (the threshold textual step) or at step 2 (the historical analysis), the nature of public parks and beaches clearly demonstrates

---

[16] Under Hawaiʻi law, all areas makai of the upper reaches of the wash of the waves are public land, *Application of Ashford*, 50 Haw. 314, 314-15, 440 P.2d 76, 77 (1968), "held in public trust by the State," *Application of Sanborn*, 57 Haw. 585, 593-94, 562 P.2d 771, 776 (1977).

[17] Other courts have recognized this principle in the context of Second Amendment challenges. *See Class*, 930 F.3d at 464 ("[T]he government—like private property owners—has the power to regulate conduct on its property."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126-27 (10th Cir. 2015) ("The government often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office)[.]"), *quoted with approval in Mahoney v. Sessions*, 871 F.3d 873, 880 (9th Cir. 2017).

that they are sensitive locations. Children and families congregate at parks and

beaches,[18] just as they do at schools. Indeed, many parks contain playgrounds and

are located next to schools.[19] Numerous organized activities in public parks

involve children, including the Summer Fun program in Honolulu and the PALS

program on Maui.[20] Parks and beaches often host crowded gatherings, like

concerts, fairs, competitions, and cultural exhibitions, and they are places where

important expressive activities occur.[21]

Hawaiʻi's beaches provide for a range of cultural opportunities (including

religious activities and traditional practices) and represent "a focal point of modern

lifestyle as well as cultural tradition."[22] Moreover, in the decades since the

---

[18] *See* https://www.mauicounty.gov/119/Parks-Recreation; https://www.mauicounty.gov/DocumentCenter/View/139258/ABOUT-PALS-for-Parents.

[19] Thielen Decl. ¶ 6; McCall Decl. ¶ 5.

[20] Thielen Decl. ¶ 6; McCall Decl. ¶¶ 16-18.

[21] Thielen Decl. ¶¶ 9-11. *See Zaitzeff v. City of Seattle*, 484 P.3d 470, 479 (Wash. App. 2021) (although *Heller* did "not list parks as sensitive areas, the public safety concerns underlying the sensitive area distinction also apply here, particularly the concern about protecting children"); *cf. United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009) (applying *Heller*; "National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities"; "the examples given [in *Heller*]—schools and government buildings—plainly suggest that motor vehicles on National Park land fall within any sensible definition of a 'sensitive place'").

[22] Haunani H. Kane et al., *Vulnerability Assessment of Hawaiʻi's Cultural Assets Attributable to Erosion Using Shoreline Trend Analysis Techniques*, 28 J. Coastal Rsch. 533, 533 (2012).

development of mass tourism, the status of beaches—throughout the United States and in Hawai'i in particular—has been transformed.[23] "Tourism, as it now exists in Hawaii, is essentially a post-World War II phenomenon."[24] It was not until the twentieth century that beaches achieved their current status as a centerpiece of mass tourism.[25] Today, Hawai'i's beaches are the most popular recreational tourist activity in the State and lie at the center of a $19.29 billion tourism industry— Hawai'i's largest industry and a central pillar of the State's economy.[26] The unique

---

[23] Plaintiffs cannot simply assert that "beaches have always existed in the United States." TRO Mot. 20. In the late nineteenth and twentieth centuries, the status of beaches in economic, cultural, and social life fundamentally changed. *See, e.g.*, Daniela Blei, *Inventing the Beach: The Unnatural History of a Natural Place*, Smithsonian Mag., https://www.smithsonianmag.com/history/inventing-beach-unnatural-history-natural-place-180959538 (June 23, 2016) ("A day at the beach is a cultural ritual. But it hasn't always been this way."); *id*. ("[B]y 1840, the beach meant something new to Europeans"—"a sought-after 'escape' from the city and the drudgery of modern life.").

