IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION, | Civil No. 1:23-cv-00265-LEK-WRP |
| Plaintiffs, | |
| v. | |
| ANNE E. LOPEZ, in her official capacity as Attorney General of the State of Hawaiʻi; MAUI COUNTY, | |
| Defendants. | |

## EXPERT DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare under penalty of perjury that the following is true and correct:

1.      I have been asked by the Department of the Attorney General for the State of Hawaiʻi to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. In *New York State Rifle & Pistol Ass'n v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation

1

of modern Second Amendment jurisprudence. This modality of constitutional

analysis requires that courts analyze history and evaluate the connections between

modern gun laws and earlier approaches to firearms regulation in the American

past. My declaration explores these issues in some detail. Finally, I have been

asked to evaluate the statute at issue in this case, particularly regarding its

connection to the tradition of firearms regulation in American legal history.

2. This declaration is based on my own personal knowledge, research

and experience, and if I am called to testify as a witness, I could and would testify

competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3. I am the Paul and Diane Guenther Chair in American History at

Fordham University. The Guenther Chair is one of three endowed chairs in the

history department at Fordham and the only one in American history. In addition to

teaching constitutional history at Fordham University to undergraduates and

graduate students, I teach constitutional law at Fordham Law School. I have been a

Senior Visiting research scholar on the faculty of Yale Law School, the University

of Connecticut Law School, and Benjamin Cardozo Law School. I have given

invited lectures, presented papers at faculty workshops, and participated in

conferences on the topic of the Second Amendment and the history of gun

regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

4.      My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.

5.      I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo. 2014);

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739-59 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518-44 (Christopher Tomlins & Michael Grossberg eds., 2008).

*Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty. 2018),

*Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal. 2014), *Miller v. Smith*, No. 2018-cv-

3085 (C.D. Ill. 2018); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal. 2019);

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal. 2019); *Worth v. Harrington,* No. 21-

cv-1348 (D. Minn. 2021); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.

2019); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. 2017); *Renna v.

Bonta*, No. 20-cv-2190 (S.D. Cal. 2020); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-

ADS (C.D. Cal. 2022); *Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE (C.D. Cal. 2017);

*B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal. 2021);

*Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022);

*Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022); *Nastri v.

Dykes*, No. 3:23-cv-00056 (D. Conn. 2023); and *Nat'l Assoc. for Gun Rts. v. Lopez*,

No. 1:22-cv-00404 (D. Haw. 2022).

### BASIS FOR OPINION AND MATERIALS CONSIDERED

6.     The opinion I provide in this declaration is based on my review of the

complaint filed in this lawsuit, plaintiffs' motion for temporary restraining order

and preliminary injunction, the laws at issue in this lawsuit, and my education,

expertise, and research in the field of legal history. The opinions contained herein

are made pursuant to a reasonable degree of professional certainty.

## SUMMARY OF OPINIONS

7.     Understanding text, history, and tradition requires a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding.

8.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights. In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

generations.[5] No legal principle was more important to the common law than the

concept of the peace.[6] As one early American justice of the peace manual noted:

"the term peace, denotes the condition of the body politic in which no person

suffers, or has just cause to fear any injury."[7] Blackstone, a leading source of early

American views about English law, opined that the common law "hath ever had a

special care and regard for the conservation of the peace; for peace is the very end

and foundation of civil society."[8] Any approach to the Second Amendment that

ignores the importance of the peace to Founding era constitutional and legal

thought is both anachronistic and profoundly distorted.[9]

9.      Early American constitutionalism built on Lockean theory, a fact

evident in many early state constitutions. Thus, Pennsylvania, the first state to

assert a right to bear arms, also unambiguously preceded the statement of that

principal with an assertion closely tracking Locke: "That all men are born equally

free and independent, and have certain natural, inherent and inalienable rights,

---

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60-61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] EDWARDS, *supra* note 6.

amongst which are, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety."[10] The right of self-defense and property rights were each viewed as fundamental, inalienable, and foundational in the Founding era.[11] Although the right associated with property and self-defense could not be alienated (a term that was itself derived from English property law) both rights were subject to robust regulation.[12]

10.    In *Bruen*, Justice Kavanaugh reiterated *Heller*'s[13] invocation of Blackstone's authority as a guide to how early Americans understood their legal inheritance from England.[14] In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased, a natural

---

[10] 5 FEDERAL AND STATE CONSTITUTIONS 3082 (F. Thorpe ed. 1909); PA. CONST., DECL. OF RIGHTS, Art. I (1776); *more generally, see* WILLI PAUL ADAMS, THE FIRST AMERICAN CONSTITUTIONS: REPUBLICAN IDEOLOGY AND THE MAKING OF STATE CONSTITUTIONS IN THE REVOLUTIONARY ERA (1980).

[11] Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J. L. & PUB. POL'Y 568 (2017).

[12] Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[13] *District of Columbia v. Heller*, 554 U.S. 570 (2008).

[14] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937).

response to new challenges posed by changes in technology and society. As had been true in England, the newly independent states exercised their broad police powers to address longstanding issues and any novel problems created by firearms in American society.

11.     American law, including the regulation of firearms, sought to protect ordered liberty. As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[15] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.

