# Exhibit 1
# Declarations of
# Clayton Cramer

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| v. | ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) ) | |
| Defendant | ) | |

i

# Table of Authorities

## Cases

Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840) ........................19

Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251 (Ky. 1822) ......................19

Commonwealth v. Leach, 1 Mass. 59 (1804). ..............................................................3

Commonwealth v. Vrooman, 164 Pa. 306, 316 (Penn. 1894). ..................................6

In re Brickey, 8 Idaho 597, 70 P. 609, 610, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902) .................................................................................................................21

McDonald v. City of Chicago, 561 U.S. 742, 779 (2010) .......................................20

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022) ..................................................................................................................2

Simpson v. State, 5 Yerg. 356 (Tenn. 1833) ............................................................19

State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844) .................................................3

State v. Reid, 1 Ala. 612 (1840) ..............................................................................19

Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795). ..............................................................................................................4

## Statutes

1 The Public Records of the Colony of Connecticut, 1636-1776 15 (1850) ............9

5 Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay 479 (1886), ch. 21 ...............................................................................................10

9 Statutes at Large of Pennsylvania 30 (1903) ..........................................................2

Charles J. Hoadly, ed., Records Of The Colony And Plantation Of New Haven, From 1638 To 1649  25-26 (1857)..........................................................................9

Clayton E. Cramer, Militia Statutes, https://claytoncramer.com/primary/primary.html#MilitiaLaws ...........................9

U.S. Const., Art. I, § 9, cl. 3..................................................................................10

### Other Authorities

1 American State Papers. Class V. Military Affairs. 159-62 (1832).........................9

2 Massachusetts Digest: Being a Digest of the Decisions of the SUPREME JUDICIAL COURT OF MASSACHUSETTS, FROM THE YEAR 1804 TO THE YEAR 1857. 661 (1863)..............................................................................3

Albert Bushnell Hart and Mabel Hill, *Camps and Firesides of the Revolution* 230 (1918)........................................................................................................18

An ACT to suppress the disorderly practice of FIRING GUNS, &c., Pennsylvania Gazette, Dec. 28, 1774. ......................................................................................15

By the last Post from New York…, Pennsylvania Gazette, Aug. 31, 1749. ...........13

Eliza Lucas Pinckney, Elise Pinckney, ed., The Letterbook of Eliza Lucas Pinckney 42, 42 n. 55 (1997)..........................................................................13

Felicia Johnson Deyrup, Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798-1870 34 (1948)..........................................................................................11

Frank Klay, The Samuel E. Dyke Collection of Kentucky Pistols 4-15 (1972) .....11

H. Richard Uviller & William G. Merkel, The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent 150 (2002). .........................................9

Harold L. Peterson, Arms and Armor in Colonial America: 1526-1783 213-14, 202, 205, 209 (1956)........................................................................11

James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 *The Papers of James Madison* 153 (1962)...................................................17

John Thomas Scharf, 1 History of Western Maryland 130 (1882). .......................18

John Winthrop, 2 Winthrop's Journal: "History of New England", 27, 153, 180, 275 (1908)....................................................................................13

John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83. ................................................16

Last Friday one Hunt, a lime seller in this…, Pennsylvania Gazette, Apr. 20, 1749. ..................................................................................................13

Last Monday Capt. Tyng in the Massachusetts…, Pennsylvania Gazette, Aug. 15, 1745. ...........................................................................................14

M.L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792 312 (1980) .......................................................11

Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina iii (1792)...................................................................2

Monday Evening last a very melancholy, Pennsylvania Gazette, Oct. 31, 1745. ...13

Monday Evening last a very melancholy…,  Pennsylvania Gazette, Oct. 31, 1745 ...............................................................................................13

Pennsylvania Gazette, August 31, 1749 .................................................12

Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840) ...............................11

Richard Burn and John Burn, A New Law Dictionary 79 (1792)............................8

Richard Maxwell Brown, The South Carolina Regulators 35, 40, 54 (1963) .........13

William M. Burwell, Address Delivered Before the Society of Alumni of the University of Virginia 446-47 (1847) .................................................10

## Declaration of Clayton Cramer in Rebuttal of Saul Cornell

**COMES NOW**, Clayton Cramer, and states as follows:

1. I am a natural person, an adult, United States of America citizen. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. This Declaration is being submitted to rebut the declaration submitted by Saul Cornell in *Wolford Et. Al. v. Lopez* No. 1:23-cv-00265-LEK-WRP

### I.   Introduction

3.      This Rebuttal Declaration to Prof. Cornell demonstrates multiple errors that demonstrate a limited knowledge of the colonial period.

### II.   Qualifications

4.      My M.A. in History is from Sonoma State University in California.  I teach history at the College of Western Idaho.  I have nine published books, mostly scholarly histories of weapons regulation.  My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004).  A

comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

5.     In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

6.     I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

### III.    Carrying Over English Common Law

7. At pp. 5-6, Cornell asserts "Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations." His footnote lists "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804)."

8. "9 STATUTES AT LARGE OF PENNSYLVANIA 29-30" carried over English law but with the important provision:

all and every person and persons whosoever are hereby enjoined and required to yield obedience to the said laws as the case may require *until the said laws or acts of general assembly respectively, shall be repealed or altered* or until they expire by their own limitation and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted.[1]  [emphasis added]

9. Certainly, the Pennsylvania Constitution of 1790, with its guarantee of a right to keep and bear arms,[2] qualifies as alteration of English common law concerning arms.

10. "FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792)."  The legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[3]  North Carolina's 1776 Constitution

---

[1] 9 STATUTES AT LARGE OF PENNSYLVANIA 30 (1903).
[2] Penn. Const., Art. IX, § 21 (1790).
[3] Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA iii (1792).

guarantees "That the people have a right to bear arms, in defense of the State"[4]
Again, this guarantee concerning the right to bear arms overrode English common
law. Furthermore pp. 60-61 in Martin's collection is the Statute of Northampton
disqualified for relevance by Bruen.[5]

11. When the North Carolina Supreme Court heard State v. Newsom (1844),
one of the claims made by the black defendant was that the 17th article the Bill of
Rights of North Carolina protected his right to carry a shotgun. The North
Carolina Supreme Court in deciding in this case, did not question whether the right
to keep and bear arms was individual in nature. Instead, they ruled that the
defendant's color was the deciding principle, taking precedence over the text.
Referring to the authors of the North Carolina Constitution: "They must have felt
the absolute necessity of the existence of a power somewhere, to adopt such rules
and regulations, as the safety of the community might, from time to time, require."[6]

12. "*Commonwealth v. Leach*, 1 Mass. 59 (1804)": The decision did nothing
to make English common law applicable in Massachusetts:

> Hooker, for the prosecution, conceded that justices of the peace
> were officers created by statute, and that their jurisdiction and

---

[4] North Carolina Const. Art. XVII (1776).
[5] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140
(2022).
[6] State v. Newsom, 27 N.C. (5 Ired.) 250, 255 (1844).

powers were wholly dependent upon the statutes; 2 Hawk. P. C. c. 8, 13 , &c. …

In this act, the term *common law* cannot mean the common law of *England*, because justices of the peace there are not common law officers; it must, therefore, mean our common law; and on this subject, our common law must be precisely what the *statute* law of *England* was at the time of the emigration of our ancestors from that country. The statutes which were previous to that time enacted in England, and which define or describe the authorities, powers, and jurisdiction of justices of the peace, give to them, expressly, cognizance of divers offences which were offences at common law; among which are trespasses.[7] [emphasis in original]

13.   Clearly, only *some* parts of English law were common with Massachusetts law.  Where Massachusetts law had differed, English law was no longer valid.