[24] James Mak, *Developing a Dream Destination: Tourism and Tourism Policy Planning in Hawai'i* 13 (2008). "There was a visitor industry in Hawaii before 1959, of course, but the difference in degree is sufficiently great as to constitute a difference in kind." *Id.*

[25] *See* John Davenport & Julia L. Davenport, *The Impact of Tourism and Personal Leisure Transport on Coastal Environments: A Review*, 67 Estuarine, Coastal & Shelf Sci. 280, 280 (2006) ("Mass tourism is a modern phenomenon[.]").

[26] State of Hawai'i, Dep't of Bus., Econ. Dev. & Tourism, *Visitor Satisfaction Study Q1 2023*, 32-33, https://www.hawaiitourismauthority.org/media/11034/q1_2023_hta_vsat_final.pdf; State of Hawai'i, *Fact Sheet: Benefits of Hawai'i's Tourism Economy*, https://www.hawaiitourismauthority.org/media/11158/tourism-econ-impact-fact-sheet-may-2023.pdf ($19.29 billion in visitor spending in 2022). In May 2023 alone, 801,569 visitors arrived in the State of Hawai'i and spent $1.69 billion. The island of Maui welcomed 240,407 visitors in May 2023, and those visitors spent $523.9 million. *See* Dep't of Bus., Econ. Dev. & Tourism, Rsch. & Econ. Analysis

modern status of public beaches—as places where, among other things, large crowds of families and children now assemble from all over the world for recreation—implicates "unprecedented societal concerns" that "require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132.[27]

There is a robust historical tradition of restricting guns in places like parks and beaches.[28] "[N]umerous historical statutes and ordinances from the time period before and following the ratification of the Fourteenth Amendment imposed such restrictions in relation to parks." *Maryland*, 2023 WL 4373260, at *11 (citing a range of authorities, including those which "categorically bar the carrying of firearms in parks"); *id.* at *12 ("Where there is a distinct foundation of historical precedent demonstrating that prohibitions on carrying firearms in public parks, places of recreation, and social gatherings are part of the Nation's historical tradition of firearm regulation, . . . Plaintiffs are not likely to succeed on the merits

---

Div*., U.S. Visitors Continued Surpassing 2019 Level in May* (June 29, 2023), https://www.hawaiitourismauthority.org/media/11194/may-2023-visitor-statistics-6-28-2023-final.pdf. This data is subject to judicial notice. FRE 201(b); *Jarvis v. JP Morgan Chase Bank, N.A.*, No. 10-cv-4184-GHK (FMOx), 2010 WL 2927276, at *1 (C.D. Cal. July 23, 2010) ("Judicial notice may be taken of documents available on government websites.").

[27] *Cf. Maryland*, 2023 WL 4373260, at *14 (more nuanced approach warranted because "hospitals were only beginning to become prevalent at the time of the ratification of the Fourteenth Amendment" and "did not resemble their modern counterparts until the twentieth century").

[28] As a practical matter, moreover, many beaches are inseparable from public parks. *See* Thielen Decl. ¶ 7.

of their challenges . . . ." (cleaned up)). This tradition dates back to when public parks first proliferated in the United States in the 1800s.[29] In 1858, the Board of Commissioners of New York's Central Park adopted an ordinance that forbade "[a]ll persons . . . [t]o carry fire-arms or to throw stones or other missiles within" the park. Ex. 21. The Commissioners of Prospect Park followed in 1866 with a similar ordinance. Ex. 22. In 1868, Pennsylvania passed a law that "[n]o person shall carry fire arms, or shoot birds in [Fairmount] Park [in Philadelphia] or within fifty yards thereof, or throw ston[e]s or other missiles therein." Ex. 23. During the Reconstruction era, governments continued to pass laws banning guns in public parks. *E.g.*, Ex. 24 (1872 San Francisco ordinance); Ex. 25 (1873 Chicago ordinance); Ex. 26 (1875 South Park, Illinois ordinance); Ex. 27 (1881 St. Louis ordinance); Ex. 28 (1886 Boston ordinance). This demonstrates a tradition of prohibiting firearms in locations like those identified in HRS § 134-A(a)(9). "Whether viewed as direct historical precedent or historical analogues, these statutes and ordinances demonstrate a historical tradition of restricting the carrying of firearms in places where individuals gather for recreation or social activities[.]"