12.     The members of the Founding generation lived in a pre-modern rural society. There were no modern style police forces to keep the peace. Even after the creation of modern style police forces in the period before the Civil War, firearms were rarely carried routinely in public outside of the South and frontier regions. Indeed, none of the nation's early police forces in Boston, New York, and Philadelphia issued firearms to those charged with enforcing the peace and protecting society from criminals.

---

[15] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799) (text available in the Evans Early American Imprint Collection) (emphasis in original).

13.    Few of the institutions modern Americans take for granted existed in Founding era America. Outside of major cities there were few hospitals and even fewer museums, and these were private institutions that served the public. There was no modern-style mass transportation. All forms of transport were privately owned.

14.    Although many public spaces existed in early America, modern style parks did not emerge until the nineteenth century. The development of such spaces in period before the Civil War was itself a response to the greater urbanization of the nation and a perception that America needed to create havens of tranquility to offset the negative impacts of the market revolution. From their inception, these new public spaces prohibited firearms.

## I.    THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER: RIGHTS AND REGULATION*

15.    The United States Supreme Court's decisions in *Heller*, *McDonald*[16], and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid

---

[16] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

approaching history, text, and tradition with an "ahistorical literalism."[17] Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[18]

16.    Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straitjacket nor a regulatory blank check."[19] The Court acknowledged that when novel problems created by firearms are at issue the analysis must reflect this fact: "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

17.    In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-

---

[17] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

[18] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[19] *Bruen*, 142 S. Ct. at 2133.

American legal tradition, but much more work needs to be done to fill out this picture.[20] Indeed, such research is still ongoing: new materials continue to emerge; and in the year since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[21]

18.    Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[22]

19.    The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's

---

[20] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[21] *Symposium—The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[22] *Bruen*, 142 S. Ct. at 2132-33.

conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text. [23] The inclusion of rights guarantees in Founding era constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[24]

20.     Rather than limiting rights, regulation was the essential means of preserving rights, including self-defense.[25] In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its

---

[23] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how they impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation); Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233-34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s-1830s, at 2 (2019); Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

[24] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. CRIM. L. & CRIMINOLOGY 203, 206 (2016).

[25] *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85 (2017).

state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[26] The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties. Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[27]

21.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[28] The most basic right of all in Founding era constitutionalism was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[29] The first state constitutions clearly articulated

---

[26] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[27] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONST. COMMENT. 988 (1999).

[28] *Heller*, 554 U.S. at 634-35; Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008).

[29] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *see generally* Aaron T. Knapp, *The*

such a right — including it alongside more familiar rights such as the right to bear arms.[30] Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." Although Justice Scalia's observation on the scope of the right to bear arms has figured prominently in recent Second Amendment jurisprudence, the equally important right of the people to regulate their internal police has not been similarly acknowledged by many lower courts. This asymmetry is not only inconsistent with Founding era conceptions of law and constitutionalism, but also not consistent with *Heller*, a point that Chief Justice Roberts and Justice Kavanaugh have each asserted in their interpretations of *Heller* and subsequent jurisprudence. In short, an asymmetrical approach to gun rights and regulation, favoring the former over the latter, is precluded by *Heller* and not consistent with *Bruen*'s focus on text, history, and tradition. The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this key point. The

---

*Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008).

[30] PA. CONST. OF 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); VT. DECLARATION OF RIGHTS, art. V (1777).

right to bear arms was seldom interpreted (outside of a few outlier cases in the South) as precluding robust regulation of arms and gun powder.

## II.    FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.    Guns have been regulated from the dawn of American history.[31] At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[32] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[33] Indeed, in the year following *Bruen* new sources have come to light and new scholarship as well.[34]

23.    The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework. The entire body of the common law was designed to preserve the peace, and the right of self-defense existed within this

---

[31] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[32] *Id.*

[33] Ruben & Miller, *supra* note 20, at 1.

[34] *See Atkinson v. Garland*, 70 F.4th 1018, 1036 (7th Cir. 2023) (Wood, J., dissenting) (citing new scholarship by Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 WASH. U. L. REV. (forthcoming 2023) (manuscript at 27)).

larger framework.[35] Statutory law, both in England and America, functioned to further secure the peace and public safety. Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[36]

24.     Recent historical research has illuminated the nature of Founding era gun culture and the history of regulation. There was no analogue to the types of gun violence that plague modern America. The nature of firearms technology and early American society militated against guns as the preferred tool for most forms of interpersonal violence.[37]

25.     Weapons in the Founding era were muzzle loaded guns that were not particularly accurate and took a long time to load. The black powder used in these firearms was corrosive and attracted moisture like a sponge: two facts that militated against storing weapons loaded. Given the state of firearms technology in

---

[35] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[36] *McDonald*, 561 U.S. at 785 (plurality opinion) (noting that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment" (cleaned up)).