14.   A later digest of Massachusetts decisions includes "*Commonwealth v. Leach*, 1 Mass. 59 (1804)" in its list of "English Statutes Adopted Here."[8]  Only individual s*tatutes*, not necessarily all of common law applied in Massachusetts, or there would be no need to have a detailed list.

15. Cornell has attributed this carryover of English law as it was in 1776 to "[e]ach of the new states" from sources in three states, none of which fits his claim. Cornell does not understand his sources.

_____

[7] Commonwealth v. Leach, 1 Mass. 59 (1804).

[8] 2 Massachusetts Digest: Being a Digest of the Decisions of the Supreme Judicial Court Of Massachusetts, From The Year 1804 to the Year 1857. 661 (1863).

16. The U.S. Supreme Court has also emphasized how little significance English common law has compared to a constitution: "Legislation is the exercise of sovereign authority. High and important powers are necessarily vested in the Legislative body; whose acts, under some forms of government, are irresistible and subject to no controul. In England, from whence most of our legal principles and legislative notions are derived, the authority of the Parliament is transcendant and has no bounds."[9]

## IV.   Conserving the Peace

17. Prof. Cornell on p. 6 quotes Blackstone's COMMENTARIES about how the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."  True enough, but Blackstone's quote is from a discussion of:

> [S]ubordinate magistrates, whom I am to consider justices of the peace…  Of these, some had, and still have, this power annexed to other offices which they hold; others had it merely by itself, and were thence named *custodes* or *conservatores pacis*. Those that were so *virtute officii* still continue: but the latter sort are superseded by the modern justices.[10]

18. While perhaps an accurate statement of Blackstone's view of the common law, it seems a good case can be made that it is a retrospective

---

[9] Vanhorne's Lessee v. Dorrance, 2 U.S. (2 Dall.) 304, 308, 28 F. Cas. 1012 (C.C.D. Pa. 1795).
[10] William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 143 (1775).

description, and irrelevant to English law in Blackstone's time and therefore irrelevant to American law.

19. When Blackstone listed the absolute rights that every Englishman enjoyed, peace was not on the list, but "5. THE fifth and last auxiliary right of the subject, that I shall at present mention, is that of having arms for their defence…"[11] Blackstone does not identify peace as one of these "Rights of Persons" in Book I, ch. 1:

> The rights themselves, thus defined by these several statutes, consist in a number of private immunities; which will appear, from what has been premised, to be indeed no other, than either that residuum of natural liberty, which is not required by the laws of society to be sacrificed to public convenience; or else those civil privileges, which society hath engaged to provide, in lieu of the natural liberties so given up by individuals.[12]

20. If Blackstone is of great importance for determining what was important in English and therefore American law, this core right of self-defense deserves *at least* as much weight as Cornell's apparently out of context of quote from Blackstone.

21. At p. 13:

> The most basic right of all at the time of Founding was the right of the people to regulate their own internal police. Although modern lawyers and jurists are accustomed to thinking of state police

---

[11] Id., at 143.
[12] Id., at 121.

power, the Founding generation viewed this concept as a right, not a power. The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.  Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."

22. The Pennsylvania Constitution included a guarantee of a right to keep and bear arms,[13] a guarantee "[N]o part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives"[14] and a guarantee of "a right to freedom of speech, and of writing, and publishing their sentiments."[15]  These seem to be pretty large exceptions to Cornell's imagined right "to legislate for the common good."  Perhaps Cornell's understanding of state police power is wrong or at least more limited than he imagines?

23. Pennsylvania Supreme Court decisions portray the state's police power somewhat more narrowly than Cornell: "*Its exercise may be limited by the frame or constitution of a particular government*, but its natural limitations, in the absence of a written constitution, are found in the situation and necessities of the

---

[13] Penn. Const. Art. 11 (1776).
[14] Penn. Const. Art. 8 (1776).
[15] Penn. Const. Art. 12  (1776).

state, and these must be judged of in the first instance by the government itself."[16] [emphasis added]

24. What the people, and ideally the legislature as well, consider what was needed "for the common good has been restrained by both state constitution bills of rights and the U.S. Bill of Rights from the very beginning. Rep. James Madison, author of the Bill of Rights, is also remembered for his MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN arguing that Virginia should disestablish the Anglican Church:

> Either then, we must say that the will of the Legislature is the only measure of their authority, and that, in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: either we must say that they may control the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary powers of the State; nay, that they may despoil us of our right of suffrage, and erect themselves into an independent and hereditary assembly: or, we must say, that they have no authority to enact into law the bill under consideration.[17]

25. If Cornell really believes in this right of the states to legislate on all matters related to the police power, 'such as unlicensed public houses, nuisances, and many other things of the like nature,'" I look forward to his defense of state

---

[16] Commonwealth v. Vrooman, 164 Pa. 306, 316 (Penn. 1894).

[17] James Madison, A MEMORIAL AND REMONSTRANCE, ON THE RELIGIOUS RIGHTS OF MAN; WRITTEN IN 1784-5, AT THE REQUEST OF THE RELIGIOUS SOCIETY OF BAPTISTS IN VIRGINIA 41 (1828).

laws mandating racially segregated public schools and public accommodations, censorship of dirty books, prohibitions on sodomy, one man/one woman marriage laws, and bans on transgender sports.  It is hard to consider a person a legal scholar or historian who does not understand that the American experiment in democracy has always been restrained by a recognition that majorities can and do make mistakes.  This is the reason that every state constitution today, many of the Revolutionary state constitutions, and the U.S. Constitution has a Bill of Rights.

26. At pp. 19, Cornell quotes the Second Amendment and asserts, "Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state."  The first clause of the Second Amendment references not well-regulated arms but a "well-regulated militia."

27. Heller pointed out that, "The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose."[18]  Either Cornell is misreading the Second Amendment's text or he is unfamiliar with the Heller decision.  In either case, he has demonstrated his lack of expertise in this subject.

28. At p. 19:

---

[18] D.C. v. Heller, 554 U.S. 570, 577 (2008).

> In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits the diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy."