---

[29] Plaintiffs incorrectly suggest (at TRO Mot. 19) that public parks date back to the establishment of the Boston Common in the 1600s. "There were no modern-style parks in the era of the Second Amendment. The oldest urban public space in America, the Boston Common, was used primarily as a pasture, a place of execution, and a site for the militia to muster and drill." Cornell Decl. ¶ 55.

*Maryland*, 2023 WL 4373260, at \*12. *See* Young Decl. ¶¶ 28, 35, 42 (finding no evidence supporting carriage of firearms in urban, state, or national parks).

### c. Banks and financial institutions

Plaintiffs' challenge to Act 52's provision on banks and financial institutions, HRS § 134-A(a)(12), also fails. As with bars and restaurants serving alcohol, Plaintiffs lack standing because they provide no allegations or evidence that any financial institution has authorized (or would authorize) carrying firearms on its premises. The financial institutions identified by Plaintiffs are private, so even if the banks provision did not exist, Plaintiffs still would not be able to take guns onto those premises without authorization. *See* HRS § 134-E. Because Plaintiffs have not shown that any bank or financial institution authorizes (or would authorize) firearms on its property, their challenge to HRS § 134-A(a)(12) should be rejected for lack of standing alone.

Moreover, banks and financial institutions plainly are sensitive locations where carrying firearms may be restricted. As the Hawaiʻi Bankers Association testified during legislative hearings on Act 52, "the elevated risk of danger in bank crimes that involve firearms" means that "it makes good policy sense and is appropriate to restrict firearms on bank premises."[30]

---

[30] https://www.capitol.hawaii.gov/sessions/session2023/Testimony/SB1230_HD1_TESTIMONY_FIN_04-05-23_.PDF.

Even if the Court were to conclude (or assume) that Plaintiffs satisfy their initial textual burden with regard to banks and financial institutions—for the same reasons noted above, they have not—Act 52's restriction on guns in banks and financial institutions is constitutional because it fits within a long historical tradition of prohibiting firearms in sensitive commercial centers. *See Frey*, 2023 WL 2473375, at *16 (noting "a number of laws between 1328 to 1903 that show a historical tradition of banning firearms in 'fairs' or 'markets'"). "[A] 1786 law in Virginia and a 1792 law in North Carolina" both contained a prohibition on carrying firearms in "'fairs' and 'markets.'" *Id.* (citing Ex. 29 and Ex. 30). These prohibitions align with longstanding English law, including the 1328 Statute of Northampton. *See id.*; Ex. 31. Professor Saul Cornell explains that "[t]he English tradition of bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics. Indeed, it was the very fact that individuals congregated in large numbers and moved about freely, engaging in productive economic, cultural, and political activities that was the reason arms were prohibited from these locations." Cornell Decl. ¶ 42. In the nineteenth century, governments enacted laws that restricted carrying firearms in places where people regularly assembled for commercial or social purposes. *See id.*

17

¶ 46.[31] These laws were viewed as both constitutional and commonsensical when passed,[32] and they support prohibiting guns in banks and financial institutions.

### d.   Parking lots adjacent to government buildings

Plaintiffs also challenge HRS § 134-A(a)(1), which prohibits guns in parking areas adjacent to government buildings. TRO Mot. 23-24. *Heller* and *Bruen* establish that "government buildings" are sensitive places where firearms may be "altogether prohibited." *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Parking lots adjacent to government buildings are properly deemed sensitive to the same extent as the buildings themselves, as persuasive post-*Heller* cases have held. *Class*, 930 F.3d at 464; *Bonidy*, 790 F.3d at 1125. Plaintiffs' challenge fails.[33]