[37] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

the Founding era, it is not surprising that recent scholarship has demonstrated that there was not a widespread gun violence problem in the era of the Second Amendment.[38]

26.    History is marked by change and the history of guns is no exception. Changes in firearms technology and American society in the nineteenth century led to the emergence of America's first gun violence problems. The response of states to the emergence of new firearms that threatened the peace was a plethora of new laws. The first notable expansion of regulation occurred during the period after the War of 1812, when cheap, reliable, and easily concealable pistols were produced for the first time in American history. More than 90% of the firearms in circulation in the Founding era were long guns, so pistols were not a serious problem for the Founders.[39]

27.    In short, when addressing changes in technology, consumer behavior, and faced with novel threats to public safety, states used their ample authority under the police power to enact laws to address these problems. Apart from a few

---

[38] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[39] Sweeney *supra* note 37.

outlier cases in the South, courts upheld such limits on the unfettered exercise of a right to keep and bear arms.[40]

28.      Weapons that posed a particular danger were regulated and, in some cases, prohibited. Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.[41]

29.      Anglo-American law treated unusually dangerous weapons as legitimate targets for strong regulation. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as "dangerous and unusual" and more typically as "dangerous or unusual." Although some modern commentary on the Second Amendment have misread the Blackstonian principle as asserting that weapons must be both dangerous and unusual to justify government regulation, the term dangerous and unusual was not conjunctive, but a Latinate construction familiar to early American lawyers, hendiadys. Thus, the best translation of the term in modern parlance would be "unusually dangerous." Indeed, this reading is the only

---

[40] On southern gun rights exceptionalism, *see* Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[41] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

parsing of the texts of Blackstone and Hawkins that reconciles the two author's treatment of the scope of government authority to regulate arms.[42]

30.    As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of a form of interest balancing undertaken by the people themselves in framing the federal constitution and the first ten amendments. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complementary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits the diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to

---

[42]  This phrase was an example of an archaic grammatical and rhetorical form hendiadys; *see* Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VA. L. REV. 687 (2016). Thus, the term was not conjunctive and is best rendered as "unusually dangerous."

bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy." Richard Burns, in his influential eighteenth-century legal dictionary, illustrated the concept of infringement by discussing the differences between the anarchic liberty associated with the state of nature and the well-regulated liberty associated with civil society and the rule of law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty. Regulation was therefore not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.  In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the text of the two Amendments was seen to set up very different frameworks for thinking about the rights they protect. Members of the Founding generation would have understood that legislatures could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long such regulations did not negate the underlying *right*. In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[43] In keeping with the clear public meaning of the Second Amendment's

---

[43] UVILLER & MERKEL, *supra* note 26.

text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goal of public safety.

## III. THE POLICE POWER AND FIREARMS REGULATION, 1776-1868

31.     The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[44] The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[45] By the early nineteenth century, the term "police" was a fixture in American law.[46] Thus, an 1832 American encyclopedia confidently asserted that police, "in the

---

[44] PA. CONST. OF 1776, Ch. I, art iii.

[45] For other examples of constitutional language similar to Pennsylvania's provision, *see* N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES: GENERAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS; PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[46] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2 n.2 (1904).

common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[47] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

32.    The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[48] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[49]

---

[47] 10 ENCYCLOPEDIA AMERICANA 214 (Francis Lieber ed. 1849).

[48] Harry N. Scheiber, *State Police Power*, *in* 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[49] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

33.     Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible. Brutus, a leading Anti-Federalist, emphatically declared that: "[I]t ought to be left to the state governments to provide for the protection and defence [sic] of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[50] Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power, "such as unlicensed public houses, nuisances, and many other things of the like nature."[51] State police power authority was at its pinnacle in matters relating to guns or gun powder.[52]

34.     Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were separate in the Founding era but were mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation

---

[50] Brutus, *Essays of Brutus VII*, *reprinted in* 2 THE COMPLETE ANTIFEDERALIST 358, 400-05 (Herbert J. Storing ed., 1981).

[51] Tench Coxe, *A Freeman*, PA. GAZETTE (Jan. 23, 1788), *reprinted in* FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[52] Cornell, *supra* note 35.

of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle. This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty. As a result, state constitutions no longer included free standing affirmations of a police right. Secondly, the constitutional "mischief to be remedied" that arms bearing provisions addressed had changed as well. Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of unusually dangerous weapons and the societal harms they caused. The Reconstruction-era constitutional solution cast aside the eighteenth-century language that was steeped in fears of standing armies and substituted in its place new language affirming the state's police power authority to regulate arms, particularly in public.[53]

---

[53] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

| Pennsylvania Constitution (1776) | Texas Constitution (1868) |
|---|---|
| "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."<br><br>"That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power."[54] | "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe.[55] |

**Private Property and the Founding Era's Default Rule about Arms**

35.     There was no right to carry firearms onto the property of others in the Founding era. Indeed, had such a right existed, it would have undermined the peace, not preserved it. The castle doctrine, which included one's domicile and curtilage, meant individuals could respond with deadly force to perceived threats.[56]

---

[54] PA. CONST. OF 1776, amend. III, XIII.

[55] TEX. CONST. OF 1868, Art. I, § 13. For similarly expansive constitutional provisions enacted after the Civil War, *see infra* Table One.

[56]  On the history of stand your ground, *see* Richard Maxwell Brown, NO DUTY TO RETREAT: VIOLENCE AND VALUES IN AMERICAN HISTORY AND SOCIETY (1994).