29. In support of this claim, Cornell at p. 20 cites Burns' New Law Dictionary definition of "liberty," but it does not match any American concept of that term. If anything, it is a profoundly anti-American concept: privilege granted to a select few:

> LIBERTY, is a privilege held by grant or prescription, by which men enjoy some benefit beyond the ordinary subject.[19]

30. Cornell makes a strong claim but it is a distinction without a difference. In what way is limiting free speech *just a bit* (e.g., prohibiting criticism of the U.S. Government) different from limiting the right to bear arms *just a bit* (e.g., prohibiting open carry). Of course *just a bit* has a non-boolean aspect to it. Would prohibiting possession of all rifles destroy the right? What about prohibiting possession of handguns? What about knives? At what point does regulation not destroy the right?

31. At p. 8, quoting a "patriotic revolutionary era orator," "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they

---

[19] Richard Burn and John Burn, A New Law Dictionary 79 (1792).

effect [sic] our persons and property." The relevance of this quote to this case seems confused. The plaintiffs are not arguing for no government or a "destitution of all law," but a disagreement about *this* law. Cornell's reasoning could be equally applied to laws prohibiting free speech, or opponents of warrantless searches; First Amendment or Fourth Amendment opponents of unlimited power to the government are not arguing for anarchy.

32. At p. 12, Cornell quotes Jud Campbell that "Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic." What Cornell and perhaps Campbell seem to have missed is that the Bill of Rights limits democracy because a majority can, and often does, abuse its power. The recent consequences of panic after 9/11 should be a reminder that even well-intentioned polity's can blow it.

33. Cornell continues: "In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order." Cornell's source for this claim? "H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002)." P. 150 makes no such claim. It is a discussion of the

meaning of the Second Amendment that directly contradicts Cornell's claims. Review of militia censuses cited in UVILLER & MERKEL,[20] shows that militia censuses show the number of militiamen by state, broken down by rank.[21]  There is no record of who was a member or what arms each person possessed.  Cornell is just making this stuff up.  Mustering the militia required no such recordkeeping. Colonial and state militia laws did not keep track of who was armed.  They imposed a duty to be armed and to show up with those arms on muster day or face fines.[22]  I am unaware of any safe storage laws of this period, and Cornell cites only a secondary source for a rather important claim.  I have a pretty complete

---

[20] H. Richard Uviller & William G. Merkel, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002)

[21] 1 American State Papers. Class V. Military Affairs. 159-62 (1832).

[22] A few examples: 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) ("It, it is ordered that all persons shall beare Armes that are above the age of sixteene yeeres except they doe tender a sufficient excuse [to] the Corte & the Cort allowe the same."); Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649  25-26 (1857) ("It is ordered that every one that beares armes shall be compleatly furnished with armes (viz), a muskett, a sworde, bandaleers, a rest, a pound of powder, 20 bullets fitted to their muskett, or 4 pound of pistoll shott or swan shott att least, and be ready to show them in the markett place upon Munday the 16th of this Month before Captaine Turner and Leiutennant Seely under the penalty 20 s fine for every default or absen[ce].")

collection of colonial and Revolutionary militia laws[23] and there are no such provisions that I can find.

34. At p. 13: "The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties."

35. In 1777, Pennsylvania responded to concerns that Loyalists might be a fifth column by passing a law that provided that those of militia age refusing to swear an oath of loyalty to the Revolutionary governments were prohibited from "holding any office or place of trust in this state, serving on juries, suing for any debts, electing or being elected, buying, selling or transferring any lands, tenements or hereditaments, and shall be disarmed by the lieutenant or sub-lieutenant of the city or counties respectively."

36. Massachusetts' similar Test Act:

> That every male person above sixteen years of age, resident in any town or place in this colony, who shall neglect or refuse to subscribe a printed or written declaration, of the form and tenor hereinafter prescribed, upon being required thereto by the committee of correspondence, inspection and safety, shall be disarmed, and have taken from him, in manner hereafter directed, all such arms, ammunition and warlike implements, as, by the

---

[23]     Clayton        E.        Cramer, *Militia        Statutes*, https://claytoncramer.com/primary/primary.html#MilitiaLaws, last accessed July 15, 2023/

strictest search, can be found in his possession or belonging to him…[24]

37. Like its cousins in other states, refusing the oath disqualified one for any public office, work as a minister, voting, or teaching.[25]  Cornell could easily use these wartime emergency acts as justification today for restrictions on transferring property, voting, teaching, or preaching the gospel.

38. Abuses of civil liberties were widespread during the chaos of the Revolution.  Thomas Jefferson drafted a bill of attainder passed by the Virginia Legislature in 1778.[26]  In Cornell's model, the U.S. Constitution's prohibition on Bills of Attainder[27] can be safely ignored.

39. On p. 17:

> The first notable expansion of regulation occurred during the period after the War of 1812, when cheap, reliable, and easily concealable pistols were produced for the first time in American history. More than 90% of the firearms in circulation in the Founding era were long guns, so pistols were not a serious problem for the Founders.

40. How common were pistols before the Revolution?  The evidence from archaeological digs, probate inventories, advertising, and from surviving pistols demonstrates that Americans made handguns before the Revolution; that there was

---

[24] 5 Acts and Resolve, Public and Private, of the Province of the Massachusetts Bay 479 (1886), ch. 21.
[25] Ibid., 481.
[26] William M. Burwell, Address Delivered Before the Society of Alumni of the University of Virginia 446-47 (1847).
[27] U.S. Const., Art. I, § 9, cl. 3.

a civilian market for them in at least some cities; and that pistol ownership was unremarkable. An analysis of all Plymouth Colony probate inventories found that of 339 listed firearms, forty-four, or thirteen percent, were pistols, and 54.5 percent of lead projectiles recovered from Plymouth Colony digs were pistol bullets.[28]

41. On August 22, 1775, the New-York Provincial Congress ordered the militia to arm themselves; Calvarymen were obligated to provide themselves with "a case of pistols, and a carabine." Every man 16 to 50 was to "furnish himself" with either a long gun or "a case of pistols." [29] (How many pistols were in one case? At least one.)

42. While Americans made pistols early in the eighteenth century, most colonists preferred to buy pistols imported from Britain, perhaps because of price or prestige. Only a few pre-Revolutionary War American-made pistols have survived.[30] Surviving pistols made for William Smith of Farmington, Connecticut

---

[28] Plymouth Archaeological Rediscovery Project, "Firearms in Plymouth Colony" (2002), Tables 1 and 4, available at https://www.plymoutharch.com/wp-content/uploads/2014/11/62869457-Firearms-in-Plymouth.pdf, last accessed March 1, 2023.

[29] Peter Force, ed., 3 American Archives, 4th ser., 665-6 (1840).