### 2.   The private property default rule is constitutional.

---

[31] *See, e.g.*, Ex. 32 (1817 New Orleans law forbidding weapons in public ball rooms); Ex. 19 (1853 New Mexico law prohibiting firearms in balls and fandangos); Ex. 33 (1869 Tennessee law prohibiting pistols at "any fair, race course, or other public assembly"); Ex. 34 (1870 Georgia law prohibiting firearms at "any . . . public gathering"); Ex. 35 (1870 Texas law prohibiting firearms in any "ball room, social party or other social gathering"); Ex. 36 (1875 Missouri law prohibiting firearms at social gatherings or any other non-military "public assemblage of persons"); Ex. 37 (1889 Arizona law; no firearms at any "place where persons are assembled for amusement" or "any other public assembly").

[32] "The principle justifying such a decision, excluding arms from sensitive places such as fair and markets, was ancient and informed Founding era laws as well as those enacted in the era of the Fourteenth Amendment." Cornell Decl. ¶ 46; *see Andrews v. State*, 50 Tenn. 165, 182 (1871); *Hill v. State*, 53 Ga. 472, 475 (1874); Rivas Decl. ¶¶ 25-32.

[33] Places "where motor vehicles travel," like parking lots, are in some respects "even more sensitive" because they are "frequented by large numbers of strangers, including children." *Masciandaro*, 648 F. Supp. 2d at 790 (emphasis omitted).

Plaintiffs also challenge HRS § 134-E, which governs carrying firearms on private property without the consent of the owner, lessee, operator, or manager of the property.[34] As a threshold matter, Plaintiffs lack standing because property owners could prohibit firearms even if HRS § 134-E were enjoined, leaving Plaintiffs in the exact same position.[35] But even if Plaintiffs had standing, they would not succeed for three reasons. First, carrying a gun on private property without the owner's consent falls outside the Second Amendment's plain text. Second, HRS § 134-E is consistent with the Nation's tradition of firearms regulation. And third, HRS § 134-E does not compel speech.

*First*, the Second Amendment does *not* include a right to carry guns on others' property without their consent. Under *Bruen*, the threshold inquiry requires an analysis of the Second Amendment's text that is "informed by history," 142 S. Ct. at 2127, including the principles of "property law, tort law, and criminal law" that "provide[d] the canvas on which our Founding Fathers drafted the Second Amendment," *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). Private property rights were exalted by the Founders, and a property owner's right to exclude was "one of the most essential sticks in the

---

[34] Plaintiffs challenge the default rule only as to private property held open to the public—not as to other private property. TRO Mot. 15-16.

[35] Moreover, because Plaintiffs "fail[] to provide any statement . . . indicating that [they] will not seek permission before carrying in a private property," they "fail[] to establish injury-in-fact." *Frey*, at 2023 WL 2473375, at *9.

bundle of [property] rights," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (cleaned up). At common law, entering the land of another without permission was trespass. *See GeorgiaCarry.Org*, 687 F.3d at 1262. States long reinforced private property rights through the criminal offense of trespass. *Id.* at 1263 (recounting this history). "[T]here is no constitutional infirmity when a private property owner exercises" their "right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right." *Id*. at 1264. How the right to exclude is applied, and how landowners signify authorization, is a matter for Hawaiʻi property law—not federal constitutional law.

HRS § 134-E does no more than vindicate the traditional right to exclude by preventing Plaintiffs from carrying firearms onto private property absent the owner's consent. Setting a default rule does not substitute the State's judgment for that of property owners. It merely establishes a background presumption, and property owners retain the right to dictate the terms of entry onto their property as they wish. *See* TRO Mot. 16 ("Plaintiffs here do not challenge that right of a private property owner."). This is not unconstitutional. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("[C]onstitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."). Nothing in *Bruen* changes this conclusion. The Court's ruling that individuals have a right to carry firearms "in public" does not address whether they

20

have a presumptive right to do so on someone else's private property, and *Bruen*

nowhere suggested that the Second Amendment trumps private property rights.