36.     Anglo-American constitutionalism was founded on the Lockean trinity of life, liberty, and property. Property rights in the Founding era were not only highly esteemed, but English common law doctrine gave individuals broad authority over their lands and powerful tools to enforce their claims against those who committed trespass. It would have been unthinkable to members of the Founding generation that any person could enter another's land armed, without permission or appropriate legal authority. The limits on peace officers underscore this fact. Entry on private property by a constable, sheriff, or justice of the peace without proper legal authority was a trespass. Moreover, it is important to note that peace officers in the Founding era were not typically armed with firearms so even when serving legal process, justices of the peace, sheriffs, and constables did not typically enter private property with firearms.  The most notable exceptions to this principle were situations where one was in pursuit of a felon or a dangerous animal.[57]

37.     The default rule enacted by Hawaiʻi simply restores property to its rightful place alongside life and liberty in the Founding era's Lockean vision of

---

[57] Stuart Bruchey, *The Impact of Concern for the Security of Property Rights on the Legal System of the Early American Republic*, 1980 Wis. L. Rev. 1135, 1136; James W. Ely, Jr., The Guardian of Every Other Right: A Constitutional History of Property Rights 30-32 (3d ed. 2008); William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 Hastings L.J. 1061, 1081-83 (1994).

liberty. Blackstone's discussion of the centrality of property to English common law is apposite and offers a foundation for understanding why a restoration of the default rule prohibiting entering another's lands while armed is consistent with Founding era constitutionalism.

> The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land. . . . The laws of England are therefore, in point of honor and justice, extremely watchful in ascertaining and protecting this right.[58]

The practical implication of this robust view of property rights was considerable. In a celebrated English case where the Lord Chief Justice of the King's Bench summarized the implications of this view for English law: "our law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbor's ground, he must justify it by law."[59]

38.    The default rule prohibiting firearms on private property adopted by Hawai'i simply restores the legal rule in place at the Founding, a rule rooted in English common law. The prohibition on entering another's land without

---

[58] 1 WILLIAM BLACKSTONE, COMMENTARIES 134-35.

[59] *Entick v. Carrington*, 95 Eng. Rep. 807 (K.B. 1765).

permission was part of the background assumptions against which the right to keep and bear arms would have been understood by those who wrote it and enacted the Second Amendment into law.

39.    Blackstone's extensive discussion of the law of trespass elaborated this understanding and was well known to members of the Founding generation, including those who wrote and enacted the Second Amendment and similar state analogues. Judge Zephaniah Swift, author of one of the first legal treatises written after the adoption of the Second Amendment, summarized this Blackstonian consensus when he wrote: "every unwarrantable entry upon the lands and tenements of another, without his consent, is deemed a breaking of his close, and is an injury."[60]

40.    Pennsylvania and New Jersey each enacted laws drawing on this tradition to pass broad restrictions on traveling armed onto private lands without permission:

> Be it enacted, That if any person or persons shall presume, at any time after the publication of this act, to carry any gun, or hunt on any enclosed or improved lands of any of the inhabitants of this province, other than his own, unless he shall have license or permission from the owner of such lands, or shall presume to fire a gun on or near any of the king's highways, and shall be thereof convicted, either upon view of any Justice of the Peace within this province, or by the oath or affirmation of

---

[60] 2 ZEPHANIAH SWIFT, A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 74 (1795).

any one or more witnesses, before any Justice of the Peace, he shall, for every such offence, forfeit the sum of forty shillings.[61]

41.    The restoration of the common law default rule by Hawaiʻi therefore fits squarely within the long tradition of the regulation of arms under Anglo-American law.

### The Historical Meaning of Sensitive Places and Limits on Arms

42.    The sensitive places doctrine described in *Heller* derives from well-established principles in Anglo-American law, including the Statute of Northampton (and its many analogs) and the common law itself. The sensitive places doctrine did not, as some gun rights advocates have erroneously suggested, depend on the fact that government could provide comprehensive security, such as modern court houses which have metal detectors and armed guards.[62] Founding era court houses did not enjoy anything remotely analogous to these types of security measures. The English tradition of bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics.

---

[61] 1 LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE TWENTIETH DAY OF MARCH, ONE THOUSAND EIGHT HUNDRED AND TEN 229 (1810); CHARLES NETTLETON, LAWS OF THE STATE OF NEW-JERSEY 26 (1821).

[62] David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 290 (2018).

Indeed, it was the very fact that individuals congregated in large numbers and moved about freely, engaging in productive economic, cultural, and political activities that was the reason arms were prohibited from these locations.[63]

43.    An early American justices of the peace manual captured the common law's understanding of "sensitive places" when it reminded readers that constables, sheriffs, and other peace officers had the authority to arrest those who "shall go or ride armed with unusual and offensive weapons . . . among any great Concourse of the People."[64]

44.    A good illustration of how early American governments understood sensitive places is provided by an early Louisiana law, prohibiting "any person to enter into a public ball-room with any cane, stick, sword or any other weapon" and requiring weapons be checked before entering a ball room. New Mexico enacted a similar statute. The law prohibited "any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with firearms or other deadly weapons, whether they be shown or concealed upon their

---

[63] JEROME BAYON, GENERAL DIGEST OF THE ORDINANCES AND RESOLUTIONS OF THE CORPORATION OF NEW ORLEANS 371 (1831) (art. 1).