[30] Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA: 1526-1783 213-14, 202, 205, 209 (1956); M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792 312 (1980); Frank Klay, THE SAMUEL E. DYKE COLLECTION OF KENTUCKY PISTOLS 4-15 (1972); Felicia Johnson Deyrup, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 34 (1948).

by Medad Hills in 1771 were equipped with American-made barrels, and apparently English locks.[31]

43. Advertising and news reports show that merchants offered pistols for sale in Colonial America. Such ads appear in the *Boston Gazette* as early as 1720. Sampling ads from the 1741-1742 period reveals at least two different merchants offering pistols for sale.[32]

44. A gang of robbers, having terrorized New York City, moved on to Philadelphia in 1749. A newspaper account of their crimes reported that, "two Men, unknown, were lately at Mr. Rush's, a Gun smith, enquiring for six Pair of Pocket Pistols, to make up twelve Pair, having as they said, got the six Pair at some other Place."[33]   In 1772 and 1773, Heinrich Diebenberger advertised in Pennsylvania newspapers that he sold pistols,[34] as did Henry Deabarear, who sold "pistols for holsters and the pocket…."  Philadelphia merchants advertised pistols

---

[31] George A. Stickels, *The William Smith Pistols Made by Medad Hills*, THE GUN REPORT 10-12 (September, 1979).

[32] BOSTON GAZETTE issues with one or more ads offering pistols: May 30, 1720, November 17, 1741, December 8, 1741, February 2, 1742, May 11, 1742¸ May 18, 1742, May 25, 1742, July 13, 1742, August 10, 1742, August 24, 1742, August 31, 1742, [September 13?], 1742.

[33] PENNSYLVANIA GAZETTE, August 31, 1749.

[34]   September 4, 1772 and September 14, 1773, WOCHTENLICHTER PENNSYLVANISCHE STAATSBOTE, translated and quoted in James Whisker, THE GUNSMITH'S TRADE 159-160 (Lewiston, N.Y.: Edwin Mellen Press, 1992).

for sale repeatedly from 1744 onward.[35]   A 1745 ad in the PENNSYLVANIA GAZETTE, offered "ship muskets, *pistols* , cutlashes and poleaxes, gunpowder, lead, shot and bullets, English and French gun flints."[36] [emphasis added]

45. Pistols appear in journals and newspaper articles throughout the colonial period—and while the crimes committed with them are sometimes shocking, the *presence* of pistols is never remarkable.  Governor John Winthrop made several references to pistols in New England in the nineteen years that his journal covers. One was a 1641 theological dispute at Pascataquack (now Dover, New Hampshire) that led the factions to arm themselves and march; at least one member Winthrop identified as armed with a pistol.  There were murders with pistols at Stamford, Connecticut and at Penobscott in 1644, and an attempted murder with a pistol at Cape Sable in 1646.[37]   Pistols appear in other places in Winthrop's Journal.[38] Winthrop never expressed any surprise over the presence of pistols.

_____

[35] *Pennsylvania Gazette*, November 1, 1744; September 26, 1745; October 3, 1745; October 17, 1745; February 11, 1746; July 17, 1746; July 30, 1747; May 12, 1748; September 15, 1748; October 25, 1750; November 27, 1755; August 2, 1759; February 11, 1762; April 14, 1763; May 19, 1763; April 12, 1764; April 19, 1764; August 16, 1770; May 28, 1772; February 17, 1773; September 15, 1773.

[36] *Just imported by Hamilton, Wallace and Company, in the Ship*, PENNSYLVANIA GAZETTE, Sep. 26, 1745, Oct. 3, 1745.

[37] John Winthrop, 2 WINTHROP'S JOURNAL: "HISTORY OF NEW ENGLAND", 27, 153, 180, 275 (1908).

[38] Id., at 95, 151,

46. An accident in New York City in 1745: "a young Gentleman having been on board the Clinton Privateer, then going out, had a Pair of *Pistols* given him; which on his coming on Shore he carried into a Publick House, among some of his Acquaintance, where one of them was found to be loaded; upon which several Attempts were made to discharge it; but it missing Fire, he sat down in order to amend the Flint; in doing of which, the *Pistol* unhappily went off, and shot Mr. Thomas Cox, Butcher, through the Head…"[39] [emphasis in original]

47. Many eighteenth century accounts also mention pistols. Eliza Lucas Pinckney described the suicide of Anne LeBrasseur with a pistol as "melancholy and shocking," but newspaper accounts suggest that what was shocking was not the weapon, but that she was "a Disciple of Mr. Whitefield's" (the noted evangelist).[40] In 1749, the PENNSYLVANIA GAZETTE reported that, "Sunday night last, about eight a Clock, Richard Green, coming to Town from Kensington, was stopt on the Road, and his Money demanded, by two Men with Pistols…."[41] There are other examples available in the PENNSYLVANIA GAZETTE of the criminal misuse

---

[39] *NEW YORK, October 28. Monday Evening last a very melancholy*, PENNSYLVANIA GAZETTE, OCT. 31, 1745.
[40] Eliza Lucas Pinckney, Elise Pinckney, ed., THE LETTERBOOK OF ELIZA LUCAS PINCKNEY 42, 42 n. 55 (1997).
[41] *By the last Post from New York…,* PENNSYLVANIA GAZETTE, Aug. 31, 1749.

of and accidental deaths from pistols; they are never described as surprising.[42]

Pistols appear among the South Carolina Regulators and the criminals to whom they administered frontier justice.[43]   Nor was there any surprise when pistols appear in the hands of the law-abiding, such as a description of Rev. Whitfield preaching in Massachusetts, "he was attended by many Friends with Muskets and Pistols on Account of the Indians…."[44]

48. Pistols appear in news reports: This came from New York in 1775, describing events before March 23 (so before the Revolutionary War started):

> The sheriff came to the courthouse, and demanded entrance, which was refused him; and whilst struggling to enter the door, he received a blow upon his head, which leveled him with the ground: Having recovered a little, he arose and discharged a *pistol* among the opposers, and commanded the Court party to fire also; when, as Mr. Langdon supposes, about five of them fired. Mr. French, one of the opposers, was killed by a ball's being lodged in his head, and two more of the same party were also wounded. The sheriff and the Court party then entered the courthouse. The populace without discharged a gun and two *pistols* .[45] [emphasis added]

─────────────────

[42] *Monday Evening last a very melancholy…,*  PENNSYLVANIA GAZETTE, Oct. 31, 1745; Last Friday one Hunt, a lime seller in this…, PENNSYLVANIA GAZETTE, Apr. 20, 1749.

[43] Richard Maxwell Brown, THE SOUTH CAROLINA REGULATORS 35, 40, 54 (1963).

[44] *Last Monday Capt. Tyng in the Massachusetts…,* PENNSYLVANIA GAZETTE, Aug. 15, 1745.

[45] *MR. Mark Langdon, from Westminster, in the…,* VIRGINIA GAZETTE, Apr. 22, 1775.