*Second*, the historical record demonstrates that HRS § 134-E is consistent

with the Nation's tradition of firearms regulation. There is extensive historical

support for prohibitions on carriage on private property without consent, and for

government regulation of this conduct. *See* Exs. 38-45. These regulations are

"well-established and representative historical analogue[s]." *Bruen*, 142 S. Ct. at

2133 (emphasis omitted). Many, in fact, are better characterized as "historical

*twin[s]*" of Hawai'i's default rule, surpassing *Bruen*'s requirements. *Id.* Indeed,

with respect to the relative burdens imposed by the regulations, some of the

historical examples required permission in writing, *see, e.g.*, Exs. 41, 42, while

Hawai'i's law is more flexible, allowing for "[u]nambiguous written *or verbal*

authorization," HRS § 134-E(b)(1) (emphasis added). And with respect to

justification, Hawai'i's restriction, like its historical predecessors, is rooted in

respect for private property rights. Moreover, contrary to Plaintiffs' assertion (TRO

Mot. 12-13), these regulations were not aimed solely at hunting or poaching on

private land; rather, they generally regulated carriage onto private property without

consent *in addition to*, in some cases, regulating hunting. *E.g.*, Ex. 39 (proscribing

"carry[ing] any gun *or* hunt[ing]" (emphasis added)); Ex. 40 (same). This historical

record demonstrates HRS § 134-E's constitutionality.

*Third*, Plaintiffs' argument that the default rule violates the First Amendment by compelling Plaintiff Kasprzycki to speak is unavailing. TRO Mot. 4, 18-19; Complaint ¶ 65. The compelled speech doctrine applies only if government action "compel[s] individuals to speak a *particular* message" and, in so doing, alters a person's own message. *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (emphasis added). That includes "situation[s] in which an individual must personally speak the government's message," or where the government "force[s] one speaker to host or accommodate another speaker's message," *Rumsfeld v. FAIR*, 547 U.S. 47, 63 (2006). Neither is the case here. Act 52 does not compel property owners to speak at all, let alone send a message on behalf of any entity. Property owners are free to express their views about whether they prefer firearms on their property. They can choose to allow firearms and say so, or choose to say nothing. Either way, the government is not "telling [them] what they *must* say." *Id.* at 61 (emphasis added). Even *Koons*, the outlier decision on which Plaintiffs heavily rely in their Motion, rejected a similar First Amendment claim. *See Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604, at *70 (D.N.J. May 16, 2023) ("[T]he Default Rule does not compel property owners to speak a particular message, so it is not a regulation of speech within the scope of the First Amendment's protection."). The default must be one of two things: either firearms presumptively may be carried on others' private property unless the owner objects,

or they presumptively may not be carried unless the owner consents. Either presumption would place some property owners in the same position as Plaintiff Kasprzycki and pose the same "problem" he seeks to remedy.[36] *Id.* ("[T]he Default Rule sets a background rule and construes the sound of silence."). Because HRS § 134-E does not compel any message, the First Amendment challenge fails.[37]

### 3. Plaintiffs' facial challenge cannot succeed.

Finally, Plaintiffs are not entitled to facial relief. "A facial challenge is a claim that the law or policy at issue is unconstitutional in all its applications." *California Rifle & Pistol Ass'n, Inc. v. City of Glendale*, No. 2:22-cv-07346-SB-JC, 2022 WL 18142541, at *6 (C.D. Cal. Dec. 5, 2022) (cleaned up). Plaintiffs would have to establish that the provisions they challenge cannot be applied to *anyone*—a showing Plaintiffs have not even attempted to make.[38]

---

[36] Act 52's allocation of the private property default was "based on the legislature's assessment of public sentiment and broadly shared preferences within the State." Ex. 1; *see also* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 186 (Winter 2020) (finding strong public support for "no-carry" default rules based on nationwide survey data). Because Hawaiʻi residents prefer a no-carry default for carrying firearms onto others' private property, by Plaintiffs' logic, HRS § 134-E would "compel" less "speech" than any alternative.