[64] J. DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (Newbern, James Davis 1774)

persons."[65] In both cases the laws prohibited arms in places where people gathered in large numbers and engaged in forms of recreation.

45.    Public universities in the early republic offer another good example of the potential scope of permissible firearms regulations consistent with the notion of sensitive places. Bans on guns on college campuses were another example of the strict regulation of arms in places where large numbers of people congregated. The University of Georgia, one of the nation's oldest public institutions of higher education, passed a sweeping prohibition of guns on its campus: "[N]o student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane[,] or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[66] The University of North Carolina, likewise, enacted a total prohibition on possessing firearms. The law provided: "No Student shall keep a dog, or firearms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk,

---

[65] 1852 N.M. Laws 67, § 3.  Although *Bruen* suggested that evidence from the territories was not probative, subsequent research published after the decision has established that territories were in fact the only locations in nineteenth century America in which the Second Amendment applied prior to the Fourteenth Amendment, a fact that has gained judicial notice in the litigation spawned by *Bruen*, *see Atkinson*, 70 F.4th at 1036 (Wood, J., dissenting) ("Taking the Court at its word, new historical research should be welcome . . . .")

[66] The Minutes of the Senate Academicus, 1799-1842, (Univ. Ga. Librs. 2008), https://tinyurl.com/3nxp4uwv.

sword-cane, or any deadly weapon."[67]   The regulations enacted by the University

of Virginia are particularly telling in this regard. In 1819, Thomas Jefferson helped

establish the state-supported University of Virginia. University of Virginia, About

the University, https://www.virginia.edu/aboutuva (last accessed Nov. 4, 2022).

While both Jefferson and James Madison were serving on the six-person

University of Virginia Board of Visitors—the decision-making body for the

university—the Board took an exceedingly strict view of guns on the Virginia

campus, resolving: "No Student shall, within the precincts of the University,

introduce, keep or use any spirituous or vinous liquors, keep or use weapons or

arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school

with a stick, or any weapon."[68]

### Reconstruction: Constitutional Continuity and Social Change

---

[67] Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North-Carolina 15 (Raleigh, Off. of the Raleigh Reg. 1838), https://tinyurl.com/2p8cte3h. In 1859, the University of North Carolina expanded the reach of its prohibition on carrying deadly weapons, applying it not just to the college, but also "within the village of Chapel Hill." Acts of the General Assembly and Ordinances of the Trustees for the Organization and Government of the University of North Carolina 31 (James M. Henderson 1859), https://docsouth.unc.edu/true/unc/unc.html.

[68] Meeting Minutes of the University Board of Visitors, Oct. 4, 1824, https://tinyurl.com/543s44xk; *see also* Laws & Regulations of the College of William & Mary 19 (1830), https://tinyurl.com/2p93s7hd

46.     During the Reconstruction era, many states enacted a variety of laws building on the history of sensitive place restrictions. Thus, Reconstruction era laws did not represent a new constitutional principle different than the common law restrictions that existed for centuries, but an application of the same legal principles to new circumstances brought about by changes in firearms technology, consumer behavior, and the demographic changes associated with greater urbanization. The principle justifying such a decision, excluding arms from sensitive places such as fair and markets, was ancient and informed Founding era laws as well as those enacted in the era of the Fourteenth Amendment.

47.     One of the most comprehensive statutes enacted during the era of the Fourteenth Amendment was adopted in Texas. The law prohibited firearms in a variety of public venues, building on a tradition that had existed for centuries.

> Section 1: If any person shall go into any church or religious assembly, any school-room or other place where persons assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentle- men, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind, such persons so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined

in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same: *Provided*, That nothing contained in this section shall apply to locations subject to Indian depredations: *And provided further*, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.[69]

48.   Texas not only adopted a broad range of modern style gun regulations, including this law, but further noted that the state's highest court recognized that such an exercise of the police power was entirely constitutional. The Texas regime was not an outlier, but was consistent with the dominant conception of the right to bear arms in both the Founding era and the period of Fourteenth Amendment. What distinguished Texas from other states was not its robust use of the police power, but the level of gun violence that precipitated the need for such regulations.[70] The first state constitutions enacted after the American Revolution

---

[69] 2 GEORGE WASHINGTON PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST. CAREFULLY ANNOTATED. 1322 (3d ed. 1873).

[70] Justice Thomas dismissed the probative value of any evidence from Reconstruction-era Texas as an outlier. But subsequent historical research has demonstrated that Texas was well within the constitutional mainstream of post-Civil War America. *See* Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study* 55 U.C. DAVIS L. REV. 2603 (2022). The important evidence presented in this article only appeared after *Bruen* was argued. Rivas has demonstrated that Republicans enacted tough gun laws that were enforced in a racially neutral fashion until the Jim Crow era reversed the gains achieved during Reconstruction. For additional support for Rivas' conclusions, *see*

34

typically separated the right of the people to regulate their internal police from specific statements about the right to bear arms.[71] The Founding era formulation of the right to bear arms was distinct from the right of the people to regulate their internal police. The new state constitutions adopted during Reconstruction omit references to the dangers of standing armies and the need for civilian control of the military. In place of these textual references, state constitutions fused the right to regulate arms and the right to bear them into a single constitutional principle.[72]

49.     The new textual formulation of the right to keep and bear arms did not alter the constitutional principles framing firearms regulation; these remained unchanged. What had changed was that a new set of circumstances had created an unprecedented set of public safety concerns for states. The new danger Americans faced during and after Reconstruction was the proliferation of firearms and more aggressive cultural norms about carrying them in public, particularly in urban areas.[73]

---

Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928*, 55 U.C. DAVIS L. REV. 2545 (2022).

[71] Cornell, *supra* note 53.

[72] *See, e.g.*, UTAH CONST. OF 1896, art. I, § 6.

[73]  RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

50.     The debates in the Texas constitutional convention during Reconstruction illustrate how changed practices led to new regulations. There is no evidence that anyone attending the state ratification conventions in the Founding era traveled to these gatherings armed. By contrast there was a palpable fear of gun violence among the delegates who participated in the Reconstruction era Texas state constitutional convention.  In fact, this fear was so great that the convention passed a resolution prohibiting weapons in the convention hall. "[T]he convention do order that no person shall hereafter be allowed in this hall, who carries belted on his person, revolvers or other offensive weapons."[74] Another delegate reminded the convention's members that the constitutional right to bear arms ought not be confused with the pernicious practice of habitually arming. The right, he cautioned, ought not "be construed as giving any countenance to the evil practice of carrying private or concealed weapons about the person."[75] Although the level of gun violence in Texas was especially grave, other states and the western territories were all dealing with problems posed by the proliferation of handguns. As a result of this

---

[74] 1 Constitutional Convention, Journal of the Reconstruction Convention, Which Met at Austin, Texas, June 1,1868, at 248 (Tracy, Siemering & Co. 1870).

[75] *Id.* at 152; *see generally* Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 Tex. A&M L. Rev. 95 (2016).

broad societal trend, firearms regulation increased dramatically during the era of the 14th Amendment across the nation.[76]

**Table One**
**Post-Civil War State Constitutional**
**Arms Bearing Provisions about Regulation**

| Date | State | Provision |
|------|-------|-----------|
| 1868 | Georgia | GA. CONST. OF 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. OF 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. OF 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. OF 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |
| 1875 | Missouri | MO. CONST. OF 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. OF 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military |

---

[76] Spitzer, *supra* note 31.

|  |  | should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
|---|---|---|
| 1876 | Colorado | COLO. CONST. OF 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |
| 1876 | Texas | TEX. CONST. OF 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
| 1877 | Georgia | GA. CONST. OF 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |
| 1879 | Louisiana | LA. CONST. OF 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
| 1885 | Florida | FLA. CONST. OF 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. OF 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. OF 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |

| 1890 | Mississippi | MISS. CONST. OF 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |
| 1891 | Kentucky | KY. CONST. OF 1891, § 1(7): The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. OF 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |

51.    The new focus on regulation embodied in these revised state arms bearing provisions was not a departure from traditional views of the robust scope of police power authority to regulate arms in the interests of public safety. This power was ancient and widely acknowledged as fundamental to Anglo-American law. Nor did the adoption of the Fourteenth Amendment change this fact. The recasting of these state constitutional texts represented an important shift in emphasis and a change in constitutional style, not substance.[77]

52.    One of the motivating forces behind the push for the Fourteenth Amendment was the enactment of repressive black codes across the South, which often included restrictions on the right to keep and bear arms. Paramilitary violence

---

[77] John Bingham, Speech, *in* CINCINNATI DAILY GAZETTE (Sept. 2, 1867), *as quoted in* Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?* 50 SANTA CLARA L. REV. 1043, 1058 (2010).

against free people of color and Republicans in the South was among the most pressing threats to Reconstruction.[78] In response to the South Carolina Black Codes, Union General Daniel Sickles issued General Order No. 1.[79] Sickles not only affirmed a right to bear arms, but also reasserted the right to regulate arms, including bans on concealed carry. Crucially, Sickles restated the prevailing consensus that the right to bear arms did not sanction a right to travel armed onto private property. In *Bruen,* Justice Thomas singled out Sickles General Order No. 1 as the quintessential embodiment of the meaning of the right to keep and bear arms, noting that Sickles' views were consistent with both the ideals of 1791 and 1868.[80] General Order No. 1 offers one of the clearest pieces of evidence that the Hawaiʻi default rule about private property reflects a constitutional consensus deeply rooted in text, history, and tradition. Sickles' language was unambiguous on this point: "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction

---

[78] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019).

[79] *See* Darrell A. H. Miller, Peruta, *The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. F. 238, 241 (2014).
[80] 142 S. Ct. at 2152.

the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent."[81]

53.    The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters in Ohio that after the adoption of this Amendment, states would continue to bear the primary responsibility for "local administration and personal security."[82] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact whatever reasonable measures were necessary to promote public safety and the common good.[83]

54.    It would be difficult to overstate the significance of the growing perception among legislative bodies across the nation that America needed to enact strong laws to deal with the increased threat gun violence posed in post-Civil War America.  Indeed, the number of laws enacted skyrocketed, as did the number of states passing such laws.[84] States fulfilled their role as laboratories of democracy

---

[81] A HANDBOOK OF POLITICS FOR 1868, at 36-38 (Edward McPherson ed., 1868).

[82] Bingham, *supra* note 77.

[83] For a discussion of how the courts wrestled with the meaning of the Fourteenth Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 148-51 (1998).

[84] Spitzer, *supra* note 31.

by implementing a range of regulations aimed at curbing the problem of gun violence: limiting the sale of firearms, taxing particular types of weapons perceived to pose threats to public safety, imposing limits on the access of minors to weapons, and restricting the public places one might carry arms.[85] Texas banned "[a]ny person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing."[86] The law aimed to preserve the peace and prevent the intimidation of free persons, the exact opposite of the claims of gun rights advocates who have insisted that gun control during Reconstruction was tainted by an insidious racist agenda.[87]

**Parks**

---

[85] *Id.*

[86] *An Act to Regulate the Keeping and Bearing of Deadly Weapons, Apr. 12, 1871, reprinted in* PASCHAL, *supra* note 69.

[87] Gun rights advocates have simply ignored the most recent scholarship on gun control and race relations during Reconstruction, including the new literature on gun regulation and enforcement. For more, see the discussion in Frassetto, *supra* note 75, at 102-04, and Rivas, *supra* note 70.

55.     There were no modern-style parks in the era of the Second
Amendment. The oldest urban public space in America, the Boston Common, was
used primarily as a pasture, a place of execution, and a site for the militia to muster
and drill.[88] Yet, even when used for militia purposes, these public spaces were
tightly regulated. Colonial Massachusetts prohibited coming to muster with a
loaded firearm.[89] The Boston Commons and other similar urban spaces in
existence during the Founding era shared little with modern parks. There was little
need in the sparsely settled colonies to set aside areas for preservation or recreation
given that the population of the colonies was expanding rapidly and remained
hemmed in by various Indian nations reluctant to cede any further territory to
Europeans. Moreover, by the time of the adoption of the Second Amendment, the
nation was still 90% rural, and the majority of the population was engaged in
agricultural pursuits.[90]

---

[88] Steven R. Pendery, *Probing the Boston Common*, 43 ARCHAEOLOGY 42-47 (1990);
SUZANNE SCHELD ET AL., RETHINKING URBAN PARKS: PUBLIC SPACE AND
CULTURAL DIVERSITY 19-20 (2009); MICHAEL RAWSON, EDEN ON THE CHARLES:
THE MAKING OF BOSTON 73 (2014).

[89] RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN
NEW ENGLAND 98 (1853); 1866 Mass. Acts 197, An Act Concerning the Militia,
§ 120. The prohibition on bringing a loaded gun to muster stretches from 1632 to
1866 making it one of the longest standing regulations on firearms in the early
Republic.

[90] FORREST MCDONALD, E PLURIBUS UNUM: THE FORMATION OF THE AMERICAN
REPUBLIC, 1776-1790, at 72 (1965); Peter C. Mancall, *Economic History of the*

56.     The creation of parks as we now know them began in the middle of the nineteenth century and was influenced by the slow impact of romanticism and the Transcendentalist ideas of visionaries such as Henry David Thoreau. The new idea of parks as places of relaxation, repose, and recreation gradually inspired a new attitude toward nature and public spaces. This new vision inspired urban planners, landscape architects, and government officials to embark upon an ambitious series of new parks. By the middle of the century these new public spaces, best exemplified by New York's Central Park, had become places of refuge from the congestion, grime, and stresses of city life. The creation of large urban public parks in the 1850s posed new challenges for those eager to preserve the peace and public safety: among the pressing issues was the regulation of firearms.[91] The expansion of urban parks, the creation of new state parks, and eventually the involvement of the federal government in land preservation intensified in the post-Civil War period.

---

*United States: Precolonial and Colonial Periods*, *in* OXFORD RESEARCH ENCYCLOPEDIA OF ECONOMICS AND FINANCE (2021), https://oxfordre.com/economics/view/10.1093/acrefore/9780190625979.001.0001/acrefore-9780190625979-e-480.

[91] GALEN CRANZ, THE POLITICS OF PARK DESIGN: A HISTORY OF URBAN PARKS IN AMERICA 19 (1989).

57.    From the outset modern parks banned firearms.  Millions of Americans, including the entire population of the nation's five largest cities, lived under a firearms regulatory regime that prohibited firearms in parks. During the era of the Fourteenth Amendment, there was little disagreement that state and local governments had the authority under the police power to regulate and prohibit guns in parks.

**Table Two**

**Post-Civil War Limits on Public Carry in the Nation's Five Largest Cities**

| Rank | City | Population (1900)[92] | Date of Law | Gun Prohibition in Parks |
|------|------|---------------------|-------------|--------------------------|
| 1 | N.Y. | 3,437,202 | 1861 | X |
| 2 | Chicago | 1,698,575 | 1881 | X |
| 3 | Phila. | 1,293,697 | 1869 | X |
| 4 | St. Louis | 575,238 | 1883 | X |
| 5 | Boston | 560,892 | 1886 | X |

Nor were such bans limited to the nation's largest municipalities.[93] For example, during this period, San Francisco enacted an ordinance prohibiting guns in its

---

[92] 1 U.S. CENSUS OFF., CENSUS REPORTS 1xix tbl. XXII (1901).

[93] A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887, at 513 (1887); The Revised Municipal Code of Ohio 196 (1899); Report of the Board of Park Commissioners of the City of Rochester, N.Y., 1888 to 1898, at 98 (1898); The Municipal Code of the City of Spokane, Washington: Comprising the Ordinances of the City ... Revised to October 22, 1896, at 316 (1896); Annual Report of the Park Commissioners of the City of Lynn for the Year Ending December 20, 1892, at 45 (1893); Charter and Ordinances of the City of New Haven: Together with Legislative Acts Affecting

parks, as did the cities of Boulder and St. Paul.[94] Statutes prohibiting possession of arms in these important public spaces were enacted in major urban areas of every region of the nation. As Table Two vividly illustrates, limits on arms in public parks were the norm in America in the era of the Fourteenth Amendment.

58.    There was a close connection between the urban park movement and the rise of state parks. The primary architect behind New York's Central Park, Frederick Olmsted, also took a leading role in the creation of California's Yosemite State Park in the 1860s. Although Congress ceded the land to the state, the expense and difficulty of managing it led to the state returning control of the park to the federal government several decades later.[95] The federal government's decision to create Yellowstone in 1872 added yet another type of park to America's roster of public spaces.

---

Said City 293 (1898); A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh 496 (1897); The Revised Ordinances of the City of Danville (1883); Law and Ordinances governing the Village of Hyde Park (1875); The Municipal Code of Chicago 391 (1881).

[94] San Francisco Municipal Reports 499 (1874); Ordinances of the City of Boulder 157 (1899); Proceedings of the Common Council of the City of Saint Paul 133 (1892).

[95] NEY C. LANDRUM, THE STATE MOVEMENT IN AMERICA: A CRITICAL REVIEW (2013). On the creation of Yellowstone, *see* https://www.loc.gov/collections/national-parks-maps/articles-and-essays/yellowstone-the-first-national-park/

59.     The federal government also passed laws limiting firearms in its

parks. Such regulations are especially important because federal lands were

indisputably governed by the Second Amendment, irrespective of the incorporation

doctrine.[96] The Secretary of the Interior underscored the danger posed by firearms

in parks when he wrote this about Yellowstone: "Absolute prohibition of firearms

in the park is recommended."[97] Accordingly, the federal government prohibited

guns in the park.[98]

60.     The federal government also prohibited firearms in numerous other

national parks in the early twentieth century, prior to the adoption of nationwide

federal regulations in June 1936.[99] For example, in Hawaiʻi National Park—which

at the time operated as a single park encompassing Haleakalā on Maui as well as

Mauna Loa and Kīlauea on the Big Island—the federal government made clear that

---

[96] REPORT OF THE DEPARTMENT OF THE INTERIOR . . . [WITH ACCOMPANYING DOCUMENTS] 499 (1899); REPORT OF THE SECRETARY OF THE INTERIOR FOR THE FISCAL YEAR 125 (1900).

[97] THE ABRIDGMENT: CONTAINING MESSAGES OF THE PRESIDENT OF THE UNITED STATES TO THE TWO HOUSES OF CONGRESS WITH REPORTS OF DEPARTMENTS AND SELECTIONS FROM ACCOMPANYING PAPERS 618 (1893).

[98] ANNUAL REPORT OF THE SUPERINTENDENT OF THE YELLOWSTONE NATIONAL PARK TO THE SECRETARY OF THE INTERIOR .... UNITED STATES: U.S. GOVERNMENT PRINTING OFFICE 19 (1898).

[99] FIREARMS REGULATION IN THE NATIONAL PARKS, 1897-1936 (2008), http://npshistory.com/publications/ranger/np-firearms-regs-history.pdf.

"[f]irearms are prohibited in the park except on written permission of the superintendent."[100]

61.     The emergence of modern style parks in the middle of the nineteenth century was a response to profound changes in American society, particularly urbanization. These places of repose and recreation were designed to offer Americans places to escape the increasingly chaotic world they encountered in the expanding cities of the nineteenth century. From the outset, the regulations governing these spaces prohibited firearms. State parks were motivated by similar impulses. Indeed, Frederick Olmsted, one of the leading landscape architects of the period also took a prominent role in helping to create these important public spaces. When the federal government organized its first national parks, it also tightly regulated the carriage of arms in public lands. Given that arms have been tightly regulated, and in many instances prohibited in parks since their creation, Hawai'i's statute limiting guns in parks is well within the long history of firearms regulation in America.

---

[100] UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, RULES AND REGULATIONS: HAWAII NATIONAL PARK 14 (1927) http://npshistory.com/brochures/havo/1927.pdf ("Firearms are prohibited in the park except on written permission of the superintendent, who also has authority to waive inquiry as to the possession of firearms by visitors traveling through the park to places beyond."). Hawai'i National Park was created in 1916. *See generally* National Park Service, Federal Laws Specific to Hawai'i Volcanoes National Park, https://www.nps.gov/havo/learn/management/mgmtdocs_fedlaws.htm.

## IV.  CONCLUSION

62.    The Hawaiʻi law at issue in this case is analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *See* 28 U.S.C. 1746.

Executed on July 13, 2023 at Redding, CT.

_Saul Cornell_
_____
Saul Cornell