49. Other news accounts report pistols being used.[46]

50. A London gun-maker complained in the SOUTH CAROLINA GAZETTE that "a Person in the Country in putting my Name and *London* on some parcels of Guns and Pistols" apparently not proofed (as English law required) thus creating a risk to his reputation.[47]  A 1766 ad in the SUPPLEMENT TO THE SOUTH CAROLINA GAZETTE; AND COUNTRY JOURNAL offered "brass barrel pistols."[48]

51. Enough pistols were present in private hands in Pennsylvania in 1774 for the legislature to include handguns in a law regulating New Year's Day festivities. This statute made it illegal for "any person or persons shall, on any thirty-first day of December, or first or second day of January, in every year, wantonly, and without reasonable occasion, discharge and fire off any *handgun, pistol*, or other firearms, or shall cast, throw or fire any squibs, rockets or other fireworks, within the inhabited parts of this province…."[49] [emphasis added]

---

[46] BY THE LAST POST FROM NEW YORK…, PENNSYLVANIA GAZETTE, Aug. 31, 1749.
[47] *To the Publick,*  SOUTH CAROLINA GAZETTE, Dec. 26, 1743.
48 GUERIN & WILLIAMSON, Have just imported in the London, Supplement to the South Carolina Gazette; and Country Journal, Jun. 24, 1766,  Jul. 1, 1766, Jul. 8, 1766
[49] *An ACT to suppress the disorderly practice of FIRING GUNS, &c.,* PENNSYLVANIA GAZETTE, Dec. 28, 1774.



PAUL REVERE'S VERY COMPACT POCKET PISTOL[50]

52. My search through newspapers from the 1730s through 1760s at Accessible Archives for "pistol" showed 2,962 matches.[51]   Some of these are militia use references, some are references to a coin of that time, and some to a type of cloth called pistol. A few are references to foreign news events; some news accounts appear in multiple newspapers. Still, it is pretty apparent that Cornell's claim about the scarcity of pistols is utterly wrong and shows a limited knowledge of the period for which he has "expert" opinions.

**B. Black Powder**

53. At pp. 16-17:

_____

[50] Photograph by Clayton E. Cramer at the Massachusetts Historical Society.
[51] Accessible Archives is a proprietary data base.  I searched for "pistol" in all newspapers for the 1730s through 1760s.

The nature of firearms technology and early American society militated against guns as the preferred tool for most forms of interpersonal violence.

Weapons in the Founding era were muzzle loaded guns that were not particularly accurate and took a long time to load. . The black powder used in these firearms was corrosive and attracted moisture like a sponge: two facts that militated against storing weapons loaded. Given the state of firearms technology in the Founding era, it is not surprising that recent scholarship has demonstrated that there was not a widespread gun violence problem in the era of the Second Amendment.

54. This is a perfectly logical statement, but the documents left by colonial Americans show that they did not follow it very consistently. Colonial Americans kept black powder firearms loaded with tragic results. Massachusetts Governor Winthrop's journal reports several accidental deaths or injuries caused by colonists failing to follow this very logical action:

At a training at Watertown, a man of John Oldham's, having a musket, which had been long charged with pistol bullets, not knowing of it, gave fire, and shot three men, two into their bodies, and one into his hands; but it was so far off, as the shot entered the skin and stayed there, and they all recovered.[52]

55. And:

Three men coming in a shallop from Braintree, the wind taking them short at Castle Island, one of them stepping forward to hand the sail, caused a fowling piece with a French lock, which lay in the boat, to go off. The whole charge went through the thigh of one

_____

[52] John Winthrop, James Kendall Hosmer, ed., 1 *Winthrop's Journal: "History of New England" 1630-1649* (1908), 83.

23

> man within one inch of his belly, yet missed the bone, then the shot
> (being goose shot) scattered a little and struck the second man
> under his right side upon his breast, so as above 40 shot entered his
> body, many into the capacity of his breast.[53]

56. These incidents of firearms kept loaded when not in active use resulting in serious misadventure are in *one* book.  How many of these loaded firearms sat quietly in their place, never accidentally discharging?  How many incidents are in books that I have not read?   Perhaps if Cornell was well-read in colonial documents, he would know enough about colonial practices to be an expert.   The relevance of this claim to the proposed law is unclear.

57. Finally, there is one more piece of evidence that Americans kept firearms loaded when not ready for use.  In 1783, Massachusetts passed a statute that shows firearms were kept loaded regularly enough to justify a law regulating the practice.

58. The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town" establishes that it was a fire safety measure.

> Sect. 2. And be it further enacted by the authority aforesaid, That
> all canon, swivels, mortars, howitzers, cohorns, fire-arms, grenades,
> and iron shells of any kind, that shall be found in any dwelling-

---

[53] Id. 2:55.

house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having any dwelling in them any gun-powder, shall be liable to be seized by either of the Firewards of the said town…

59. You were free to keep small arms, cannon, small artillery, bombs, and grenades at home, as long as they were unloaded.  Why was there a need for such a law unless firearms (and artillery) were at least occasionally left loaded?  Would we pass a law today ordering that you not leave children unsupervised at a pool if no one did this?

**Accuracy**

60. Cornell's claim on p. 16: "Weapons in the Founding era were muzzle loaded guns that were not particularly accurate…" is false.  A letter that James Madison wrote on June 19, 1775 to William Bradford in Philadelphia:

> The strength of this Colony will lie chiefly in the rifle-men of the Upland Counties, of whom we shall have great numbers.  You would be astonished at the perfection this art is brought to.  *The most inexpert hands rec[k]on it an indifferent shot to miss the bigness of a man's face at the distance of 100 Yards.  I am far from being among the best & should not often miss it on a fair trial at that distance.*  If we come into an engagement, I make no doubt but the officers of the enemy will fall at the distance before they get [within] 150 or 200 Yards.  Indeed I believe we have men that would very often hit such a mark 250 Yds. Our greatest apprehensions proceed from the scarcity of powder but a little will go a great way with such as use rifles.[54] [emphasis added]

---

[54] James Madison, William T. Hutchinson and William M.E. Rachal, ed., 1 *The Papers of James Madison* 153 (1962).

61. Frederick County, Maryland raised two companies of riflemen to join the army forming outside of Boston.   An eyewitness account of Captain Michael Cresap's rifle company of "upwards of 130 men" described a demonstration:

> to show the gentlemen of the town their dexterity at shooting.  A clapboard, with a mark the size of a dollar, was put up; they began to fire off-hand, and the bystanders were surprised, so few shots being made that were not close to or in the paper.
>
> When they had shot for a time in this way, some lay on their backs, some of their breast or side, others ran twenty or thirty steps, and, firing, appeared to be equally certain of the mark.  With this performance the company was more than satisfied, when a young man took up the board in his hand, not by the end, but by the side, and holding it up, his brother walked to the distance, and very coolly shot into the white; laying down his rifle, he took up the board, and, holding it as was held before, the second brother shot as the former had done.
>
> By this exercise I was more astonished than pleased.  But will you believe me, when I tell you, that one of the men took the board, and placing it between his legs, stood with his back to the tree, while another drove the center?[55]

62. Other accounts of Cresap's company also report on their marksmanship:

> [W]e mention a fact which can be fully attested by several of the reputable persons who were eye-witnesses of it. Two brothers in the company took a piece of board five inches broad and seven inches long, with a bit of white paper, about the size of a dollar, nailed in the centre; and while one of them supported this board perpendicularly between his knees, the other, at the distance of upwards of sixty yards, and without any kind of rest, shot eight bullets through it successively, and spared a brother's thigh!

---

[55] John Thomas Scharf, 1 HISTORY OF WESTERN MARYLAND 130 (1882).

Another of the company held a barrel stave perpendicularly in his hands with one edge close to his side, while one of his comrades, at the same distance, and in the manner before mentioned, shot several bullets through it, without any apprehension of danger on either side.

The spectators appearing to be amazed at these feats, were told that there were upwards of fifty persons in the same company who could do the same thing; that there was not one who could not plug nineteen bullets out of twenty, as they termed it, within an inch of the head of a tenpenny nail. In short, to prove the confidence they possessed in their dexterity at these kind of arms, some of them proposed to stand with apples on their heads, while others at the same distance, undertook to shoot them off; but the people who saw the other experiments declined to be witnesses of this.[56]

63. Cornell should spend a bit more time reading what colonial Americans wrote and less of what people write with whom he already agrees.

## V.    Firearms Regulation in Antebellum America

64. Starting at page 23, Cornell seems to have stopped citing any sources, except himself, presumably because has only his own arm-waving as a source.

Secondly, the constitutional "mischief to be remedied" that arms bearing provisions addressed had changed as well. Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of unusually

---

56 "From The Virginia Gazette (1775)" in Albert Bushnell Hart and Mabel Hill, CAMPS AND FIRESIDES OF THE REVOLUTION 230 (1918).

dangerous weapons and the societal harms they caused. The Reconstruction-era constitutional solution cast aside the eighteenth-century language that was steeped in fears of standing armies and substituted in its place new language affirming the state's police power authority to regulate arms, particularly in public.

65. The specter changed from tyrannical Stuart kings to Klansmen and tyrannical Southern state governments, but Cornell pretends that the weapons laws enacted as part of the Black Codes had no influence on the Fourteenth Amendment.

66. Cornell might have benefitted from reading the primary sources concerning Reconstruction and the incorporation of the right to keep and bear arms through the Fourteenth Amendment, as historians try to do, instead of relying on his own arm-waving. Of course, Cornell would also benefit from reading the many decisions that decided the "scope of state power to regulate arms," often explicitly recognizing a right to open carry based on their state constitutions, and in some cases the Second Amendment, not the rarely mentioned "police power."[57]

---

[57] Just a *few* examples: Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251 (Ky. 1822) (struck down a ban on carrying concealed weapons based on state constitution); . Simpson v. State, 5 Yerg. 356 (Tenn. 1833) (struck down a conviction for "with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make," because "the freemen of this state have a right to keep and to bear arms for their common defence." Tenn. Const. Article 11, sec. 26); Aymette v. State, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840) (upheld a ban on

## VI.    Post-1868 Evidence

67. Cornell insists at p. 41: "As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good."   Had Cornell read McDonald v. Chicago (2010) he would know that it was precisely the racial discrimination of the Black Codes that caused the 14th Amendment to limit state authority in this area.[58]   This was the basis by which McDonald incorporated the Second Amendment against the states.[59]

---

concealed carry of a Bowie knife because the Tennessee Constitution only protected weapons of war: "The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution."); State v. Reid, 1 Ala. 612 (1840) (" A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional."); Owen v. State, 31 Ala. 387 (1858) (upheld a ban on concealed carry, but "That section was not designed to destroy the right, guarantied by the constitution to every citizen, "to bear arms in defense of himself and the State"; nor to require them to be so borne, as to render them useless for the purpose of defense."); 3 Iredell 418, 423 (N.C. 1843) (Upholding a conviction of a bully running around armed and threatening people: "For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people.")

[58] McDonald v. City of Chicago, 561 U.S. 742, 779 (2010)
[59] Id. at 790.

68. As contrary evidence, in Table One Cornell cites post-Fourteenth Amendment state constitution arms provisions and either does not know, or neglects to mention that the 1889 Idaho guarantee: "IDAHO CONST. OF 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law," was construed narrowly in the decision In re Brickey (Ida. 1902).  The Idaho Supreme Court decided the territorial-era prohibition on carrying a loaded weapon in the town of Lewiston, was contrary to both the 1889 Constitution and the Second Amendment. "Under these constitutional provisions, the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages. The legislature may, as expressly provided in our state constitution, regulate the exercise of this right, but may not prohibit it."[60]

69. Cornell proceeds to deny Bruen's incorporation of the Second Amendment through the Fourteenth Amendment where at p. 39: "The new focus on regulation embodied in these revised state arms bearing provisions was not a departure from traditional views of the robust scope of police power authority to regulate arms in the interests of public safety. This power was ancient and widely

_____

[60] In re Brickey, 8 Idaho 597, 70 P. 609, 610, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902).

acknowledged as fundamental to Anglo-American law. Nor did the adoption of the Fourteenth Amendment change this fact."   So constitutions adopted after the Fourteenth Amendment take precedence over an amendment that the Court has recognized as a limit on state power?

70. Cornell at pp. 40-41 quotes General Sickles' General Order No. 1 as evidence that the right to keep and bear arms could be limited on private property: "nor to authorize any person to enter with arms on the premises of another against his consent."   Certainly, any property owner is authorized to post a "No arms allowed" notice.  A requirement that a property owner must provide an affirmative statement of permission is far different.

71. On p. 43: "Colonial Massachusetts prohibited coming to muster with a loaded firearm."   This would be odd because target practice was common at musters.  Consulting Cornell's source: "RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 98 (1853)" shows no such order.  His citation to "1866 Mass. Acts 197, An Act Concerning the Militia, § 120" does seem to be such a law:

> SECTION 120. A soldier who unnecessarily or without order from a superior officer comes to any parade with his musket, rifle or pistol loaded with ball, slug or shot, or so loads the same while on parade, or unnecessarily or without order from a superior officer

discharges the same when going to, returning from or upon parade, shall forfeit not less than five nor more than twenty dollars.[61]

72. This statute refers not to a muster but a parade.  Assuming that the 19th century definition of parade is similar to today, this seems like a safety measure.

73. His claim in n. 89: "The prohibition on bringing a loaded gun to muster stretches from 1632 to 1866 making it one of the longest standing regulations on firearms in the early Republic." Citing a single act in 1866 which does not clearly refer to a muster does not support this claim.

74. At pp. 45-46 Cornell lists city parks that prohibited "public carry." Curiously, the only such ordinance in his Table 2 before 1868 is New York City's 1861 measure.  He provides no citation for such an ordinance.  All the smaller cities that Cornell lists in n. 93 have ordinance dates after 1868.  In any case, Bruen takes precedence.

## VII.    Summary

75. Cornell misrepresents the broadness of the carryover of English law to the American colonies.

76. He misrepresents Blackstone about the importance of conserving the peace; argues for a unlimited democracy that the Bill of Rights exists to prevent;

---

[61] 1866 Mass. Acts 197, An Act Concerning the Militia, § 120.

77.    Cornell argues for an unlimited power of the states to regulate everything with no power of the Bill of Rights to counter such abuses of majority power.

78. Cornell attempts to use post-1868 laws contrary to Bruen's clear instructions.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

_____

Clayton Cramer

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION ) ) ) ) ) | |
| Plaintiffs, ) ) ) ) | Civil Action No. 1:23-cv-00265-LEK-WRP |
| v. ) ) | |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, ) ) ) ) ) ) | |
| Defendant ) | |

i

# Table of Authorities

**CASES**

Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251, 252, 253 (1822)...............7

Cockrum v. State, 24 Tex. 394, 401, 402, 403 (1859)...............................7

Dred Scott v. Sandford, 60 U.S. 393, 417 (1857)......................................7

English v. State, 35 Tex. 473, 479, 480, 14 Am. Rep. 374 (1872)...........................8

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022)..8

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022)..3

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022)..4

New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022)..5

Smith v. State, 11 La. An. 633, 634 (1856) ................................................7

State v. Chandler, 5 La. An. 489, 490, 491 (1850)....................................7

State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843)....................6

State v. Huntly, 418, 420 (N.C. 1843). ....................................................4

**STATUTES**

1 Laws of the Republic of Texas 24 (1838)..............................................8

1821 Maine Laws ch. 76 at 353. ..............................................................5

Va. Laws ch. 21 at 278 (1786)................................................................3

**OTHER AUTHORITIES**

i

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in

the State of North Carolina, iii (1792)...................................................................4

## <u>Declaration of Clayton Cramer in Rebuttal of Brennan Rivas</u>

**COMES NOW**, Clayton Cramer, and states as follows:

1. I am a natural person, an adult, United States of America citizen. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. This Declaration is being submitted to rebut the declaration submitted by Dr. Rivas in *Wolford Et. Al. v. Lopez* No. 1:23-cv-00265-LEK-WRP

### I.     Introduction

3. This Expert Declaration and Report analyzes Dr. Rivas' expert report concerning the "historical gun regulations that pertained to public carry laws, [and] sensitive places."  Rivas also puts a lot of work into examining Texas law on this subject without demonstrating that Texas was in many respects then as even now, an outlier to American tradition.

1

## II. Qualifications

4. My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons regulation. My 18 published articles (mostly in law reviews) have been cited in D.C. v. Heller (2008), McDonald v. Chicago (2010), Jones v. Bonta (9th Cir. 2022), Young v. State (9th Cir. 2021), State v. Sieyes (Wash. 2010), Senna v. Florimont (N.H. 2008), Mosby v. Devine (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

5. In several cases, my work has been cited in defense of laws limiting firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc. 2021), King v. Sessions (E.D.Penn. 2018).

6.   I am being compensated for services performed in the above-entitled case at an hourly rate of $150 for expert declarations. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## III. The History of Public Carry Laws in America

7. Rivas starts out by overruling the Supreme Court, rejecting Bruen's findings on public carry laws. At ¶10:

Americans of the late eighteenth and nineteenth centuries had laws that broadly prohibited the carrying of firearms and other deadly weapons in public. Early versions of these regulations, particularly those enacted in the eighteenth century by colonial and early American legislatures, tended to draw heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.

8. Bruen is very clear that the Statute of Northampton and all the colonial and early Republic laws supposedly derived from it are irrelevant to interpretation of the Second Amendment:

At the very least, we cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection.[1]

9. Having started on the wrong foot, Rivas trips over herself demonstrating that she is not a scholar.  At ¶11 her footnote 4 attempts to demonstrate that states adopted laws prohibiting carrying of arms.  "1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (Ex. D)."  This is 1786 ch. 21:

CHAP. 21

An act for giving further time to officers, soldiers, sailors, and marines, to settle their arrears of pay and depreciation, with the auditor of public accounts.[2]

---

[1] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2142 (2022).

[2] Va. Laws ch. 21 at 278 (1786).

10. It appears that Rivas meant 1786 Va. Ch. 49, at 334, which is the Statute of Northampton (1328). (It really helps to check primary sources, at least if you are an "expert.") Again, progeny of the Statute of Northampton rejected by Bruen.

11. Still in n. 4:

> 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace.")

12. This a surety bond law, also rejected by Bruen:

> *Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.[3]

13. "Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)" As the title makes clear, this was not a statute passed by the North Carolina Legislature. The North Carolina Legislature tasked Martin to sift through all *existing* British statutes that might have some applicability to North Carolina. "I began at Magna

---

[3] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022)

4

Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[4]

14. Curiously, when the North Carolina Supreme Court decided State v. Huntly (N.C. 1843), a case which charged the defendant under the Statute of Northampton, the opinion held that "whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, (ch. 1st, sect. 2,) that the statutes of England or Great Britain shall cease to be of force and effect here."[5] One might expect that if this statute had been adopted legislatively, as Rivas claims, that it might have merited mention.

15. "1821 Me. Laws 285, ch. 76, § 1" Rivas at least quotes enough of the text to demonstrate that this is more progeny of Statute of Northampton.  The section that she did *not* quote in full is:

> to cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed

---

[4] Xavier Martin, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA, iii (1792).
[5] State v. Huntly, 418, 420 (N.C. 1843).

offensively, *to the fear or terror* of the good citizens of this State, or *such others as may utter any menaces or threatening speeches*;[6] [emphasis added]

16. Nor does she quote from the section which says what persons so jailed must do to regain their freedom:

shall require of the offender to find sureties to appear and answer for his offence, at the Supreme Judicial Court, or Circuit Court of Common Pleas, next to be held within or for the same county, at the discretion of the Justice, and as the nature or circumstances of the case may require[7]

17. At ¶11, again Bruen specifically rejects the relevance of surety laws:

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.[8]

18. At ¶13: "The language of concealed carry laws might at first suggest that open carry of firearms was accepted and commonplace, but that was not the case. Individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities." Her source for this claim is *State v. Huntley*, 25 N.C. 418 (1843).

---

[6] 1821 Maine Laws ch. 76 at 353.

[7] Id.

[8] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2148 (2022).

19. State v. Huntley (N.C. 1843) involved prosecution of a bully:

> His Honor instructed the jury, that if the facts charged in the indictment were proven to their satisfaction, the defendant had been guilty of a violation of the law, and that they ought to render their verdict accordingly. In the investigation before the jury it appeared, among other things, that *the defendant was seen by several witnesses, and on divers occasions, riding upon the public highway, and upon the premises of James H. Ratcliff (the person named in the indictment), armed with a double-barrelled gun, and on some of those occasions was heard to declare, "that if James H. Ratcliff did not surrender his negroes, he would kill him"; at others, "if James H. Ratcliff did not give him his rights, he would kill him"*; on some, that "he had waylaid the house of James H. Ratcliff in the night about daybreak, and if he had shown himself he would have killed him; that he showed himself once, but for too short a time to enable him to do so, and that *he mistook another man for him, and was very near shooting him*."[9] [emphasis added]

20. Huntley was not simply armed, but also making death threats; he came close to shooting someone he mistook for the object of his wrath.  To call this "to the terror of the people" seems quite clear.  Yet the North Carolina Supreme Court while upholding the conviction made it clear that riding around armed violated no laws:

> [I]t is to be remembered that the carrying of a gun per se constitutes no offence.  *For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun*.  It is the wicked purpose—and the mischievous result—which essentially constitute the crime.  He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as

---

[9] State v. Huntley, 25 N.C. (3 Ired.) 418, 419, 40 Am. Dec. 416 (1843).

naturally will terrify and alarm, a peaceful people.[10]   [emphasis added]

21. She also cites *State v. Smith*, 11 La. Ann. 633 (1856).  Her quotation is misleading.  The Louisiana Supreme Court decided that: "A partial concealment of the weapon, which does not leave it in full open view, is a violation of the statute."  Rivas' quotation concerns what the decision called "to the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."  If you were openly carrying a weapon and it was partially covered, this was the "unusual case"; not open carry which was not prohibited or concealed carry which the law prohibited.

22. Rivas also has either cherry-picked her sources, or she knows little of the case law on this.  Multiple antebellum decisions recognized a right to carry arms, protected by either the state constitution's arms provision or more rarely, the Second Amendment.[11]

---

[10] Id.

[11] State v. Chandler, 5 La. An. 489, 490, 491 (1850) (upholding a concealed carry ban, but: "It interfered with no man's right to carry arms (to use its own words), "in full open view," which places men upon an equality.  This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves"); Smith v. State, 11 La. An. 633, 634 (1856) ("The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States.  The arms there spoken of are such as are borne by a people in war, or at least carried openly."); Dred Scott v. Sandford, 60 U.S. 393, 417 (1857) ("It would

23. At ¶28, Rivas uses English v. State (Tex. 1872) to justify a very narrow definition of sensitive places. First of all, the statute and decision both postdate the ratification of the 14th Amendment, which one of the dates Bruen has indicated have significance to determining the meaning of the Second Amendment as incorporated against the states.

> The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right. With these principles in mind, the Court concludes that respondents have failed to meet

give to persons of the negro race, who were recognized as citizens in any one State of the Union,… and to keep and carry arms wherever they went."); Cockrum v. State, 24 Tex. 394, 401, 402, 403 (1859) (Responding to defendant's claim that a sentence enhancement for use of a Bowie knife in manslaughter violated his rights under the Second Amendment: "The object of the first clause cited, has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed. The clause cited in our Bill of Rights, has the same broad object in relation to the government, and in addition thereto, secures a personal right to the citizen. The right of a citizen to bear arms, in the lawful defence of himself or the State, is absolute…. A law cannot be passed to infringe upon or impair it, because it is above the law, and independent of the law-making power."); Bliss v. Commonwealth, 2 Littell 90, 13 Am. Dec. 251, 252, 253 (1822) (Striking down a ban on concealed carry of arms: "That the provisions of the act in question do not import an entire destruction of the right of the citizens to bear arms in defense of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons, concealed in the manner described in the act, they may, nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution, *it is not essential that the act should contain a prohibition against bearing arms in every possible form; it is the right to bear arms in defense of the citizens and the state, that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution*." [emphasis added])

> their burden to identify an American tradition justifying New
> York's proper-cause requirement.[12]

24. English was decided based on the Texas Constitution's right to keep and bear arms provision; Bruen's use of the Second Amendment trumps English for that reason.

25. Rivas puts great emphasis on how the 1871 Texas law was intended to protect the freedmen.  It is therefore interesting to see how English ends:

> The law under consideration has been attacked upon the ground that it was contrary to public policy, and deprived the people of the necessary means of self-defense; that it was an innovation upon the customs and habits of the people, to which they would not peaceably submit. We do not think the people of Texas are so bad as this, and we do think that the latter half of the nineteenth century is not too soon for Christian and civilized states to legislate against any and every species of crime. Every system of public laws should be, in itself, the purest and best system of public morality. We will not say to what extent the early customs and habits of the people of this state should be respected and accommodated, where they may come in conflict with the ideas of intelligent and well-meaning legislators. A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system. Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snevi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of those nations blended together into a system by no means to be compared with the sound philosophy and pure morality of the common law.[13]

---

[12] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2119 (2022).

[13] English v. State, 35 Tex. 473, 479, 480, 14 Am. Rep. 374 (1872).

26. The arms provision of the Texas Constitution of 1836 is clearly of American, not Spanish origin:

> Fourteenth. Every citizen shall have the right to bear arms in defence of himself and the republic. The military shall at all times and in all cases be subordinate to the civil power. Fifteenth. The sure and certain defence of a free people is a well regulated militia; and it shall be the duty of the legislature to enact such laws as may be necessary to the organizing of the militia of this republic.[14]

27. At ¶28: "The court held that whatever conduct offends against public morals or public decency comes within the range of legislative authority."  This train left the station with Lawrence v. Texas (2004) and Roe v. Wade (1973), both appropriately enough originating in Texas.  Is there anything that can withstand the Bill of Rights that "offends against public morals or public decency"?

28. At ¶29: "In the late 1870s and throughout the 1880s, Texas appellate judges consistently applied the sensitive places law without questioning its constitutionality."  Did they ever question the constitutionality of segregated schools?  This is not a very persuasive argument, except to the last remaining segregationist.

29. At ¶32, Rivas argues that Bruen's treatment of Texas law as an outlier was wrong because a number of other states passed similar laws after 1868.  This simply demonstrates that Rivas wants to overrule Bruen.

---

[14] 1 Laws of the Republic of Texas 24 (1838).

30. In addition to the errors in Rivas ¶15 and beyond discussion of firearms prohibition in Texas, this time period postdates the 1868 ratification of the 14th Amendment and the Second Amendment as incorporated against the states, making this discussion irrelevant.

## IV. Summary

31. Rivas claims that public carry of firearms was generally prohibited in towns and even if open carry was legal, it was not commonplace.  The first statement is false.  The second is probably unknowable.  The most commonplace actions of life are seldom recorded.

32. Rivas asserts that protection of "public gathering places" was the norm or at least not outliers, yet her evidence is all post-1868 and largely in the Reconstruction South.

33. At ¶39: "More time is needed to provide a comprehensive overview of this subject. There are likely as-yet unidentified analogous historical laws, particularly municipal ordinances. More research needs to be done surrounding the development of American towns and cities, the relative number and size of analogous sensitive places outside of government buildings, and the historical views of Americans regarding the propriety and legality of carrying weapons in those analogous spaces at earlier points in time."  Get back to us when you have

evidence.  So far, what Rivas has is a desire to overturn Bruen largely with claims already rejected by Bruen.

**FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2023.

_____

Clayton Cramer