[37] The only First Amendment theory Plaintiffs identify in their Complaint and Motion is a "compelled speech" challenge, and only that theory is addressed here.

[38] Any injunctive relief, if issued, should thus apply only to Plaintiffs and the challenged provisions. *McCormack v. Hiedeman*, 694 F.3d 1004, 1019-20 (9th Cir. 2012). Moreover, nominal/compensatory damages (Complaint at 66) are barred by the Eleventh Amendment. *Aholelei v. DPS*, 488 F.3d 1144, 1147 (9th Cir. 2007).

## B.     PLAINTIFFS FAIL TO SHOW IRREPARABLE HARM

Plaintiffs have also not demonstrated irreparable harm. Plaintiffs point to their "deprivation of constitutional rights," TRO Mot. 24 (cleaned up), but that presumes Plaintiffs have established a constitutional violation. They have not. *See Maryland*, 2023 WL 4373260, at *16 ("[T]he likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim.").[39] Plaintiffs' delay in seeking a TRO also undermines their assertion of irreparable harm. *See, e.g.*, *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("[D]elay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). Despite knowing as early as May 4 that the bill that became Act 52 passed both houses of the Legislature, Plaintiffs waited until June 23—three weeks after Act 52 was signed by the Governor—to request a TRO. Such delays militate against emergency relief.[40]

---

[39] Neither the Supreme Court nor the Ninth Circuit has adopted Plaintiffs' theory that the deprivation of Second Amendment rights is "irreparable harm per se." TRO Mot. 24; *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *18 (D. Or. Dec. 6, 2022).

[40] *E.g.*, *Altman v. Cnty. of Santa Clara*, No. 20-cv-02180 (N.D. Cal. Apr. 10, 2020), ECF No. 22 (10-day delay); *Dahl v. Swift Distrib., Inc.*, No. 10-cv-00551 SJO (RZx), 2010 WL 1458957, at *4 (C.D. Cal. Apr. 1, 2010) (17 days). Courts measure delays from when plaintiffs were on notice of alleged harm. *UnifySCC v. Cody*, No. 22-cv-01019-BLF, 2022 WL 686310, at *2 (N.D. Cal. Mar. 8, 2022) (starting clock when challenged policy announced). And for some locations—*e.g.*, State Parks and parking lots adjacent to State facilities—restrictions have been in place for years. HAR § 3-111-12; *id.* § 3-111-3. This underscores the lack of irreparable harm.

## C.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST STRONGLY WEIGH AGAINST ISSUING A TRO

The balance of the equities and public interest overwhelmingly favor the State. As the Legislature found, "there are compelling interests in protecting public health, safety, and welfare from the serious hazards associated with firearms and gun violence." Ex. 1. The "interest in protecting public safety warrants permitting the relevant parts of [Act 52] to remain in effect until a final determination is made on their constitutionality." *Maryland*, 2023 WL 4373260, at *17. "The costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime . . . would be grave." *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015). Members of the public "have a strong interest in being able to use public areas without fearing for their lives." *State v. Spencer*, 876 P.2d 939, 942 (Wash. App. 1994).

## IV.    CONCLUSION

Plaintiffs' Motion should be denied.

DATED: Honolulu, Hawaiʻi, July 14, 2023.

*/s/ Nicholas M. McLean*

KALIKOʻONĀLANI D. FERNANDES
  Solicitor General
NICHOLAS M. MCLEAN
  First Deputy Solicitor General

NEAL K. KATYAL*
MARY B. MCCORD*
BEN GIFFORD*
RUPA BHATTACHARYYA*
DANA A. RAPHAEL*
  Special Deputy Attorneys General

25

*Pro Hac Vice Motions Pending*

Attorneys for Defendant ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawaiʻi